Case No. 21-71170

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES, CALIFORNIA
*Petitioner,*

v.

UNITED STATES FEDERAL AVIATION ADMINISTRATION and
STEPHEN M. DICKSON, in his official capacity as Administrator;
UNITED STATES DEPARTMENT OF TRANSPORTATION and
PETER P. BUTTIGIEG, in his official capacity as Secretary,
*Respondents,*

BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY
*Real Party in Interest and Respondent.*

## PETITIONER'S OPENING BRIEF

| | |
|---|---|
| MICHAEL N. FEUER, SBN 111529<br>City Attorney<br>ROBERT M. MAHLOWITZ, SBN 160125<br>Deputy City Attorney<br>LOS ANGELES CITY ATTORNEY'S OFFICE<br>200 North Main Street, 8th Floor<br>Los Angeles, CA 90012<br>Telephone: (213) 978-7100<br>Facsimile: (213) 978-8090<br>Email: robert.mahlowitz@lacity.org | ANDREA K. LEISY, SBN 206681<br>LAURA M. HARRIS, SBN 246064<br>CASEY A. SHORROCK, SBN 328414<br>REMY MOOSE MANLEY, LLP<br>555 Capitol Mall, Suite 800<br>Sacramento, CA 95814<br>Telephone: (916) 443-2745<br>Facsimile: (916) 443-9017<br>Email: aleisy@rmmenvirolaw.com<br>    lharris@rmmenvirolaw.com<br>    cshorrock@rmmenvirolaw.com |

Attorneys for Petitioner
CITY OF LOS ANGELES, CALIFORNIA

## CORPORATE DISCLOSURE STATEMENT

This statement is made pursuant to Federal Rule of Appellate Procedure rule 26.1. Petitioner is a municipal corporation and therefore not subject to rule 26.1.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................................2

TABLE OF AUTHORITIES ...............................................................................6

INTRODUCTION ..............................................................................................13

STATEMENT OF JURISDICTION....................................................................15

STATEMENT OF ISSUES ................................................................................16

STATEMENT OF THE CASE............................................................................17

      I.     Burbank's Measure B and the Authority's 2016 Project Approval....17

      II.    FAA's Environmental Impact Statement and Record of Decision.....22

      III.   The Screening Out of Alternatives from the EIS's Analysis..............22

      IV.   The EIS's Evaluation of Impacts .........................................................25

      V.    City Comments on the DEIS, FAA Responses, and FAA Issuance of
the Joint FEIS and ROD....................................................................25

SUMMARY OF ARGUMENT ..........................................................................26

STANDARD OF REVIEW ................................................................................28

ARGUMENT ......................................................................................................30

      I.     FAA arbitrarily and capriciously rejected alternatives that met the
Project's purpose and need; instead FAA considered only the Project
and No Action Alternative, thereby predetermining the outcome of the
environmental review process.............................................................30

      II.    The EIS fails to take a hard look at the Project's adverse effects.......38

              A.    The EIS fails to take a hard look at construction noise and
vibration impacts.......................................................................39

3

1.      The EIS's omission of any significance threshold for construction noise impacts results in undisclosed noise impacts ...........................................................................40

2.      The EIS fails to take a hard look at noise impacts from construction truck trips ....................................................46

3.      The EIS omits any analysis of construction-related vibration impacts ............................................................49

B.      The EIS fails to take a hard look at cumulative noise impacts of the Project in combination with existing ongoing operations and previously approved Airport projects ........................................52

C.      The EIS fails to take a hard look at the Project's cumulative noise impacts on public health....................................................56

D.      The EIS fails to take a hard look at environmental justice concerns by using an overbroad study area and mispresenting the percentage of residents of color who are, and will continue to be, disproportionately impacted............................................57

1.      The EIS's environmental justice study area is unreasonably broad..........................................................60

2.      The EIS mispresents the percentage of impacted populations of color ........................................................63

      a.  The EIS misrepresents the racial and income makeup of communities near the airport by using census tracts, rather than block groups ..................................................64

      b.  The EIS's environmental justice analysis underestimates the percentages of racial and ethnic populations and low-income populations that will be affected by the Project ....................................................69

      c.  FAA did not adequately respond to the City's EJSCREEN analysis ....................................................71

CONCLUSION AND RELIEF SOUGHT ............................................................73

CERTIFICATE OF COMPLIANCE.........................................................................75

CERTIFICATE OF SERVICE ................................................................................76

ADDENDUM ...........................................................................................................77

## TABLE OF AUTHORITIES

### Cases

*Action and Env't Justice v. Fed. Aviation Admin.*,

    18 F.4th 592 (9th. Cir. 2021) ....................................................... passim

*Alaska Survival v. Surface Transp. Bd.*,

    705 F.3d 1073 (9th Cir. 2013)..............................................................32

*Anderson v. Evans*,

    371 F.3d 475 (9th Cir. 2004)................................................................68

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,

    462 U.S. 87 (1983) ...............................................................................38

*Bark v. U.S. Forest Serv.*,

    958 F.3d 865 (9th Cir. 2020)........................................................ passim

*Cal. v. Bernhardt*,

    472 F.Supp. 3d 573 (N.D. Cal. 2020) ..................................................68

*Blue Mountains Biodiversity Projec*t *v. Blackwood*,

    161 F.3d 1208 (9th Cir. 1998)..............................................................30

*Bob Marshall Alliance v. Hodel*,

    852 F.2d 1223 (9th Cir. 1988)..............................................................32

*Bowen v. Georgetown Univ. Hosp.*,

    488 U.S. 204 (1988) .............................................................................15

*Burbank-Glendale-Pasadena Airport Auth. V. City of Burbank*,

    136 F.3d 1360 (9th Cir. 1998)........................................... 19, 21, 22, 23

*Burlington Truck Lines v. U.S.*,

    371 U.S. 156 (1962) .............................................................................42

*C.A.R.E. Now, Inc. v. Fed. Aviation Admin.*,

    844 F.2d 1569 (11th Cir. 1988).............................................................46

*Citizens for a Better Henderson v. Hodel*,

   768 F.2d 1051 (9th Cir. 1985)...............................................................35

*City of Carmel-By-The-Sea v. Dept. of Transp.*,

   123 F.3d 1142 (9th Cir. 1997)...............................................................33

*Cntr. for Biological Diversity v. U.S. Forest Serv.*,

   349 F.3d 1157 (9th Cir. 2003)...............................................................72

*Coliseum Square Ass'n, Inc. v. Jackson*,

   465 F.3d 215 (5th Cir. 2006)..................................................................59

*Colo. Envt'l Coal. v. Dombeck*,

   185 F.3d 1162 (10th Cir. 1999)..............................................................33

*Columbia Basin Land Protection Ass'n v. Schlesinger*,

   643 F.2d 585 (9th Cir. 1981)..................................................................48

*Communities Against Runway Expansion, Inc. v. Fed. Air Admin.*,

   355 F.3d 678 (D.C. Cir. 2004) ........................................................ 58, 62

*Conner v. Burford*,

   848 F.2d 1441 (9th Cir. 1988)...............................................................31

*Davis v. Mineta*,

   302 F.3d 1104 (10th Cir 2002) ...................................................... 37, 46

*Earth Island Inst. v. Hogarth*,

   494 F.3d 757 (9th Cir. 2007)..................................................................71

*Earth Island Inst. v. U.S. Forest Service*,

   351 F.3d 1291 (9th Cir. 2003).......................................... 38, 48, 52, 72

*Earth Island Inst. v. U.S. Forest Serv.*,

   442 F.3d 1147 (9th Cir. 2006).......................................... 39, 51, 63, 72

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,

   451 F.3d 1005 (9th Cir. 2006)...............................................................39

*Friends of Southeast's Future v. Morrison*,

    153 F.3d 1059 (9th Cir.1998).........................................................................32, 33

*Grand Canyon Trust v. FAA*,

    290 F.3d 339 (2nd Cir. 2002)...............................................................................54

*Great Basin Resource Watch v. Bureau of Land Mgm't*,

    844 F.3d 1095 (9th Cir. 2016)..............................................................................52

*Greater Yellowstone Coal., Inc. v. Servheen*,

    665 F.3d 1015 (9th Cir. 2011)..............................................................................29

*Hausrath v. U.S. Air Force*,

    491 F.Supp.3d 770 (9th Cir. 2021) .........................................................57, 59, 67

*In Def. of Animals v. Dept. of Interior*,

    751 F.3d 1054 (9th Cir. 2014)..............................................................................39

*Kern v. BLM*,

    284 F.3d 1062 (9th Cir. 2002)..................................................................26, 38, 52

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgm't*,

    387 F.3d 989 (9th Cir. 2004).........................................................................52, 65

*Latin Americans for Social and Econ. Dev. v. Adm'r of the Fed. Highway Admin.*,

    756 F.3d 447 (6th Cir. 2014)................................................................................58

*Marsh v. Oregon Nat. Res. Council*,

    490 U.S. 360 (1989).............................................................................................30

*Metcalf v. Daley*,

    214 F.3d 1135 (9th Cir. 2000)........................................................................31, 38

*Morongo Band of Mission Indians v. Fed. Aviation Admin*,

    161 F.3d 569 (9th Cir. 1998)................................................................................58

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983)...............................................................................................42

*N. Alaska Env't Ctr. v. Dept. of Interior,*

   983 F.3d 1077 (9th Cir. 2020)..................................................................50

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*

   545 U.S. 967 (2005) ...............................................................................54

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,*

   606 F.3d 1058 (9th Cir. 2010)................................................... 33, 34, 37

*Native Ecosystems Council v. U.S. Forest Serv.,*

   418 F.3d 953 (9th Cir. 2005).....................................................................62

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*

   137 F.3d 1372 (9th Cir. 1998)..................................................................45

*Northern Plains Res. Council, Inc. v. Surface Transp. Bd.,*

   668 F.3d 1067 (9th Cir. 2011)........................................................ passim

*Nw. Coal. For Alternatives to Pesticides v. EPA,*

   544 F.3d 1043 (9th Cir. 2008)..................................................................29

*Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.,*

   475 F.3d 1136 (9th Cir. 2007)................................................... 51, 56, 72

*Or. Natural Desert Ass'n v. BLM,*

   625 F.3d 1092 (9th Cir. 2010)..................................................................28

*Or. Natural Res. Council v. Marsh,*

   52 F.3d 1485 (9th Cir. 1995)....................................................................51

*Organized Village of Kake v. U.S. Dept. of Agric.,*

   795 F.3d 956 (9th Cir. 2015)....................................................................54

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l. Marine Fisheries Serv,*

   482 F.Supp.2d 1248 (W.D. Wash. 2007).................................................72

*Pit River Tribe v. U.S. Forest Serv.,*

   469 F.3d 768 (9th Cir. 2006)............................................................ 31, 32

*Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332 (1989) ....................................................................... 30, 38

*Save Our Cumberland Mountains v. Kempthorne*,

    453 F.3d 334 (6th Cir 2006) ................................................................ 36

*Save Strawberry Canyon v. Dept. of Energy*,

    830 F.Supp.2d 737 (N.D. Cal. 2011) ................................................. 50

*Save the Yaak Comm. v. Block*,

    840 F.2d 714 (9th Cir. 1998) ............................................................. 30

*Sierra Club v. Bosworth*,

    510 F.3d 1016 (9th Cir. 2007) ..................................................... 29, 30

*Simmons v. U.S. Army Corps of Eng'rs*,

    120 F.3d 664 (7th Cir. 1997) ....................................................... 35, 36

*Sylvester v. U.S. Army Corps Eng'rs*,

    882 F.2d 407 (9th Cir. 1989) ............................................................. 34

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*,

    608 F.3d 592 (9th Cir. 2010) ............................................................. 52

*The Lands Council v. McNair*,

    537 F.3d 981 (9th Cir. 2008) ................................................. 29, 42, 72

*Turtle Island Restoration Network v. U.S. Dept. of Commerce*,

    878 F.3d 725 (9th Cir. 2017) ............................................................. 42

*West v. Sec'y of Dept. of Transp.*,

    206 F.3d 920 (9th Cir. 2000) ............................................................. 30

*WildEarth Guardians v. Montana Snowmobile Ass'n*,

    790 F.3d 920 (9th Cir. 2015) ............................................................. 44

*Winter v. Natural Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) ......................................................................... 29, 39

*Young v. Gen. Servs. Admin.*,
  99 F.Supp. 2d 59 (D.D.C. 2000) ............................................................64

## Statutes

5 U.S.C. § 706(2)(A)....................................................................................29

42 U.S.C. § 4321–4370h.............................................................................13

42 U.S.C. §§ 4331, 4332 ..................................................................... 56, 57

42 U.S.C. § 4332(2)(c)(iii)..........................................................................31

42 U.S.C. § 4370m-6(a) ..............................................................................16

42 U.S.C. § 4913(c)(1)................................................................................57

49 U.S.C. § 46110 ................................................................................ 15, 16

49 U.S.C. § 46110(a) ........................................................................... 15, 16

Cal. Pub. Resources Code, § 21000–21189.70.9.......................................19

## Regulations

14 C.F.R. § Pt. 150, App. A .......................................................................41

40 C.F.R. § 1500.1(b) .................................................................................62

40 C.F.R. § 1502.2(g) .......................................................................... 31, 38

40 C.F.R. § 1502.9(a) .......................................................................... 39, 71

40 C.F.R. § 1502.9(b), (c) ................................................................... 15, 73

40 C.F.R. § 1502.13 ....................................................................................32

40 C.F.R. § 1502.14 ....................................................................... 26, 31, 32

40 C.F.R. § 1502.14(d) ...............................................................................37

40 C.F.R. §§ 1502.16(c), 1506.2(d)...................................... 27, 43, 44, 46

40 C.F.R. § 1502.21 ....................................................................................50

40 C.F.R. § 1508.7 ............................................................................... 52, 54

40 C.F.R. § 1508.25(a)(2), (c) .................................................53

40 C.F.R. § 1508.27(a)................................................... 61, 62

85 Fed. Reg. ...............................................................15

## Other Authorities

Executive Order 12898 ............................................... 58, 59

H.R. 3001 ..................................................................57

## INTRODUCTION

Petitioner City of Los Angeles (City) filed this action to address the failure of Respondent Federal Aviation Administration (FAA) to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4370h, for the Replacement Passenger Terminal Building Project (Project) at the Bob Hope "Hollywood Burbank" Airport (Airport). The Environmental Impact Statement (EIS) prepared for the billion-dollar terminal replacement Project violates NEPA by: (i) predetermining the outcome of the environmental analysis by considering only a single version of the Project—the version already approved by the Burbank-Glendale-Pasadena Airport Authority (Authority)—and the No Action Alternative which, according to FAA, is not a feasible option; and (ii) failing to take the requisite "hard look" at construction and cumulative noise and vibration impacts, their related health impacts, and associated environmental justice impacts to communities immediately surrounding the Airport. FAA also failed to adequately respond to the City's comments when the City raised these issues.

NEPA's hard-look requirement obligates an agency to consider the environmental impacts of an action and its available alternatives *before* it decides upon a course of action. NEPA requires an agency to look before it leaps. FAA did

not do that here. Instead, FAA used inadequate environmental analysis to rationalize a decision already made.

The record reveals FAA's process of evaluating alternatives and selecting the Project was flawed from the start. Rather than evaluate a range of alternatives that would, as FAA acknowledges, meet the Project's purpose and need, the EIS analyzes only the version of the Project the Authority and the City of Burbank (Burbank) voters approved in 2016. To justify this, FAA devised a screening process that eliminated any alternative from consideration in the EIS if it was inconsistent with the already-approved Project. With the parameters drawn so tightly, FAA impermissibly screened out viable alternatives that would avoid environmental harm. This predetermined approach violates NEPA, including the requirement to objectively analyze *all reasonable* alternatives to the Project—an analysis vital to informed federal decisionmaking.

Likely due to FAA's predetermined approach, the EIS further violates NEPA by failing to take a hard look at the Project's construction noise and vibration impacts, including cumulative effects from six years of Project construction combined with intensive ongoing Airport operations. Consequently, a meaningful analysis of potentially harmful cumulative noise-related health impacts on Airport-adjacent communities, including communities of color, never occurred. Further, when confronted with these issues, including data showing the

inaccuracies of the EIS's environmental justice analysis, FAA disregarded the

City's concerns, rather than meaningfully discuss them. *Compare* 40 C.F.R. §

1502.9(b), (c).[1] These analytical shortcomings violate NEPA, a statute that requires

a comprehensive hard look.

Without this Court's intervention, the Authority will proceed with the

Project without FAA first taking a hard look at the Project's adverse impacts and

without FAA considering less injurious alternatives. Accordingly, the Court should

grant the Petition and order vacatur of the Record of Decision (ROD).

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 49 U.S.C. § 46110. The City has a

substantial interest in an order issued by the Administrator of FAA and therefore

"may apply for review of the order by filing a petition for review in … the court of

appeals of the United States for the circuit in which the person resides or has its

principal place of business." 49 U.S.C. § 46110(a). The City is a municipal

---

[1] Citations to the NEPA regulations are to the 2005 version in effect when the ROD was issued, rather than the current regulations. The 2005 regulations apply to this Court's review because NEPA regulations do not apply retroactively unless an agency chooses to apply them (FAA has rejected retroactive compliance). *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("administrative rules will not be construed to have retroactive effect unless their language requires this result"); 85 Fed. Reg. 43,370 (July 16, 2020); *see also* Petitioner's Excerpts of Record, Volume 2, page 484 ("2-PER-2-484") (FAA opting against applying the new regulations). These 2005 regulations are included in the accompanying Addendum of Legal Authority.

corporation and a charter city in the State of California and is located entirely within the geographic boundaries of this Court. This Court "has exclusive jurisdiction to affirm, amend, modify or set aside part of an order and may order … the Administrator of the [FAA] to conduct further proceedings." 49 U.S.C. § 46110.

FAA's ROD for the Project constitutes a final order and is reviewable under 42 U.S.C. § 4370m-6(a) and 49 U.S.C. § 46110(a). As required by 42 U.S.C. § 4370m-6(a), the City submitted substantive written comments regarding the inadequacy and insufficiency of FAA's Draft EIS (DEIS), which raised the issues addressed in the Petition and this brief. *See* 2-PER-424–65, 3-PER-532–77.

Consistent with 49 U.S.C. § 46110(a), on July 12, 2021, the City timely filed its Petition within 60 days of FAA's May 21, 2021, issuance of the ROD. 1-PER-2; ECF No. 1-2. On August 26, 2021, the City filed a First Amended Petition for Review. ECF No. 18.

## STATEMENT OF ISSUES

1.      Whether FAA acted arbitrarily and capriciously and in violation of NEPA when it eliminated all potential alternatives to the Project from comprehensive evaluation in the EIS because those alternatives were not pre-authorized by Burbank voters?

2. Whether FAA acted arbitrarily and capriciously and in violation of NEPA when it failed to take a hard look at noise and vibration impacts, impacts to human health, and impacts to already environmentally overburdened communities living and working around the Airport, including by failing to adequately respond to the City's comments on these issues?

## STATEMENT OF THE CASE

### I. Burbank's Measure B and the Authority's 2016 Project Approval

The Airport is one of five regional airports in Southern California. 4-PER-900. It is located in a highly developed urban area in the San Fernando Valley; no buffers separating the Airport from adjacent land uses. *See* 1-PER-102, 1-PER-166. Within the City, the Airport is located near residences, businesses, industrial uses, and public facilities. 1-PER-167–68. The City's data reveals that people of color comprise, on average, over 70 percent of the population living near the Airport. *See* 2-PER-439–40.

There are two intersecting runways at the Airport—Runway 15/33 (running north-south) and Runway 8/26 (running east-west)—which divide the Airport property into four quadrants: the northeast, southeast, northwest, and southwest quadrants. 1-PER-103, 5-PER-990–91. In the northeast quadrant, Runway 15/33 and its surrounding area are located within the City (approximately 100 acres), while the remainder of the Airport's 455 acres are within Burbank. 1-PER-101–02.

The existing 14-gate terminal is in the southeast quadrant, but the replacement terminal will be in the northeast quadrant, closer to the City. 1-PER-103.

Noise pollution from the Airport has long burdened the communities living and working near it, significantly impairing residents' quality of life. *See*, *e.g.*, 4-PER-909, 4-PER-911–13. During the day, existing ambient noise levels near the Airport range from 62 to 72 A-weighted decibels (dBA). 5-PER-1036–37, 5-PER-1038. Based on FAA's integrated noise model, significant impacts to noise sensitive areas near an airport typically occur within what is known as the 65 Community Noise Equivalent Level (CNEL) noise contour. 5-PER-1019, 5-PER-1030, 5-PER-1201. In 2015 the Airport's 65 CNEL noise contour encompassed 1.799 square miles; by 2023 it will encompass 2.153 square miles. 5-PER-1040, 5-PER-1042; *see* 5-PER-1041 (map of 2015 CNEL noise contours). Due to the Airport's location, much of the Airport's 65 CNEL noise contour is located within the City, meaning residents of those area already experience significant noise impacts. *See id.*; 1-PER-235.

Although the Airport is partially located in the City, it is owned and operated by the Authority, an entity that was formed in 1977 pursuant to a Joint Powers Agreement (JPA) between the Cities of Burbank, Glendale, and Pasadena. 4-PER-938. The City has no representation on the Authority. 5-PER-977. As a result, public review processes involving the Airport, such as the one FAA purported to

undertake here, provide the City a crucial opportunity to voice its concerns about proposed Airport changes. *See* 2-PER-310–11.

Since January 1980, the Authority and FAA have sought to replace the existing terminal because it is too close to the runways to meet FAA's safety guidelines. 5-PER-987, 6-PER-1299. The existing terminal also does not meet the California Building Code's current seismic design standards. 1-PER-119.

Over the years, several Project iterations have been proposed and subjected to environmental review under NEPA and its California-counterpart, the California Environmental Quality Act (CEQA), Cal. Pub. Resources Code, § 21000–21189.70.9. 1-PER-98–99. Ultimately, however, the replacement terminal was not pursued. *Id*. This was primarily because Burbank—which, like the City, has long endured the Airport's adverse noise impacts—refused to purchase land required for the new terminal. *See id.*; *see generally The Burbank-Glendale-Pasadena Airport Auth. V. City of Burbank*, 136 F.3d 1360, 1361 (9th Cir. 1998) (addressing these events).

In 2000, after years of disagreement between the Authority and Burbank, and the City without a vote on the matter, Burbank voters approved Measure B—a ballot measure that amended the Burbank Municipal Code to prohibit Burbank (as a voting member of the JPA) from agreeing to relocated or expanded Airport terminal project unless Burbank voters approve it first. *See* 1-PER-99.

In 2005, the Authority and the City entered into a Development Agreement (DA) concerning the potential future terminal replacement. 4-PER-939. As part of the DA, the Authority agreed not to take any steps toward constructing a new or relocated terminal building for the next decade. 6-PER-1300. Meanwhile, the Authority and Burbank met to negotiate a plan for the terminal replacement. *See* 1-PER-99.

In 2015, the Authority and Burbank approved a conceptual term sheet regarding the replacement terminal. 5-PER-1080–89. The term sheet stipulated that, if Burbank voters approved its terms, the Authority may build a 355,000 square foot (maximum) replacement terminal, with a maximum of 14 gates and 6,637 parking spaces. 1-PER-99; *see also* 5-PER-1083. The term sheet provided that CEQA review would be required prior to the proposal's presentation to Burbank voters but was silent about NEPA compliance. 5-PER-1081.

With the term sheet in place, in July 2016, the Authority certified a final EIR for the Project under CEQA. 1-PER-99. The EIR analyzed three alternative versions of the Project in addition to the "No Project" Alternative: (i) the Adjacent Property Full-Size Terminal (the alternative most resembling the Project); (ii) the Southwest Quadrant Full-Size Terminal, and (iii) the Southwest Quadrant Same-Size Terminal. 5-PER-990.

In August 2016, subject to voter ratification, the Authority and Burbank

conditionally approved a new DA (2016 DA) (signed in January 2017, 5-PER-977) to grant the Authority a "vested right" to develop a 355,000 square foot, 14-gate replacement terminal to be located at either the northeast quadrant (the Project location) or the southwest quadrant. 1-PER-99–100, 4-PER-939, 4-PER-941–42. The 2016 DA also contains 241 conditions of approval and several design standards. 4PER-957–68, 4-PER-969–75.

In November 2016, as required by Measure B, Burbank held a citywide special election for voters to decide whether to approve the replacement terminal as defined in the 2016 DA. 1-PER-100; *see also id*. at n.12 (text of ballot measure). The measure, also called "Measure B," passed. *Id*. With this passage, in 2017, the 2016 DA was executed and, along with the new JPA, became effective. 1-PER-100, 5-PER-977. The Authority then prepared an updated Airport Land Use Plan that includes the Project. 1-PER-100.

Since Measure B's passage, the Authority has continued to move forward with the Project, including entering into a service agreement for the Project's professional management team and authorizing that team to prepare the procurement documents to select the Project's design and construction contractor. 2-PER-448, 3-PER-675–76.

## II.    FAA's Environmental Impact Statement and Record of Decision

Almost four years after Burbank voters and the Authority approved the Project, on August 21, 2020, FAA issued a DEIS for the Project, commencing a 45-day public review and comment period. 1-PER-264–65. The City and others requested a 120-day extension of the public comment period; FAA instead granted a 22-day extension. *Id*. On May 21, 2021, FAA issued a combined Final EIS (FEIS) and ROD for the Project, including responses to comments on the DEIS. *See* 1-PER-2.

## III.    The Screening Out of Alternatives from the EIS's Analysis

Prior to release of the DEIS, FAA assured the public that the EIS "will evaluate a comprehensive range of alternatives." 2-PER-302. FAA explained this comprehensive range of alternatives "is necessary to ensure that other alternatives that satisfy the purpose and need, while having a less detrimental effect on the environment, have not been prematurely dismissed from consideration." *Id.* Despite this, FAA eliminated *all* alternatives to the Project from evaluation in the EIS based on an ad hoc "Screening Process" that FAA invented for the Project. 1-PER-132–51.

Specifically, to determine which alternatives warranted consideration in the EIS, FAA applied a two-step process. 1-PER-132. In Step 1, FAA eliminated alternatives that could not "achieve the objectives of the Purpose and Need to meet

current FAA Airport Design Standards, passenger demand, and state building requirements, as well as improving utilization and operational efficiency of the passenger terminal building." *Id.*

In Step 2, FAA eliminated alternatives if "they would not be practical or feasible to implement from a technical or economic standpoint." 1-PER-132. As part of this step, FAA asked "whether the alternative is consistent with the development agreement entered into by [] Burbank and the Authority and ratification of Measure B by Burbank voters." 1-PER-132–33 (footnote omitted). If an alternative was not consistent with the 2016 DA and Measure B, FAA eliminated it from consideration. 1-PER-133.

Applying Step 1 of the screening process, FAA found the following alternatives consistent with the Project's purpose and need: (i) a new airport at a location away from the populated area (the "New Airport" alternative), 1-PER-134; (ii) a remote landside alternative, which would provide a remote off-Airport landside facility that would connect to the airside facility via a shuttle system or automated transit (the "Remote Landside Facility" alternative), *id.*; (iii) a replacement passenger terminal building in the southeast quadrant of the Airport (the "Southeast Quadrant" alternative), 1-PER-136; and (iv) a replacement passenger terminal in the northeast quadrant (the "Northeast Quadrant" alternative, i.e., the Project), 1-PER-144.

At Step 2, FAA eliminated all alternatives but the Project (the "Northeast Quadrant" alternative) and the mandatory "No Action Alternative." 1-PER-147–50. The EIS acknowledged, however, that the No Action Alternative does not meet the Project's purpose and need and is infeasible because it is inconsistent with Measure B. 1-PER-149

FAA eliminated the "New Airport" alternative because (i) the Authority's JPA does not authorize the Authority to close the existing airport and construct a new one, and (ii) "*Measure B did not provide the authority to construct a new airport.*" 1-PER-148 (emphasis added).

FAA eliminated the "Remote Landside" alternative because (i) it would be "difficult" to implement due to the lack of open space near the Airport, (ii) it might increase passenger travel time, (iii) it would require the Authority to acquire property, and (iv) "*Measure B did not authorize an off-airport landside facility.*" 1-PER-148 (emphasis added).

Lastly, FAA eliminated the "Southeast Quadrant" alternative because (i) space limitations made it infeasible, (ii) the Authority would need to use the existing terminal building during construction of this alternative, and (iii) the alternative was *not* "*consistent with the requirements of voter-approved Measure B.*" 1-PER-148–49 (emphasis added).

## IV. The EIS's Evaluation of Impacts

The EIS purports to consider the Project's environmental impacts and, to a lesser extent, those of the No Action Alternative, including noise impacts, cumulative impacts, health impacts, and environmental justice impacts. *See* 4-PER-679–86 (DEIS table of contents), 1-PER-86–94. The EIS concludes that the Project would not result in any adverse environmental impacts. 1-PER-86–94. Specific information about the EIS's analyses is provided in the Argument below.

## V. City Comments on the DEIS, FAA Responses, and FAA Issuance of the Joint FEIS and ROD

FAA received over 300 comments on the DEIS, including comments from the City, several environmental organizations, and members of the public concerned about the Project's adverse impacts. *See* 2-PER-382–92. A topic of considerable concern was noise impacts. *See*, *e.g.*, 2-PER-518 (failure to address issues from severe noise), 2-PER-519–20 (noise study fails to account for topography), 2-PER-523 (noise affecting people's health), 2-PER-525 (existing noise disruption and health effects), 2-PER-526 ("[w]e are in tears every morning as the first commercial jet rattles the neighborhood awake"), 2-PER-529 (noise pollution is incessant and toxic), 2-PER-530 (residents are unhappy and fearful about noise).

The City raised similar concerns about the Project's direct and cumulative noise impacts. 2-PER-435–37, 2-PER-444. The City also commented that the

DEIS fails to take a hard look at construction noise and vibration impacts (including cumulative noise impacts), 2-PER-435–37, health impacts, 2-PER-431, 2-PER-444, and environmental justice impacts, 2-PER-437–41. Additionally, the City observed that FAA improperly predetermined the Project by foreclosing consideration of alternatives that had not been approved by Measure B. 2-PER-448–50. FAA provided (often cursory) responses to the public and agency comments. It did not prepare and circulate a supplemental EIS resolving the document's inadequacies. *See* 2-PER-381. Rather, on May 21, 2021, FAA published the combined FEIS and ROD. 1-PER-2.

## SUMMARY OF ARGUMENT

In its EIS, FAA is required to analyze *all* reasonable Project alternatives, 40 C.F.R. § 1502.14, and take a hard look at *all* of the environmental consequences of its actions. *Kern v. BLM*, 284 F.3d 1062, 1066–67 (9th Cir. 2002). FAA, arbitrarily and capriciously, failed to do those things here.

FAA impermissibly predetermined the outcome of the NEPA review process by artificially limiting the range of alternatives analyzed in the EIS. It did this by developing a screening process that unreasonably narrowed FAA's options to those alternatives that mirrored the project already approved by Burbank voters and the Authority. Unsurprisingly, this resulted in the Project being deemed the *only* feasible project alternative, and therefore the only one FAA analyzed in the EIS.

This approach violates NEPA because an agency cannot exclude reasonable alternatives that meet a project's purpose and need by defining its criteria so narrowly.

As well, the EIS does not take a hard look at noise impacts, human health impacts, and disproportionate impacts to racial and ethnic populations and low-income populations residing near the Airport. The EIS does not apply any significance threshold or standard for construction noise, despite several being available, including FAA's own threshold. Nor does the EIS consider the Project's potential to conflict with the City's noise standards, in violation of the NEPA regulations. 40 C.F.R §§ 1502.16(c), 1506.2(d). The EIS also omits analysis of noise impacts from construction truck trips, which will thunder through neighborhoods surrounding the Airport and beyond for six years. And, the EIS omits any analysis of construction-related vibration impacts, even though the administrative record shows that such impacts are harmful to human health and the built environment.

The EIS also lacks any discussion of cumulative noise impacts—specifically noise impacts resulting from the Project in conjunction with existing ongoing operations and previously approved Airport projects. When the City brought this omission to FAA's attention, FAA provided no discernible response. Resultantly, the EIS fails to take a hard look at the impacts on public health that the cumulative

noise impacts may cause, such as hearing loss, increased blood pressure and heart rate, sleeping problems, impaired prenatal development, and unsafe working conditions.

Finally, FAA failed to take a hard look at environmental justice impacts by using an unreasonably broad study area for localized noise and related health impacts, misrepresenting the percentage of impacted populations of color, and inadequately responding to the City's comments on these issues. Further, the EIS's environmental justice analysis is fundamentally inadequate because of the deficiencies in the analyses of noise and health-related impacts upon which it is based.

These failings, both individually and collectively, reveal FAA's arbitrariness and capriciousness in its EIS preparation. FAA predetermined the outcome of the NEPA review process, failed to consider reasonable alternatives to the Project, and did not take a hard look at several environmental consequences of the Project or adequately respond to the City's comments regarding these impacts. Accordingly, this Court should vacate and remand the joint FEIS and ROD and require FAA to prepare and publicly circulate an analysis that complies with NEPA.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) authorizes judicial review of an agency's determination under NEPA. *Or. Natural Desert Ass'n v. BLM*, 625 F.3d

1092, 1109 (9th Cir. 2010). Under the APA, an agency decision shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency "relied on factors" that Congress "did not intend it to consider, entirely failed to consider an important part of the problem or offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*) (*overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) (quotations omitted).

The "keystone" of the court's review of an agency's NEPA compliance "is to ensure that the [agency] engaged in reasoned decisionmaking." *Nw. Coal. For Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008). The court must satisfy itself "that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011).

Courts afford deference to agency decisions that are adequately explained, "fully informed and well-considered," and supported by the evidence before the agency, but act as an important corrective to agency decisions that are conclusory, poorly reasoned, or unsupported by evidence. *Sierra Club v. Bosworth*, 510 F.3d

1016, 1023 (9th Cir. 2007) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1998)).

No deference is owed to agency conclusions or decisions where they are not supported by the facts in the record or where the agency "made 'a clear error of judgment.'" *Id.*; *West v. Sec'y of Dept. of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)). Furthermore, when an agency acts "without observance of the procedure required by law, that action will be set aside." *Sierra Club*, 510 F.3d at 1023.

## ARGUMENT

**I.** **FAA arbitrarily and capriciously rejected alternatives that met the Project's purpose and need; instead FAA considered only the Project and No Action Alternative, thereby predetermining the outcome of the environmental review process.**

NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making so that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (quoting *Marsh*, 490 U.S. at 371). By requiring agencies to focus on the environmental consequences of their decisions, "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

As this Court has recognized, "NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process." *Metcalf v. Daley*, 214 F.3d 1135, 1145 (9th Cir. 2000). The "comprehensive 'hard look' mandated by Congress and required by [NEPA] must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Id*. at 1142; 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."). A federal agency cannot eschew NEPA obligations by skewing its analysis to favor a predetermined outcome. *See Metcalf*, 214 F.3d at 1145.

"'The purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they retain a maximum range of options.'" *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006) (quoting *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988). To that end, "NEPA requires that federal agencies include a detailed statement of 'alternatives to the proposed action' in any recommendation or report on actions significantly affecting the quality of the human environment." *Id*. (quoting 42 U.S.C. § 4332(2)(c)(iii)). This "alternatives" section is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. The requirement that

agencies consider alternatives "'guarantee[s] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance.'" *Pit River Tribe*, 469 F.3d at 785 (alteration in original) (quoting *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988)). Agencies must therefore:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

40 C.F.R. § 1502.14.

In crafting the alternatives for detailed evaluation in an EIS, an agency is guided by the project's statement of purpose and need. *See* 40 C.F.R. § 1502.13. The purpose and need statement must not, however, "unreasonably narrow[] the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). Although agencies enjoy "considerable discretion to define the purpose and need of a project," *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir.1998), "an agency cannot define its objectives in unreasonably narrow terms."

*City of Carmel-By-The-Sea v. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

More specifically, the purpose and need must not be so "'unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.'" *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (quoting *Friends of Southeast's*, 153 F.3d at 1066). This, unfortunately, is what occurred here.

Specifically, as outlined above, FAA eliminated *all* action alternatives from review in the EIS, even alternatives that would meet the Project's purpose and need, if they were not the Project that Burbank voters and the Authority already approved in 2016. 1-PER-147–50. This omission of any action alternative in the EIS is precisely the type of "foreordained formality" decision-making that violates NEPA as a matter of law. *See National Parks*, 606 F.3d at 1070; *Colo. Envt'l Coal. v. Dombeck,* 185 F.3d 1162, 1174 (10th Cir. 1999) ("[NEPA] and [the NEPA] Regulations require [an agency] to study in detail all 'reasonable' alternatives [in an EIS] … [Courts] have interpreted this requirement to preclude agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative (i.e., the applicant's proposed project).").

This Court's decision in *National Parks* is instructive. There, a private party applied to the Bureau of Land Management (BLM) for a land exchange so that the private party could construct a large landfill. *National Parks*, 606 F.3d at 1062–63. The private party desired specific parcels of adjoining federal lands and offered some private land in another area for exchange. *Id*. BLM prepared an EIS for the project. *Id*. BLM's statement of purpose and need was crafted to meet the goals of the private party to obtain the land it wanted for its landfill. *Id*. at 1071–72. The Court concluded BLM's statement of purpose and need was "so narrowly drawn" that it "unreasonably constrain[ed] the possible range of alternatives." *Id*. at 1072. Therefore, the Court held BLM violated NEPA by failing to analyze a reasonable range of alternatives. *Id*.; *accord, Sylvester v. U.S. Army Corps Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) ("Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practical appear impracticable.").

Likewise, here, FAA adopted another party's narrow goals (Burbank's goals, as specifically approved by Measure B) and used those goals in a way that guaranteed no alternative could survive the EIS's screening process. 1-PER-148–50. In doing so, FAA improperly predetermined the outcome of its NEPA review process. FAA also unreasonably narrowed the EIS's range of alternatives to only the Project and the (theoretical) No Action Alternative. The result is that FAA

ignored the concerns of the City and the neighboring communities by refusing to consider less impactful alternatives, such as the "New Airport" and "Remote Landside" alternatives that would meet the Project's purpose and need but in ways that are less disruptive to the City and less environmentally degrative. The existence of these "viable but unexamined alternative[s] renders [the EIS] inadequate" as a matter of law. *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985).

Other circuits similarly hold that an agency violates NEPA when it accepts an applicant's narrow definition of a project in a way that unduly restricts the range of alternatives. In *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997), the Seventh Circuit held the Army Corps of Engineers (USACE) violated NEPA by accepting an applicant's definition of the project as its own, leading USACE to limit potentially viable alternatives from evaluation its EIS. There, a city applied to USACE for permission to construct a reservoir. *Id*. at 666. The city envisioned that the reservoir would supply water to the city as well as to a six-county water district. *Id*. USACE prepared an EIS, which implicitly defined the project's purpose and need as "finding or creating a *single source* to supply" water to both the city and the water district. *Id*. at 669 (emphasis added). The court held USACE's "imputed definition" of the project was unreasonable: the purpose of the project was not to supply water to the city and water district from a single source,

but simply to supply the city and the district with more water, regardless of source. *Id*.

USACE argued that its narrow definition of the project was justified because a contract existed between the city and the water district requiring the city to provide water to the district if the reservoir were built. *Simmons*, 120 F.3d at 670. The court rejected this argument, explaining that NEPA requires USACE to explore "alternatives free of contractual arrangements" and the "public interest in the environment cannot be limited by private agreements." *Id*. "If NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives." *Id*. By focusing on the single-source project, and never looking at multi-source alternatives, USACE failed to satisfy NEPA. *Id*.

Here too, by only considering the version of the Project that had been authorized by the 2016 DA and Measure B, FAA failed to consider potentially viable alternatives that would have fewer or less severe adverse environmental effects. Just as the contract between the city and the water district in *Simmons* did not excuse USACE's failure to analyze alternatives, the 2016 DA and Measure B do not excuse FAA from fully analyzing a range of alternatives as required by NEPA. *Simmons*, 120 F.3d at 669–70; *see also Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 345 (6th Cir 2006) ("[NEPA] prevents federal

agencies from effectively reducing the discussion of environmentally sound alternatives to a binary choice between granting or denying an application."); *Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir 2002) ("[O]nly two alternatives were studied in detail: the no build alternative, and the preferred alternative. [The agency] acted arbitrarily and capriciously in approving an [environmental assessment] that does not provide an adequate discussion of [p]roject alternatives.").

FAA might argue the EIS contains a reasonable range of alternatives because the EIS includes an evaluation of the No Action Alternative. Such a contention would be without merit. NEPA requires evaluation of a "no action" alternative to assist agencies in "providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. 1502.14(d). Here, the EIS admits that the No Action Alternative is only considered because it is "required by" the NEPA regulations, but states it is not actually a feasible alternative. 1-PER-149–50. Clearly, FAA never considered the No Action Alternative a viable option. *Id*. FAA's treatment of the No Action Alternative is further proof the EIS is an example of an improper "'foreordained formality'" used to justify approval of a project to which FAA was already fully committed, in violation of NEPA. *National Parks*, 606 F.3d at 1070.

In sum, FAA's alternatives screening process unreasonably limited FAA's choice of alternatives to only the Project. The record does not evince any effort by FAA to independently reexamine the definition of the Project beyond what was approved by Measure B. FAA's screening process unreasonably led to the development of only one real course of action—the Project—resulting in a predetermined outcome that, in violation of NEPA, defeated informed decisionmaking. *See* 40 C.F.R. §§ 1502.2(g), 1502.4(b), 1502.5.

## II. The EIS fails to take a hard look at the Project's adverse effects.

NEPA's aims are two-fold. "'First, it places upon [a federal] agency the obligation to consider *every significant aspect* of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.'" *Kern*, 284 F.3d at 1066 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)) (alterations in original) (emphasis added); *see also Earth Island Inst. v. U.S. Forest Service* (*Earth Island I*), 351 F.3d 1291, 1300 (9th Cir. 2003). To accomplish this, NEPA "'establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences.'" *Kern*, 284 F.3d at 1066–67 (quoting *Metcalf*, 214 F.3d at 1141); *see also Robertson*, 490 U.S. at 348.

This Court has "interpreted the 'hard look' requirement as entailing both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (*Earth Island II*), 1172 (9th Cir. 2006), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see also* 40 C.F.R. § 1502.9(a). Meaningful statements include a "'convincing statement of reasons to explain why a project's impacts are insignificant.'" *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020) (citing *In Def. of Animals v. Dept. of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (quoting *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006))).

A.  **The EIS fails to take a hard look at construction noise and vibration impacts.**

The Project requires a mammoth construction effort adjacent to the residential and commercial uses neighboring the Airport. *See* 1-PER-25–26, 1-PER-102. It will "include the construction of the replacement passenger terminal building and an automobile parking structure" followed by "demolition of the existing terminal, paving of the taxiways, and construction of the Aircraft Rescue and Fire Fighting [] Station." 1-PER-208–09. Demolition will include excavating "approximately 82,020 cubic yards (cy) of concrete and asphalt" and exporting "approximately 179,000 cy of soil" via haul trucks. 1-PER-208. This work will require myriad construction equipment and vehicles, including, "excavators,

graders, worker vehicles," 1-PER-209, "dozers, loaders, forklifts, and tractors" as well as "haul trucks," 2-PER-344–45, jackhammers, scrapers, backhoes, compressors, generators, 1-PER-238, and pile drivers, 2-PER-492, 5-PER-1033. Construction will occur for at least six years, six days per week, eight hours per day, 1-PER-207–09—all while nearby residents and businesses bear already-high ambient noise levels. 5-PER-1037–38. Construction will create an intense and prolonged amount of noise and vibration, impacts which the EIS fails to adequately consider.

1. ***The EIS's omission of any significance threshold for construction noise impacts results in undisclosed noise impacts.***

The EIS arbitrarily and capriciously concludes that the Project's prolonged, intensive, and concentrated construction activities will not significantly impact nearby residences. 1-PER-237–39. This conclusion is contradicted by the record, however, which shows that construction noise levels will exceed the City's adopted noise standards and FAA's own noise standards.

In particular, both the City's General Plan and FAA's 2015 Order 1050.1F and accompanying Desk Reference (Desk Reference) express noise levels in terms of CNEL (community noise equivalent levels) and increases in CNEL decibels. 5-PER-1022, 5-PER-1201, 5-PER-1274. Under the City's General Plan, noise levels are *not* "normally acceptable" for single-family and multi-family uses if they

exceed CNEL 60 dB and 65 dB, respectively. 5-PER-1022–25. These standards are based on the California Department of Health Services' guidelines. 5-PER-1023.

Under FAA's Desk Reference, an FAA action will have a "significant" impact if it will either cause a noise-sensitive area to be exposed to noise levels at or above 65 CNEL dB, or, (ii) cause an increase in noise of CNEL 1.5 dB, if noise levels without the project are already 65 CNEL dB or above. 5-PER-1203; *see also* 14 C.F.R. § Pt. 150, App. A, Table 1 (FAA Airport Noise Compatibility Planning Regulations, establishing that yearly day-night average noise levels of 65 dB and greater are not compatible with residential land uses). These standards apply not just to aircraft noise, but also "to airport development and other actions in the immediate vicinity of an airport." 5-PER-1203; *see also* 5-PER-1206–08 ("For some noise analyses, it may be necessary to include noise sources other than aircraft departures and arrivals in the noise analysis," including "construction noise."); 14 C.F.R. § Pt. 150, App. A.

Rather than apply FAA's or the City's standards, or *any* standard, the EIS disingenuously asserts that there is no significance threshold for construction noise caused by construction equipment. 1-PER-232. In the purported absence of an adopted threshold, the EIS concludes that construction noise impacts will be insignificant because noise levels from individual pieces of construction equipment "would attenuate to less than CNEL 70 dB at the closest noise sensitive land use."

1-PER-238–39. This explanation fails to account for the fact that construction equipment would operate simultaneously. *See* 1-PER-209 (construction schedule showing overlap). It also fails to explain why a noise level of CNEL 70 dB will not constitute a significant impact. This lack of explanation is particularly troubling given that under both FAA's and the City's noise standards, CNEL 70 dB *does* constitute a *significant* impact. 5-PER-1241, 5-PER-1022, 5-PER-1025.

The EIS's failure to articulate a rational basis for its significance conclusion renders that conclusion arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (failing to articulate a "rational connection between the facts found and the choice made" means the agency's decision cannot be upheld (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)); *Turtle Island Restoration Network v. U.S. Dept. of Commerce* 878 F.3d 725, 732 (9th Cir. 2017) ("[W]e require the agency to 'examine the relevant data and articulate a satisfactory explanation for its action."' (citations omitted)); *Northern Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1075 (9th Cir. 2011) ("The agency must 'explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable."' (quoting *Lands Council*, 537 F.3d at 988)).

In response to the City's comment that FAA should consider the Project's consistency with the City's noise standards, FAA stated it is not required to adhere

to the City's standards. 2-PER-493. This disavowal of any duty to consider the City's noise standards, however, violates the NEPA regulations, which require federal agencies to discuss a project's inconsistencies with local standards. 40 C.F.R §§ 1502.16(c), 1506.2(d). FAA's assertion is also inconsistent with the 2015 Desk Reference which provides that "[t]here may be state or local laws or ordinances that apply to noise from a proposed project (e.g. construction noise)," 5-PER-1235, and local noise standards "must be disclosed to the extent required under 40 CFR 1502.16(c) and 1506.2(d)." 5-PER-1202, 5-PER-1239.[2]

Although the City is not a member of the Authority, and thus has no direct say in the Project, the Project occurs, in part, within the City's boundaries and directly impacts the City and its residents. *See* 1-PER-234. The City's noise standards are evidence that the Project will have a significant—*undisclosed and unmitigated*—impact because noise levels will likely exceed the City's "normally acceptable" noise standards for residential uses. *See* 5-PER-1022, 5-PER-1025, 1-PER-238–39.[3] By dismissing the City's noise standards as irrelevant, FAA failed

---

[2] The Desk Reference also recognizes that certain settings exist where FAA's noise standard "may not apply" and for which FAA should "see state and local ordinances, which may be used as guidelines for evaluating noise impacts from operations" of non-aircraft equipment. 5-PER-1239; *see also* 5-PER-1250 ("The responsibility for determining…the relationship between specific properties and specific noise contours rests with the local authorities.").

[3] Notably, unlike for Burbank, the City's General Plan containing its noise policies are not even included in FAA's administrative record for the Project, further

to take a hard look at the Project's noise impacts, including the Project's conflict with the City's noise standards, in violation of NEPA. *See* 40 C.F.R. §§ 1502.16(c), 1506.2(d).

FAA also unreasonably dismissed the City's comments concerning FAA's *own* noise thresholds by opining, without evidence, that the Project's construction noise "would not change the CNEL 65 dB [aircraft] noise contour" and would not cause sensitive areas "to experience a 1.5 dB increase," and so would not, "exceed FAA's significance threshold." 2-PER-492–93. FAA, however, did not provide any technical analysis or information to support its conclusion. NEPA, however, "requires more" than asking a court "to assume the adequacy and accuracy of partial data without providing any basis for doing so." *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 927 (9th Cir. 2015).

Furthermore, the record belies FAA's unsubstantiated conclusion. The EIS's Noise Appendix indicates an impact will likely occur. For instance, an equation included in the Noise Appendix instructs that when "two sounds of the same level are added, the sound level increases by approximately 3 dB." 2-PER-366. So, for example, where jackhammering can be heard at the nearest sensitive land use (approximately 930 feet away) at and around 64 dB Leq (equivalent continuous

---

confirming that FAA did not consider the City's noise standards as part of its NEPA analysis.

sound level), 1-PER-238, and where the ambient noise level at that location might vary from 60 to 70 dB—a realistic range given the EIS's CNEL noise contours—that jackhammering could increase the ambient noise level by 3 dB or more, or some other amount that exceeds FAA's CNEL 1.5 dB threshold, creating "a significant impact."" 1-PER-231. This shows FAA failed to consider an impact its own data demonstrates is likely to occur.

FAA's failure to perform these, or any construction noise calculations, demonstrates FAA did not take a hard look at the Project's construction noise impacts. *See Northern Plains*, 668 F.3d at 1084–85 (holding EIS's construction impact analysis inadequate where agency failed to gather data regarding the potential construction impacts); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.").

Moreover, FAA is aware of the value a quantitative construction noise assessment provides in a NEPA analysis. In fact, FAA advocates "conducting a noise analysis...for a quantitative assessment of potential noise levels generated by construction" that may impact "sensitive wildlife species." 5-PER-1230. It is anomalous that this same level of analysis should not be afforded to humans.

In sum, the EIS's failure to disclose (and mitigate) the Project's significant construction noise impacts—as evidenced by both the City's and FAA's noise standards—fails the hard-look standard. *See*, *e.g.*, *Davis,* 302 F.3d at 1124–25 (significant noise impact found where project would increase noise levels from 45 to 57 dBA to over 65 dBA); *C.A.R.E. Now, Inc. v. Fed. Aviation Admin.*, 844 F.2d 1569, 1575 (11th Cir. 1988) (adding 2,500 persons to the 65-dB contour was a significant noise impact requiring mitigation). The EIS's complete failure to consider the Project's conflict with the City's noise standards also violates NEPA's procedural requirement that federal agencies consider conflicts with local plans and policies in their NEPA documents. *See* C.F.R. §§ 1502.16(c), 1506.2(d).

### 2. *The EIS fails to take a hard look at noise impacts from construction truck trips.*

The EIS also fails to adequately evaluate ambient noise increases from construction truck trips that will travel through neighborhoods surrounding the Airport. The DEIS *includes no analysis* of noise impacts from truck trips, an omission that the City pointed out in its comment letter. 2-PER-435. In response, FAA provided a new table (Table M.5-1) that summarizes maximum daily vehicle trip estimates for construction. 2-PER-481. The table identifies the significant scope of the Project's construction truck traffic. It shows that, in 2022, the Project will generate up to *580 daily haul truck trips* during grading and up to *429 daily*

46

*vendor truck trips* during building of the replacement terminal in the northeast quadrant of the Airport. *Id*. In 2025, the Project will generate up to *58 daily haul truck trips* during demolition, up to *690 daily haul truck trip*s during grading, and up to *91 daily vendor truck trips* during work in the southeast quadrant of the Airport. *Id*. This construction traffic will persist for at least six years. 1-PER-207– 09. Remarkably, the EIS does not evaluate the effect of the noise impacts of these thousands of truck trips upon the people who live in the neighborhoods through which the trucks will travel for this extended period of time. *See* 1-PER-237–39.

FAA is well aware that truck trips create substantial noise, *see*, *e.g.*, 5-PER-1049 (EIR noise analysis of haul truck trips), and FAA possesses the tools to analyze that noise (see above). FAA is also well aware of the current degraded environment from existing aircraft on the Airport's runways and freeway traffic on neighborhoods surrounding the Airport. 5-PER-1036–38. Airport-related noise disturbances that negatively impact residents' daily lives are frequently reported. *See*, *e.g.*, 2-PER-518, 2-PER-523, 2-PER-525, 2-PER-526, 2-PER-529. Yet, FAA did not evaluate this potentially significant impact.

Instead, in response to the City's comments, FAA cited Order 1050.1F and the Desk Reference, 2-PER-489, implying that because those documents do not explicitly require a noise evaluation of construction truck trips, FAA need not perform that analysis. This logic is flawed for two reasons.

47

First, the fact that the Order and Desk Reference do not explicitly mandate review of a particular impact does not mean that the impact may be ignored. "NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action…." *Earth Island I*, 351 F.3d at 1300. The Desk Reference may be used as a guide, but as this Court stated, it "does not serve as *binding* guidance upon the FAA." *Ctr. for Comty. Action and Env't Justice v. Fed. Aviation Admin.*, 18 F.4th 592, 599 (9th. Cir. 2021) (emphasis added) (noting that the Desk Reference "may not be cited as the source of requirements under laws, regulations … or other authorities"). Simply put, FAA cannot use the Desk Reference or Order as an excuse to limit or avoid an impact analysis.

Second, the Order and Desk Reference explicitly state that an evaluation of construction noise may be necessary in the noise analysis. 5-PER-1206, 5-PER-1244. Truck noise is part of construction noise that ought to be assessed. Construction trucks will haul excavated and fill soil, demolition debris and construction materials for at least six years through densely-packed, already heavily impacted communities, including within the City, exacerbating existing significant noise levels on sensitive receptors. 2-PER-481, 1-PER-207–09. NEPA requires a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a project. *Columbia Basin Land*

*Protection Ass'n v. Schlesinger*, 643 F.2d 585, 592 (9th Cir. 1981). In contrast with that standard, the EIS completely ignores the impacts of this important aspect of the Project, an aspect *for which data already exists*. *See* 1-PER-237–39, 1-PER-207–09, 5-PER-1049. FAA's decision not to analyze noise impacts caused by the Project's haul trucks is thus arbitrary and capricious, and a violation of the hard-look standard.

### 3. *The EIS omits any analysis of construction-related vibration impacts.*

The EIS does not consider whether the Project would cause construction-related vibration impacts on nearby sensitive land uses. The City brought this omission to FAA's attention, and FAA responded by stating that "[c]onstruction related vibration is not an environmental resource category included in FAA 1050.1F [Desk Reference/Order]," yet again implying that the impact need not be evaluated. 2-PER-489. FAA is incorrect. As just explained, the Order and Desk Reference's failure to mandate review of a specific impact does not mean that FAA can ignore a known potential significant impact. *Ctr. for Comty. Action*, 18 F.4th at 599.

It is well known that vibration from regular and ongoing construction activities, such as pile driving and jackhammering, causes annoyance and distress to humans. 2-PER-366 (identifying jackhammering as an example of an activity that "disturbs routine activities or quiet, and/or causes feelings of annoyance"); 5-

PER-1029, 2-PER-528, 3-PER-554–57, 5-PER-1042 ("Ground-related vibration can be a significant source of annoyance."). At certain intensities, vibration can even cause structural damage. 5-PER-1043. Nevertheless, FAA "entirely failed to consider [this] important aspect of the problem," in an "arbitrary and capricious" manner. *Bark*, 958 F.3d at 869.[4]

FAA's responses to the City's comments on the issue of construction-vibration impacts are disappointing and defective. In particular, FAA asserted construction-related vibration impacts need not be addressed, in part, because the Project's CEQA EIR concluded such impacts would be less than significant. 2-PER-490; *see also* 5-PER-1042–43. California's CEQA statute and the federal NEPA statute, however, impose different standards of environmental review. *Save Strawberry Canyon v. Dept. of Energy*, 830 F.Supp.2d 737, 749 (N.D. Cal. 2011). Indeed, the EIS repeatedly disavows the Authority's CEQA EIR as inapplicable to NEPA and irrelevant. 2-PER-510–11, 2-PER-402. The EIS thus does not incorporate the EIR by reference. *See id.*; *compare* 40 C.F.R. §1502.21. Accordingly, FAA cannot rely on the CEQA EIR to avoid conducting some form of independent analysis. *See N. Alaska Env't Ctr. v. Dept. of Interior*, 983 F.3d

---

[4] Contrary to FAA's conduct here, it is common for federal agencies to consider construction vibration impacts. For instance, the Federal Transit Authority, another administration under the DOT, has adopted vibration thresholds of significance for determining impacts on residences as part of its NEPA reviews. 5-PER-1020.

1077, 1085 n. 9 (9th Cir. 2020) (explaining agency cannot rely on CEQA analysis in defending a hard-look challenge, unless that analysis is incorporated into the NEPA document).

Also, FAA attempted to excuse its failure to study construction vibration by asserting it was not required to study impacts that the City did not expressly raise in the City's pre-EIS scoping letter. 2-PER-489–90. That the City did not raise the issue of construction-vibration impacts until its DEIS comments does not excuse FAA from addressing the impact. As this Court explained, an "agency preparing an EIS has a duty to assess, consider, and respond to all comments, even those relating to environmental factors not mentioned during the scoping process." *Or. Nat. Desert Ass'n v. BLM* 625, F.3d 1092, 1120 n.23 (9th Cir. 2010) (quoting *Or. Natural Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995)). Additionally, FAA was put on notice during scoping that the EIS should assess the Project's construction vibration effects. *See*, *e.g.*, 2-PER-312.

NEPA requires FAA to provide a "reasonable basis" for its decision to exclude an analysis of construction related vibration impacts. *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). By failing to do so, FAA committed an arbitrary and capricious abuse of discretion. *See Bark*, 958 F.3d at 869; *Earth Island II*, 442 F.3d at 1172.

**B.     The EIS fails to take a hard look at cumulative noise impacts of the Project in combination with existing ongoing operations and previously approved Airport projects.**

NEPA requires federal agencies to consider cumulative impacts—that is, impacts "on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; *Id*. at § 1508.25(a)(2), (c); *Kern*, 284 F.3d at 1075. The EIS violates this requirement by failing to include *any* actual discussion of cumulative noise impacts. 1-PER-248–56.

To satisfy the requirement to examine cumulative impacts, "an agency must take a 'hard look' at *all* actions" that may combine with the action under consideration to affect the environment. *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (emphasis added). "[S]imply listing all relevant actions is not sufficient." *Great Basin Resource Watch v. Bureau of Land Mgm't*, 844 F.3d 1095 (9th Cir. 2016); *Bark*, 958 F.3d at 872; *see Earth Island I*, 351 F.3d at 1306–07 ("[T]he fact that [a cumulative impacts] section exists [in the EIS] is not enough."). Instead, "some quantified or detailed information is required." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgm't*, 387 F.3d 989, 993–94 (9th Cir. 2004).

Here, the EIS includes a table of other projects ostensibly considered in the cumulative impact analysis. 1-PER-197–201. For example, the EIS identifies completed and in-progress changes to departure routes as part of FAA's Southern California Metroplex project. 1-PER-199–200. The record shows that existing operational noise at the airport is "disruptive" and "unbearable," impacting residents' ability to work, sleep, connect, and peacefully enjoy their properties.[5] 4-PER-917–18. Even more telling, when changes to the Airport's departure routes were proposed, more than 390,000 noise complaints were submitted objecting to those changes. 4-PER-909. The changes to the departure routes—which are now "in progress"—are the types of noise-generating activities that NEPA requires an EIS to evaluate in a cumulative impact analysis. 40 C.F.R. § 1508.25(a)(2), (c); *See* 1-PER-200 (the "SLAPP Two" and "OROSZ Three" amendments to the departure routes identified as "in progress" in EIS's list of cumulative projects).

Knowing the Airport's ongoing noise impacts are the source of tremendous public controversy, FAA assured the public that it would address cumulative noise impacts in the EIS. *See*, *e.g.*, 2-PER-308. Yet, despite FAA's commitment to do so,

---

[5] During the pre-EIS scoping process, FAA received comments from 92 individuals of which 72 expressed concerns about existing noise. *E.g.,* PER 4:912 (noise makes it difficult to work from home and conduct businesses), 4:914 (impaired sleep pattern due to noise), 4:915 (home inundated by noise from air traffic), 4:916 (woken up daily by plains), 4-PER-917 (bombarded by flight noise), 4:918 (noise disturbance affecting nervous system).

the EIS does not include a cumulative construction noise impact analysis. *See* 1-PER-248–56. The EIS does not explain why FAA abandoned its commitment to assess cumulative noise impacts; thus the analysis is arbitrary and capricious. *Organized Village of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) ("'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'") (*quoting Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981 (2005)).

Rather than offer reasonable explanation or analysis, the EIS merely asserts that the Project "cannot result in cumulative [noise] impacts" because it would not result in a significant (project-specific) noise effect. 1-PER-248. This conclusion is legally improper. A cumulative impact to a particular resource cannot be eliminated from analysis simply because the project impact is (allegedly) less than significant. To the contrary, the very reason cumulative impacts must be assessed is that they "can result from *individually minor* but *collectively significant* actions taking place over a period of time." 40 C.F.R. § 1508.7 (emphasis added); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 343 (2nd Cir. 2002) ("Even a slight increase in adverse conditions that form an existing environmental milieu may sometimes threaten harm that is significant.").

*Northern Plains* is on point. There, this Court found an EIS's cumulative impact discussion inadequate because it failed to address the combined effects of a proposed railroad project and existing operational methane wells on water quality, even though the railroad—by itself—would have a "virtually non-existent impact on water quality." *Northern Plains*, 668 F.3d at 1082–83. Further, the Court held that NEPA required the EIS to analyze cumulative water quality effects of the railroad and nine approved sites for gas wells because there was evidence that the project and the wells might be constructed simultaneously. *Id*.

Similarly, here, FAA's cumulative analysis is flawed because it assumes there would be no cumulative noise impact based on the EIS's conclusion that the Project's construction noise impacts, standing alone, will not be significant. 1-PER-248. Further, as in *Northern Plains*, the EIS fails to analyze the Project's construction noise impacts in combination with noise impacts from existing operations, including existing aircraft operations, which *will occur simultaneously*. 1-PER-207, 1-PER-217 ("construction and demolition activities would overlap with operations"), 5-PER-1048. Sensitive land uses will experience noise from existing airport operations *plus* construction activities for at least six years, for six days a week and eight hours per day. 1-PER-207–09, 1-PER-207, 1-PER-217, 5-PER-1048. The cumulative impacts of these activities must be addressed in a revised and recirculated EIS. *See* § 1508.25(a)(2), (c).

In addition to failing to analyze cumulative noise impacts, FAA did not adequately respond to noise-related concerns when commenters identified the failure—providing *no response* to the City's comments that the DEIS's cumulative noise impact was inadequate. 2-PER-497 (Response 37). This failure to respond violates NEPA. *Compare Nw. Ecosystem All.*, 475 F.3d at 1140 (agency must provide a "reasonable basis" for excluding analysis).

In sum, FAA's unsupported conclusion that cumulative noise impacts "cannot result" from the Project fails to satisfy NEPA's hard-look standard.

### C.    The EIS fails to take a hard look at the Project's cumulative noise impacts on public health.

NEPA requires the EIS to assess the Project's human health impacts. *See* 42 U.S.C. §§ 4331, 4332. Although the EIS purports to evaluate health impacts, the EIS includes *no* analysis of whether the Project's cumulative noise levels will cause significant health impacts to people who live and work near the Airport. Loud noises cause significant, and sometimes irreversible, health problems. 3-PER-554–57. Impacts include hearing loss, increased blood pressure and heart rate, sleeping problems (even after the noise stops), and impaired prenatal development. *Id*. Loud noises can also lead to unsafe working conditions, making it harder for workers to pay attention or to hear warning signals or equipment problems. 3-PER-

557. These are life-altering effects,[6] and those living and working near the Airport already suffer from them. *See*, *e.g.*, 4-PER-909, 4-PER-932–34. The EIS's failure to analyze these impacts violates the hard-look obligation. *See Hausrath v. U.S. Air Force*, 491 F.Supp.3d 770, 792–93 (D. Idaho Oct. 1, 2020), *appeal dismissed sub nom. Hausrath v. U.S. Air Force*, No. 20-36036, 2021 WL 2207189 (9th Cir. Jan. 28, 2021) (NEPA document inadequate where agency did not "conduct any analysis of the project's effects upon sleep disturbance" and inadequately analyzed the impact of repeated noise-producing actions on speech disturbance).

### D. The EIS fails to take a hard look at environmental justice concerns by using an overbroad study area and mispresenting the percentage of residents of color who are, and will continue to be, disproportionately impacted.

The EIS fails to take a hard look at the environmental justice impacts associated with demolishing the existing terminal and constructing a new terminal adjacent to predominately low-income residents of color living near the Airport,

---

[6] The Quiet Communities Act of 2019 was passed to reestablish the Office of Noise Abatement and Control in response to concerns over the extraordinary number of Americans experiencing hearing loss and impairments "at least partially attributable to damage exposure from noise," including "aircraft, vehicular traffic, and a variety of other sources …." Quiet Communities Act of 2019, H.R. 3001, 116th Cong. § 1 (2019). "Chronic exposure to noise has been linked to increased risk of cardiovascular disorders, learning deficits in children, stress, and diminished quality of life…[e]xcessive noise leading to sleep deprivation and task interruptions can result in untold costs on society in diminished worker productivity." *Id.*; *see also* 42 U.S.C. § 4913(c)(1).

discussed in detail below. As a threshold matter, the City first addresses this Court's ability to review the EIS's environmental justice analysis.

Executive Order 12898, as amended, 59 F.R. 7629 (1994), requires "[t]o the greatest extent practicable and permitted by law, ... each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations[.]" Exec. Order No. 12898 § 1–101, 59 Fed. Reg. 7629 (1994); 3-PER-560–63.

Although Executive Order 12898 does not address NEPA or create a private right of action, *Morongo Band of Mission Indians v. Fed. Aviation Admin,* 161 F.3d 569, 575 (9th Cir. 1998), this Court should review the EIS's environmental justice analysis as part of its review of FAA's compliance with the APA and NEPA. Such review is consistent with the holdings of other circuits, which have reviewed environmental justice studies under the arbitrary and capricious standard where the agency undertook the study as part of its NEPA review. *See*, *e.g.*, *Latin Americans for Social and Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014) ("In this case, the environmental justice study undertaken by the FHWA was part of the NEPA analysis and part of the AR."); *Communities Against Runway Expansion, Inc. v. Fed. Air Admin.*, 355 F.3d 678,

689 (D.C. Cir. 2004) (an environmental justice claim is "properly before [the] court because it arises under NEPA and the APA, rather than [Executive Order 12898]" as the agency "exercised its discretion to include the environmental justice analysis in its NEPA evaluation"); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006) (reviewing environmental justice study as part of administrative record subject to arbitrary and capricious review in NEPA record).

Likewise, here, FAA undertook an environmental justice study in the EIS, 1-PER-153, 1-PER-244–46, and its own orders and guidance specify that FAA should evaluate environmental justice impacts under NEPA. 5-PER-1123, 5-PER-1131, 5-PER-1257–63, 5-PER-1270, 6-PER-1295, 6-PER-1297. On other words, FAA opened the door to judicial review. Thus, the Court should review the EIS's environmental justice analysis as part of the Court's review of FAA's NEPA compliance under the APA.

Such review will reveal the EIS's environmental justice analysis is inadequate because it is based on the EIS's flawed noise and health impact analyses. 1-PER-244–45. *See Hausrath*, 491 F.Supp. 3d at 795 (an "[environmental justice] conclusion lacks sufficient support in the record" when it relies on a flawed "noise impact analysis"). Furthermore, as demonstrated below, the EIS fails to take a hard look at environmental justice impacts by arbitrarily and capriciously defining the study area so broadly that disparate localized impacts,

such as construction noise and health impacts, are not captured; and the percentage of residents who identify as persons of color and who may be impacted by the Project is diluted. The Court should therefore vacate and remand the EIS so that FAA may properly consider these impacts.

### 1. *The EIS's environmental justice study area is unreasonably broad.*

FAA's Desk Reference provides that when assessing environmental justice impacts, FAA should evaluate impacts to populations consisting primarily of "minority and low-income populations located within the identified study area." 5-PER-1260. The most common significance threshold, and the one applied by FAA, asks whether the federal action will "cause disproportionately high and adverse effects on low-income or minority populations," 5-PER-1261, where a

> [d]isproportionately high and adverse effect on minority and low-income populations means an adverse effect that:
>
> 1. Is predominately borne by a minority population and/or a low-income population; or
>
> 2. Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the non-minority population and/or non-low-income population[.]

5-PER-1262 (formatting added); *see also* 5-PER-1131.

To ensure the assessment captures the relevant demographic data, the Desk Reference requires FAA to accurately define the "affected geographic area or areas

(i.e., the study area)." 5-PER-1230. Importantly, the affected area "varies based on the impact category being analyzed." *Id*. The affected area "may be larger (or smaller)," depending on which resource category is being analyzed and the area's "unique conditions." 3-PER-614, 3-PER-608–12 (from "Promising Practices for EJ Methodologies in NEPA Review" prepared by the "Federal Interagency Working Group on Environmental Justice & NEPA Committee," including DOT). For instance, air emissions widely disperse, so the affected area for air quality impacts can be relatively broad. *See* 2-PER-461, 2-PER-464, 5-PER-1273. In contrast, noise, and its associated health impacts, are localized around the noise's source. *See* 1-PER-238. Thus, agencies typically assess noise impacts on *nearby* sensitive receptors. *See*, *e.g.*, 2-PER-490–92, 3-PER-535, 1-PER-232.

This approach reflects NEPA's requirement that "the significance of an action [] be analyzed in several contexts such as...the affected region...and the locality." 40 C.F.R. § 1508.27(a). The EIS does not do those things here.

Instead, the EIS assesses the Project's environmental justice impacts for *all* environmental categories using the same, large study area. The EIS first identifies the "General Study Area" ("a larger geographic area where the 'indirect' impacts could occur"), and then expands that area by a half a mile or more to include the entirety of the 26 census tracts, rather than only the portions of the census tracts potentially affected by construction and cumulative noise and health impacts. 1-

PER-176, 1-PER-245, 2-PER-437, 2-PER-493. This enhanced study area greatly

exceeds the boundaries of the 65 dB CNEL aircraft noise contour used by the EIS

to assess noise impacts, thereby improperly diffusing the potential impacts to

minority populations near the Airport. *See* 1-PER-171, 1-PER-176, 2-PER-437.

   FAA's unreasonable use of this enhanced study area produced inaccurate

results, particularly for construction noise and associated health impacts. As the

D.C. Circuit explained, "[a] comparison population based on a larger geographic

area could reasonably be rejected because significant noise impacts are limited to

the vicinity of the airport." *Communities Against Runway Expansion, Inc. v. Fed.

Air Admin.*, 355 F.3d at 689.[7] "To take the required 'hard look' at a proposed

project's effects, an agency may not rely on incorrect assumptions or data in an

EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir.

2005) (citing 40 C.F.R. § 1500.1(b)).

   By reviewing a large geographic area that did not accurately represent the

"affected region" in the context of the "locality," 40 C.F.R. § 1508.27(a), FAA

unreasonably watered down the Project's potential noise and related-health impacts

on environmental justice communities. FAA thus defied the hard-look standard,

---

[7] In the *Communities Against Runway Expansion* case, FAA argued that examining a smaller geographic area for environmental justice was necessary to ensure that "the population that otherwise might conceivably be affected by noise from the airport" was properly evaluated. 355 F.3d at 689. Thus, the area of potential affect for noise should be limited to the vicinity of the noise source.

which required FAA to assess the "the actual impact" of the Project. *Earth Island II*, 442 F.3d at 1172.

## 2. *The EIS mispresents the percentage of impacted populations of color.*

The EIS also misrepresents the percentage of people of color that would be impacted by Project-related and cumulative noises. As explained above, FAA's environmental justice analysis was based on the entirety of 26 census tracts—tracts which exceed the boundaries of the EIS's already expansive General Study Area. 1-PER-176, 1-PER-157. To assess environmental justice impacts, the EIS first identifies the percentage of "minority" populations in these tracts. Then, the EIS appears to use a 50 percent threshold to establish whether a given significant impact would be disproportionately borne by those populations. 1-PER-245. That is, the EIS defines a "significant impact[]" as one that would disproportionately affect a minority population where that population represents 50 percent or more of the total population of a census tract. *Id*.

This approach fails for two reasons. First, the EIS's use of population data for entire census tracts, versus the smaller block groups that comprise those tracts, misrepresents the makeup of the communities nearest the Airport that are most likely to be exposed to the Project's localized impacts like construction noise. Second, the EIS vastly underestimates the percentages of residents of color within the census tracts, resulting in a meaningless analysis.

63

a. The EIS misrepresents the racial and income makeup of communities near the airport by using census tracts, rather than block groups.

To accurately determine which populations are likely to experience the Project's localized impacts (e.g., noise impacts), FAA should have based its analysis on the individual block group data nearest to the Airport. *See* 2-PER-437–38. A "block group" is defined as "subdivisions...which split the [census] tract into a smaller geographical area." 1-PER-175; *see, e.g., Young v. Gen. Servs. Admin.*, 99 F.Supp. 2d 59, 84 n.28 (D.D.C. 2000), *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000) (identifying environmental justice communities by block group).

Census tracts regularly consist of two or more block groups, 1-PER-174–75, which ordinarily vary in demographic makeup based on neighborhood lines, 1-PER-174. Neighborhoods immediately adjacent to airports often house a far higher percentage of low-income residents and residents of color than ones farther from airports, even though both low-income/of color and wealthier/non-Hispanic white populations may exist in the same overall census tract. *See Cntr. for Cmty. Action*, 18 F.4th at 614 (Rawlinson, J.B., dissenting).[8] As shown in City comments on the

---

[8] The dissent in *Center for Community Action & Environmental Justice*, discusses the wide-ranging and devastating social and health implications associated with disproportionally high and adverse impacts on minority populations. In that case, Justice Rawlinson tailored his critique to air quality impacts on populations surrounding the San Bernardino Airport, but the premise applies to noise and noise-related health impacts on these same populations surrounding the Airport,

DEIS, this trend exists in the areas surrounding the Airport. *See* 2-PER-441.[9]

Rather than using block-group data, the EIS instead aggregates the City's racially and economically dissimilar block groups by census tract and averages their minority and low-income populations. *See* 1-PER-192–94, 1-PER-245, 2-PER-493. In doing so, the EIS unreasonably underestimates the percentage of potentially impacted minority, and likely, low-income residents. *Id*. By failing to provide definitive information identifying the impacted minority population (or to explain why such information cannot be provided), the EIS fails to take a hard look at the disproportionate impacts to the minority and low-income populations. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994 (a hard look requires an agency to provide "'justification regarding why more definitive information could not be provided'") (internal citation omitted)).

Notably, moreover, although FAA failed to undertake environmental justice analysis using block-group data, it possessed this data. 4-PER-904–05.[10] And, that

---

*see* Sections B.1-B.3. In that case, as here, FAA "must do better." 18 F.4th at p. 622.

[9] FAA additionally should have, but did not, factor the City's understanding of its own population makeup into the EIS's environmental justice analysis. *See* 3-PER-623 (FAA advocating consultation with "local" agencies "regarding the social impacts of the proposed action"), 3-PER-631–32 (FAA advocating using "local knowledge" to supplement other screening methods).

[10] FAA's environmental justice data was not provided in the DEIS or FEIS or publicly available technical reports. *Compare Northern Plains*, 688 F.3d at 1083 ("NEPA requires that the agency provide the data on which it bases its

data is compelling. *Id.* As an example, Census Tract 3105.01, located immediately east of the existing terminal where years of demolition and construction activity will occur, consists of three block groups. 1-PER-174, 1-PER-176. The EIS reports the minority population for Census Tract 3105.01 as 45.5 percent—just below the EIS's 50 percent threshold. 1-PER-193. But the data shows that Block Group 3 of Census Tract 3105.01 has a minority population of 54.1 percent—*exceeding* the EIS's 50 percent threshold. *See* 4-PER-904–05. By aggregating and averaging block group data for Census Tract 3105.01, the EIS obscures this critical information, which might show that—contrary to the EIS's conclusion—there are environmental justice populations that will be disproportionately impacted by the Project's construction.

The EPA recognizes the importance of this granular analysis. In its *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis*, referenced in the EIS's environmental justice methodology, 1-PER-245, EPA states that "extensive differences in effects among population groups of concern may occur in only a few geographic locations" and recommends federal agencies

environmental analysis."). Further, the links to online sources cited in the EIS in support of the environmental justice analysis were defunct and rendered no useful information. 2-PER-438, 2-PER-495. Thus, neither the City nor the public was afforded the opportunity to comment on FAA's data or verify its accuracy prior to issuance of the ROD. Only when the City received the administrative record was it able to review FAA's data, which includes the information necessary to perform a block-group analysis. 4-PER-904–05.

identify those locations to "tailor the analysis to evaluate impacts in a few specific areas." 5-PER-1074. Further, "appropriate sources of data and analytic techniques [for these areas]…*may differ from those used for a broader analysis*." *Id.* (emphasis added).

In contradiction of EPA's guidance and "Current Best Practices," however, the EIS fails to "[c]arefully select and justify the choice of the geographic unit of analysis and discuss any particular challenges or aggregation issues related to the choice of spatial scale[.]" 5-PER-1075. Likewise, the EIS fails to "[d]isaggregat[e] data to reveal important spatial differences." *Id*.

The EIS also ignores other EPA environmental justice best practices, including "[d]iscuss[ing] available evidence on factors that may make population groups of concern more vulnerable to adverse effects (e.g., ... cumulative exposure from multiple stressors...)," distinguishing characteristics of populations with a higher percentage of vulnerable persons, and discussing "the severity and nature of the health consequences" for these more vulnerable groups. 5-PER-1075. Without these considerations, the EIS's analysis is incomplete. *See Hausrath*, 491 F.Supp. 3d at 795 (NEPA document should "consider that low-income and minority residents may be more susceptible to adverse noise impacts than the general population. For example, such communities may reside in inadequate housing, or lack housing at all, thus experiencing greater noise impacts"); *see also* 3-PER-608,

3-PER-614 (explaining agencies should "consider identifying and describing any unique conditions of the potentially affected minority populations," including "human health vulnerabilities" and "socioeconomic vulnerabilities").

The EIS "cannot discount the localized impacts to people for whom the public health impacts are of clear significance." *Cal. v. Bernhardt*, 472 F.Supp. 3d 573, 622 (N.D. Cal. 2020), *appeal filed, Cal. Air Resources Board v. American Petroleum Inst., 20-16891*[11]; *see also Anderson v. Evans*, 371 F.3d 475, 490 (9th Cir. 2004) ("local effects are a basis for a finding that there will be a significant impact…"). This is particularly true where, as here, the agency possessed the information and tools needed to assess these localized impacts and failed to conduct that analysis. *Id*. at 621–22. If FAA is to meet its legal obligation to demonstrate that the Project will not disproportionately impact minority populations, it must take a hard look at the appropriately disaggregated data. *See Bark*, 958 F.3d at 869.

---

[11] This case is on appeal in this Court and therefore is not settled law. However, it addresses localized impacts on minority populations in a manner that may be useful. In *California v. Bernhardt*, the court admonishes the BLM for failing to assess air emission impacts on low-income tribal communities known to populate areas surrounding oil and gas production wells. The City argues the same principle here for noise impacts on minority populations surrounding the Airport.

b.    The EIS's environmental justice analysis underestimates the percentages of racial and ethnic populations and low-income populations that will be affected by the Project.

The EIS's environmental justice analysis also presents remarkably smaller percentages of minority and low-income populations than likely actually exist. The percentage of minority populations reported in the EIS do not comport with the City's knowledge of the City neighborhoods surrounding the Airport nor with common knowledge that municipal airports are regularly surrounded by low-income communities of color (discussed above). *See* 2-PER-441.

As part of its comments on the DEIS, the City endeavored to replicate FAA's calculations to understand *how* FAA could have arrived at such implausible numbers. 2-PER-438–41, 3-PER-638–40. Unfortunately, FAA did not show its work, making replication of FAA's calculations impossible. 1-PER-244–46, 2-PER-438, 2-PER-441. For example, URL sources cited in the DEIS that *should have* provided statistics instead led to defunct and convoluted webpages. 2-PER-438, 2-PER-495. The DEIS also excluded any statistics or raw data used for calculating minority population percentages. 2-PER-438.

Consequently, the City employed EJSCREEN[12] to determine minority populations in the 10 census tracts abutting the Airport, and it arrived at

_____

[12] EJSCREEN, created by the EPA and currently endorsed by FAA, is a widely used environmental justice mapping and screening tool. 3-PER-632, 2-PER-438, 5-PER-1077.

staggeringly different results than reported in the EIS. 2-PER-438–41, 3-PER-638–40. The City's use of EJSCREEN is timely because FAA's current (2020) Desk Reference *recommends* using EJSCREEN to identify and calculate the percentages of environmental justice communities that may be affected by a federal action. 3-PER-632. Presumably, FAA would not recommend a flawed analytical tool.

For Census Tract 3105.01, used in the example above, EJSCREEN showed an average minority population of 72.4 percent, *more than 25 percentage points higher* than the EIS's estimate of 45.5 percent. 2-PER-439–40. Moreover, for Block Group 3 in Census Tract 3105.01, where the EIS showed a minority population of 54.1 percent, EJSCREEN showed this percentage to be 71.2 percent.[13] EJSCREEN produced elevated minority-population data for nearly all of the other adjacent census tracts and their block groups, with some minority populations exceeding 90 percent in the same locations where the EIS found these same tracts averaging below the 50 percent threshold. 2-PER-440–41.

The differences in this data, derived using a tool currently endorsed by the FAA, and the EIS's data are astonishing. "No deference to agency discretion as to

_____

[13] This percentage derives from data included in the table on pages 16 and 17 of the City's comment letter on the DEIS. 2-PER-439–40. The City obtained this data directly from EJSCREEN. *See, e.g.*, 3-PER-639–40 (screenshot of data obtained from EJSCREEN's mapping tool for one sample census tract). Please note that, in this table, the City inadvertently transposed the column headings for minority populations and total populations. Thus, the column labeled "Minority Population per EJSCREEN" is actually "Total Populations per EJSCREEN," and vice versa.

methodology is appropriate when the agency ignores its own statistical methodology." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007).

<blockquote>
c.     <u>FAA did not adequately respond to the City's EJSCREEN analysis.</u>
</blockquote>

Significantly, not only is the EIS's environmental justice analysis defective, FAA failed to adequately respond to the City's EJSCREEN analysis, an analysis that dramatically conflicts with the EIS's estimates. 2-PER-495. NEPA regulations require agencies to discuss "all major points of view" regarding a project's potential impacts. *See* 40 C.F.R. § 1502.9(a) ("The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."); *id.* § 1502.9(b) ("The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.").

Here, rather than consider and discuss the City's analysis, FAA responded only that its *2015* Desk Reference "does not identify EJSCREEN as an acceptable source of information." 2-PER-495. That may be so, but NEPA still requires FAA to ***explain*** the *astounding* difference in results. FAA's failure to do so squarely violated FAA's procedural duty under NEPA to "acknowledge and respond to comments by outside parties that raise significant scientific uncertainties and

reasonably support that such uncertainties exist." *Lands Council*, 537 F.3d at 1001;

*see also Cntr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167–

68 (9th Cir. 2003) (holding that where commenters' evidence and opinions directly

challenge the EIS's scientific basis, agency is required to disclose and respond to

such viewpoints in the final EIS); *Earth Island I*, 351 F.3d at 1301 (agencies must

take a "hard look at the issues and respond to reasonable opposing viewpoints");

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l. Marine Fisheries Serv*, 482

F.Supp.2d 1248, 1255 (W.D. Wash. 2007) ("The agency must not only recite

dissenting opinions, it must 'analyze,' 'respond to' and 'discuss' them."). And, as

explained above, FAA cannot use its Desk Reference as an excuse to limit is

NEPA-required analysis. *Ctr. for Comty. Action*, 18 F.4th at 599.

     Here, FAA was presented with conflicting data obtained using a

methodology *that it currently endorses* yet provided no reasonable explanation for

the discrepancy. *Nw. Ecosystem All.*, 475 F.3d at 1140 (requiring a reasonable

basis for agency conclusions). It is impossible to make "meaningful statements

regarding actual impact[s]" with inaccurate data. *Earth Island II*, 442 F.3d at 1172.

By failing to discuss the City's analysis and to explain why FAA instead chose to

rely on the EIS's (outdated) analysis, FAA violated its procedural duties under

NEPA and the NEPA regulations. 40 C.F.R. §§ 1502.9(b), (c).

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, the City respectfully requests that the Court: (i) find FAA's May, 21, 2021, joint FEIS and ROD arbitrary and capricious, in violation of the APA and NEPA; (ii) vacate and remand the joint FEIS and ROD; and (iii) require FAA to take appropriate action to evaluate a reasonable range of alternatives to the Project and take a hard look at noise (including cumulative noise), health, and environmental justice impacts of the Project and its alternatives and to reconstruct its environmental justice analysis using accurate data, or provide credible support for its findings.

Respectfully submitted,

Dated: January 25, 2022

By: /s/ *Andrea K. Leisy*
ANDREA K. LEISY
LAURA M. HARRIS
CASEY A. SHORROCK
REMY MOOSE MANLEY, LLP
555 Capitol Mall, Suite 800
Sacramento, CA 95814
Tel.: (916) 443-2745
Fax: (916) 443-9017
aleisy@rmmenvirolaw.com
lharris@rmmenvirolaw.com
cshorrock@rmmenvirolaw.com

By: /s/ *Robert M. Mahlowitz*

MICHAEL N. FEUER
ROBERT M. MAHLOWITZ
LOS ANGELES ATTORNEY'S OFFICE
200 North Mains Street, 8th Floor
Tel.: (213) 978-7100
Fax: (213) 978-8090
mike.n.feuer@lacity.org
robert.mahlowitz@lacity.org

Attorneys for Petitioner
CITY OF LOS ANGELES, CALIFORNIA

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   | 21-71170 |

I am the attorney or self-represented party.

**This brief contains**   | 13,831 |   **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
    - ○ it is a joint brief submitted by separately represented parties;
    - ○ a party or parties are filing a single brief in response to multiple briefs; or
    - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated |        |.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  | /s/ Andrea K. Leisy |   **Date** | Jan 25, 2022 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                      *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on this 25th day of January, 2022.

All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

| | |
|---|---|
| Justin D. Heminger<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>Appellate Section<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530<br>justin.heminger@usdoj.gov<br>efile_app.enrd@usdoj.gov | Respondents<br>*United States Federal Aviation Administration, Stephen M. Dickson, United States Department of Transportation, and Peter P. Buttigieg*<br><br>**VIA ECF/E-SERVICE** |
| Ginetta L. Giovinco<br>Chelsea E. O'Sullivan<br>RICHARDS, WATSON & GERSHON<br>350 South Grand Avenue, 37th Floor<br>Los Angeles, CA 90071<br>ggiovinco@rwglaw.com<br>psaunders@rwglaw.com<br>co'sullivan@rwglaw.com<br><br>Thomas A. Ryan<br>Jessica J. Thomas<br>MCDERMOTT, WILL & EMERY, LLP<br>3049 Century Park East, Suite 3200<br>Los Angeles, CA 90067<br>tryan@mwe.co<br>swoods@mwe.com<br>jthomas@mwe.com<br>bsommars@mwe.com | Real Party in Interest and Respondent<br>*Burbank-Glendale-Pasadena Airport Authority*<br><br>**VIA ECF/E-SERVICE** |

/s/ *Kathryn A. Ramirez*
KATHRYN A. RAMIREZ

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### CITY OF LOS ANGELES, CALIFORNIA
*Petitioner,*

v.

### UNITED STATES FEDERAL AVIATION ADMINISTRATION and STEPHEN M. DICKSON, in his official capacity as Administrator; UNITED STATES DEPARTMENT OF TRANSPORTATION and PETER P. BUTTIGIEG, in his official capacity as Secretary,
*Respondents,*

### BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY
*Real Party in Interest and Respondent.*

---

### ADDENDUM TO PETITIONER'S OPENING BRIEF

---

| | |
|---|---|
| MICHAEL N. FEUER, SBN 111529<br>City Attorney<br>ROBERT M. MAHLOWITZ, SBN 160125<br>Deputy City Attorney<br>LOS ANGELES CITY ATTORNEY'S OFFICE<br>200 North Main Street, 8th Floor<br>Los Angeles, CA 90012<br>Telephone: (213) 978-7100<br>Facsimile: (213) 978-8090<br>Email: mike.n.feuer@lacity.org<br>     robert.mahlowitz@lacity.org | ANDREA K. LEISY, SBN 206681<br>LAURA M. HARRIS, SBN 246064<br>CASEY A. SHORROCK, SBN 328414<br>REMY MOOSE MANLEY, LLP<br>555 Capitol Mall, Suite 800<br>Sacramento, CA 95814<br>Telephone: (916) 443-2745<br>Facsimile: (916) 443-9017<br>Email: aleisy@rmmenvirolaw.com<br>     lharris@rmmenvirolaw.com<br>     cshorrock@rmmenvirolaw.com |

Attorneys for Petitioner
CITY OF LOS ANGELES, CALIFORNIA

# ADDENDUM
# TABLE OF CONTENTS

## Statutes

5 U.S.C. § 706(2)(A) ........................................................................ A004

42 U.S.C. § 4321 ............................................................................. A005

42 U.S.C. § 4331 ............................................................................. A006

42 U.S.C. § 4332 ............................................................................. A008

42 U.S.C. § 4370m-6(a) ................................................................... A013

42 U.S.C. § 4913(c)(1) ..................................................................... A015

49 U.S.C. § 46110 ........................................................................... A017

## Regulations

14 C.F.R. § Pt. 150, App. A .............................................................. A020

40 C.F.R. § 1502.2(g) ...................................................................... A031

40 C.F.R. §§ 1502.9(a), (b) .............................................................. A033

40 C.F.R. § 1502.13 ........................................................................ A034

40 C.F.R. § 1502.14 ........................................................................ A034

40 C.F.R. § 1502.16(c) .................................................................... A034

40 C.F.R. § 1502.22(b)(4) ................................................................ A036

40 C.F.R. § 1506.2(d) ...................................................................... A037

40 C.F.R. § 1508.7 .......................................................................... A038

40 C.F.R. §§ 1508.25(a)(2), (c) ........................................................ A039

40 C.F.R. § 1508.27(a) .................................................................... A040

## Other Authorities

Executive Order 12898 ................................................................... A042

H.R. 3001, 116th Cong. § 1 (2019) ................................................. A046

FAA 2015 Order 1050.1F See Petitioner's Excerpts of Record (PER)5:1090–1221[1]

FAA 2015 Order 1050.1F Desk Reference (excerpt) ............ See PER5:1222–1298

FAA Order 2006 5050.4B (excerpt) ...................................... See PER6:1276–1298

---

[1] FAA Orders and Desk Reference were included in FAA's administrative record and are therefore included in the PER. They are listed here for the Court's information.



# STATUTES

| United States Code Annotated |
| Title 5. Government Organization and Employees (Refs & Annos) |
| Part I. The Agencies Generally |
| Chapter 7. Judicial Review (Refs & Annos) |

5 U.S.C.A. § 706

# § 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 55. National Environmental Policy (Refs & Annos) |

42 U.S.C.A. § 4321

# § 4321. Congressional declaration of purpose

Currentness

<For Executive Order No. 13990, "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis" (revoking permit for Keystone XL Pipeline), see Executive Order No. 13990, January 20, 2021, 86 F.R. 7037.>

<For Executive Order No. 14008, "Tackling the Climate Crisis at Home and Abroad", see Executive Order No. 14008, January 27, 2021, 86 F.R. 7619.>

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**CREDIT(S)**

(Pub.L. 91-190, § 2, Jan. 1, 1970, 83 Stat. 852.)

**REORGANIZATION PLANS**

**Reorganization Plan No. 3 of 1970**

<Eff. Dec. 2, 1970, 35 F.R. 15623, 84 Stat. 2086, as amended Aug. 23, 1983, Pub.L. 98-80, § 2(a)(2), (b)(2), (c)(2)(C), 97 Stat. 485, 486.>

**Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, July 9, 1970, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code [5 U.S.C.A. § 901 et seq.]**

**Environmental Protection Agency**

A005

| United States Code Annotated |
| --- |
| Title 42. The Public Health and Welfare |
| Chapter 55. National Environmental Policy (Refs & Annos) |
| Subchapter I. Policies and Goals (Refs & Annos) |

42 U.S.C.A. § 4331

§ 4331. Congressional declaration of national environmental policy

Currentness

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may--

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(**5**) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(**6**) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(**c**) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

## CREDIT(S)

(Pub.L. 91-190, Title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out as a note under this section.

### EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, set out as a note under this section, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

Notes of Decisions (44)

42 U.S.C.A. § 4331, 42 USCA § 4331
Current through P.L. 117-80.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 55. National Environmental Policy (Refs & Annos) |
| Subchapter I. Policies and Goals (Refs & Annos) |

42 U.S.C.A. § 4332

## § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

Currentness

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** the environmental impact of the proposed action,

**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)** alternatives to the proposed action,

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)** recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign

policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(I)** assist the Council on Environmental Quality established by subchapter II of this chapter.

## CREDIT(S)

(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 13352

<Aug. 26, 2004, 69 F.R. 52989>

### Facilitation of Cooperative Conservation

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Purpose.** The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

**Sec. 2. Definition.** As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

**Sec. 3. Federal Activities.** To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the

availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

**Sec. 4. White House Conference on Cooperative Conservation.** The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

**Sec. 5. General Provision.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

George W. Bush

Notes of Decisions (5111)

Footnotes

**A011**

[1]

So in original. The period probably should be a semicolon.

42 U.S.C.A. § 4332, 42 USCA § 4332
Current through P.L. 117-80.

**End of Document**                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**A012**

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 55. National Environmental Policy (Refs & Annos) |
| Subchapter IV. Federal Permitting Improvement (Refs & Annos) |

42 U.S.C.A. § 4370m-6

§ 4370m-6. Litigation, judicial review, and savings provision

Effective: November 15, 2021

Currentness

**(a) Limitations on claims**

**(1) In general**

Notwithstanding any other provision of law, a claim arising under Federal law seeking judicial review of any authorization issued by a Federal agency for a covered project shall be barred unless--

**(A)** the claim is filed not later than 2 years after the date of publication in the Federal Register of notice of final agency action on the authorization, unless a shorter time is specified in the Federal law under which judicial review is allowed; and

**(B)** in the case of an action pertaining to an environmental review conducted under NEPA--

**(i)** the claim is filed by a party that submitted a comment during the environmental review; and

**(ii)** any commenter filed a sufficiently detailed comment so as to put the lead agency on notice of the issue on which the party seeks judicial review, or the lead agency did not provide a reasonable opportunity for such a comment on that issue.

**(2) New information**

A013

**(A) In general**

The head of a lead agency or participating agency shall consider new information received after the close of a comment period if the information satisfies the requirements under regulations implementing NEPA.

**(B) Separate action**

If Federal law requires the preparation of a supplemental environmental impact statement or other supplemental environmental document, the preparation of such document shall be considered a separate final agency action and the deadline for filing a claim for judicial review of the agency action shall be 2 years after the date on which a notice announcing the final agency action is published in the Federal Register, unless a shorter time is specified in the Federal law under which judicial review is allowed.

**(3) Rule of construction**

Nothing in this subsection creates a right to judicial review or places any limit on filing a claim that a person has violated the terms of an authorization.

**(b) Preliminary injunctive relief**

In addition to considering any other applicable equitable factors, in any action seeking a temporary restraining order or preliminary injunction against an agency or a project sponsor in connection with review or authorization of a covered project, the court shall--

**(1)** consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and

**(2)** not presume that the harms described in paragraph (1) are reparable.

**(c) Judicial review**

Except as provided in subsection (a), nothing in this subchapter affects the reviewability of any final Federal agency action in a court of competent jurisdiction.

**A014**

| United States Code Annotated |
| Title 42. The Public Health and Welfare |
| Chapter 65. Noise Control (Refs & Annos) |

42 U.S.C.A. § 4913

## § 4913. Quiet communities, research, and public information

Currentness

To promote the development of effective State and local noise control programs, to provide an adequate Federal noise control research program designed to meet the objectives of this chapter, and to otherwise carry out the policy of this chapter, the Administrator shall, in cooperation with other Federal agencies and through the use of grants, contracts, and direct Federal actions--

**(a)** develop and disseminate information and educational materials to all segments of the public on the public health and other effects of noise and the most effective means for noise control, through the use of materials for school curricula, volunteer organizations, radio and television programs, publication, and other means;

**(b)** conduct or finance research directly or with any public or private organization or any person on the effects, measurement, and control of noise, including but not limited to--

**(1)** investigation of the psychological and physiological effects of noise on humans and the effects of noise on domestic animals, wildlife, and property, and the determination of dose/response relationships suitable for use in decisionmaking, with special emphasis on the nonauditory effects of noise;

**(2)** investigation, development, and demonstration of noise control technology for products subject to possible regulation under sections 4905 and 4907 of this title and section 44715 of Title 49;

**(3)** investigation, development, and demonstration of monitoring equipment and other technology especially suited for use by State and local noise control programs;

**(4)** investigation of the economic impact of noise on property and human activities; and

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(5)** investigation and demonstration of the use of economic incentives (including emission charges) in the control of noise;

**(c)** administer a nationwide Quiet Communities Program which shall include, but not be limited to--

**(1)** grants to States, local governments, and authorized regional planning agencies for the purpose of--

**(A)** identifying and determining the nature and extent of the noise problem within the subject jurisdiction;

**(B)** planning, developing, and establishing a noise control capacity in such jurisdiction, including purchasing initial equipment;

**(C)** developing abatement plans for areas around major transportation facilities (including airports, highways, and rail yards) and other major stationary sources of noise, and, where appropriate, for the facility or source itself; and,

**(D)** evaluating techniques for controlling noise (including institutional arrangements) and demonstrating the best available techniques in such jurisdiction;

**(2)** purchase of monitoring and other equipment for loan to State and local noise control programs to meet special needs or assist in the beginning implementation of a noise control program or project;

**(3)** development and implementation of a quality assurance program for equipment and monitoring procedures of State and local noise control programs to help communities assure that their data collection activities are accurate;

**(4)** conduct of studies and demonstrations to determine the resource and personnel needs of States and local governments required for the establishment and implementation of effective noise abatement and control programs; and

**(5)** development of education and training materials and programs, including national and regional workshops, to support State and local noise abatement and control programs;

except that no actions, plans or programs hereunder shall be inconsistent with existing Federal authority under this chapter to regulate sources of noise in interstate commerce;

**A016**

| United States Code Annotated |
| Title 49. Transportation (Refs & Annos) |
| Subtitle VII. Aviation Programs |
| Part A. Air Commerce and Safety (Refs & Annos) |
| Subpart IV. Enforcement and Penalties (Refs & Annos) |
| Chapter 461. Investigations and Proceedings |

49 U.S.C.A. § 46110

§ 46110. Judicial review

Effective: October 5, 2018

Currentness

**(a) Filing and venue.**--Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

**(b) Judicial procedures.**--When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, as appropriate. The Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

**(c) Authority of court.**--When the petition is sent to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration to conduct further proceedings. After reasonable notice to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, if supported by substantial evidence, are conclusive.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(d) Requirement for prior objection.**--In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration only if the objection was made in the proceeding conducted by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration or if there was a reasonable ground for not making the objection in the proceeding.

**(e) Supreme Court review.**--A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

## CREDIT(S)

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1230; Pub.L. 107-71, Title I, § 140(b)(1), (2), Nov. 19, 2001, 115 Stat. 641; Pub.L. 108-176, Title II, § 228, Dec. 12, 2003, 117 Stat. 2532; Pub.L. 115-254, Div. K, Title I, § 1991(f)(1) to (4), Oct. 5, 2018, 132 Stat. 3642.)

Notes of Decisions (202)

49 U.S.C.A. § 46110, 49 USCA § 46110
Current through P.L. 117-80.

**End of Document**                                                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**A018**

# REGULATIONS

Code of Federal Regulations
  Title 14. Aeronautics and Space
    Chapter I. Federal Aviation Administration, Department of Transportation
      Subchapter I. Airports
        Part 150. Airport Noise Compatibility Planning (Refs & Annos)
                  14 C.F.R. Pt. 150, App. A

## Appendix A to Part 150—Noise Exposure Maps

Currentness

Part A—General

  Sec. A150.1 Purpose.

  Sec. A150.3 Noise descriptors.

  Sec. A150.5 Noise measurement procedures and equipment.

Part B—Noise Exposure Map Development

  Sec. A150.101 Noise contours and land usages.

  Sec. A150.103 Use of computer prediction model.

  Sec. A150.105 Identification of public agencies and planning agencies.

Part C—Mathematical Descriptions

  Sec. A150.201 General.

  Sec. A150.203 Symbols.

  Sec. A150.205 Mathematical computations.

**A020**

Part A—General

Sec. A150.1 Purpose.

(a) This appendix establishes a uniform methodology for the development and preparation of airport noise exposure maps. That methodology includes a single system of measuring noise at airports for which there is a highly reliable relationship between projected noise exposure and surveyed reactions of people to noise along with a separate single system for determining the exposure of individuals to noise. It also identifies land uses which, for the purpose of this part are considered to be compatible with various exposures of individuals to noise around airports.

(b) This appendix provides for the use of the FAA's Integrated Noise Model (INM) or an FAA approved equivalent, for developing standardized noise exposure maps and predicting noise impacts. Noise monitoring may be utilized by airport operators for data acquisition and data refinement, but is not required by this part for the development of noise exposure maps or airport noise compatibility programs. Whenever noise monitoring is used, under this part, it should be accomplished in accordance with Sec. A150.5 of this appendix.

Sec. A150.3 Noise descriptors.

(a) Airport Noise Measurement. The A–Weighted Sound Level, measured, filtered and recorded in accordance with Sec. A150.5 of this appendix, must be employed as the unit for the measurement of single event noise at airports and in the areas surrounding the airports.

(b) Airport Noise Exposure. The yearly day-night average sound level (YDNL) must be employed for the analysis and characterization of multiple aircraft noise events and for determining the cumulative exposure of individuals to noise around airports.

Sec. A150.5 Noise measurement procedures and equipment.

(a) Sound levels must be measured or analyzed with equipment having the "A" frequency weighting, filter characteristics, and the "slow response" characteristics as defined in International Electrotechnical Commission (IEC) Publication No. 179, entitled "Precision Sound Level Meters" as incorporated by reference in part 150 under § 150.11. For purposes of this part, the tolerances allowed for general purpose, type 2 sound level meters in IEU 179, are acceptable.

(b) Noise measurements and documentation must be in accordance with accepted acoustical measurement methodology, such as those described in American National Standards Institute publication ANSI 51.13, dated 1971 as revised 1979, entitled "ANS—Methods for the Measurement of Sound Pressure Levels"; ARP No. 796, dated 1969, entitled "Measurement of Aircraft Exterior Noise in the Field"; "Handbook of Noise Measurement," Ninth Ed. 1980, by Arnold P.G. Peterson; or "Acoustic Noise Measurement," dated Jan., 1979, by J.R. Hassell and K. Zaveri. For purposes of this part, measurements intended for comparison to a State or local standard or with another transportation noise source (including other aircraft) must be reported in maximum A-weighted sound levels ($L_{AM}$); for computation or validation of the yearly day-night average level ($L_{dn}$), measurements must be reported in sound exposure level ($L_{AE}$), as defined in Sec. A150.205 of this appendix.

Part B—Noise Exposure Map Development

Sec. A150.101 Noise contours and land usages.

(a) To determine the extent of the noise impact around an airport, airport proprietors developing noise exposure maps in accordance with this part must develop $L_{dn}$ contours. Continuous contours must be developed for YDNL levels of 65, 70, and 75 (additional contours may be developed and depicted when appropriate). In those areas where YDNL values are 65 YDNL or greater, the airport operator shall identify land uses and determine land use compatibility in accordance with the standards and procedures of this appendix.

(b) Table 1 of this appendix describes compatible land use information for several land uses as a function of YDNL values. The ranges of YDNL values in Table 1 reflect the statistical variability for the responses of large groups of people to noise. Any particular level might not, therefore, accurately assess an individual's perception of an actual noise environment. Compatible or noncompatible land use is determined by comparing the predicted or measured YDNL values at a site with the values given. Adjustments or modifications of the descriptions of the land-use categories may be desirable after consideration of specific local conditions.

(c) Compatibility designations in Table 1 generally refer to the major use of the site. If other uses with greater sensitivity to noise are permitted by local government at a site, a determination of compatibility must be based on that use which is most adversely affected by noise. When appropriate, noise level reduction through incorporation of sound attenuation into the design and construction of a structure may be necessary to achieve compatibility.

(d) For the purpose of compliance with this part, all land uses are considered to be compatible with noise levels less than $L_{dn}$ 65 dB. Local needs or values may dictate further delineation based on local requirements or determinations.

(e) Except as provided in (f) below, the noise exposure maps must also contain and identify:

(1) Runway locations.

(2) Flight tracks.

(3) Noise contours of $L_{dn}$ 65, 70, and 75 dB resulting from aircraft operations.

(4) Outline of the airport boundaries.

(5) Noncompatible land uses within the noise contours, including those within the $L_{dn}$ 65 dB contours. (No land use has to be identified as noncompatible if the self-generated noise from that use and/or the ambient noise from other nonaircraft and nonairport uses is equal to or greater than the noise from aircraft and airport sources.)

(6) Location of noise sensitive public buildings (such as schools, hospitals, and health care facilities), and properties on or

eligible for inclusion in the National Register of Historic Places.

(7) Locations of any aircraft noise monitoring sites utilized for data acquisition and refinement procedures.

(8) Estimates of the number of people residing within the $L_{dn}$ 65, 70, and 75 dB contours.

(9) Depiction of the required noise contours over a land use map of a sufficient scale and quality to discern streets and other identifiable geographic features.

(f) Notwithstanding any other provision of this part, noise exposure maps prepared in connection with studies which were either Federally funded or Federally approved and which commenced before October 1, 1981, are not required to be modified to contain the following items:

(1) Flight tracks depicted on the map.

(2) Use of ambient noise to determine land use compatibility.

(3) The $L_{dn}$ 70 dB noise contour and data related to $L_{dn}$ 70 dB contour. When determinations on land use compatibility using Table 1 differ between $L_{dn}$ 65–70 dB and the $L_{dn}$ 70–75 dB, determinations should either use the more conservative $L_{dn}$ 70–75 dB column or reflect determinations based on local needs and values.

(4) Estimates of the number of people residing within the $L_{dn}$ 65, 70, and 75 dB contours.

**Table 1–Land Use Compatibility° With Yearly Day-Night Average Sound Levels**

| Land use | Yearly day-night average sound level ($L_{dn}$) in decibels | | | | | |
|---|---|---|---|---|---|---|
| | Below 65 | 65-70 | 70-75 | 75-80 | 80-85 | Over 85 |
| Residential | | | | | | |
| Residential, other than mobile homes and transient lodgings.. | Y | N¹ | N¹ | N | N | N |
| Mobile home parks ................................................. | Y | N | N | N | N | N |
| Transient lodgings.................................................. | Y | N¹ | N¹ | N¹ | N | N |
| Public Use | | | | | | |
| Schools ................................................................ | Y | N¹ | N¹ | N | N | N |

| | | | | | | |
|---|---|---|---|---|---|---|
| Hospitals and nursing homes | Y | 25 | 30 | N | N | N |
| Churches, auditoriums, and concert halls | Y | 25 | 30 | N | N | N |
| Governmental services | Y | Y | 25 | 30 | N | N |
| Transportation | Y | Y | Y[2] | Y[3] | Y[4] | Y[4] |
| Parking | Y | Y | Y[2] | Y[3] | Y[4] | N |
| **Commercial Use** | | | | | | |
| Offices, business and professional | Y | Y | 25 | 30 | N | N |
| Wholesale and retail–building materials, hardware and farm equipment | Y | Y | Y[2] | Y[3] | Y[4] | N |
| Retail trade–general | Y | Y | 25 | 30 | N | N |
| Utilities | Y | Y | Y[2] | Y[3] | Y[4] | N |
| Communication | Y | Y | 25 | 30 | N | N |
| **Manufacturing and Production** | | | | | | |
| Manufacturing, general | Y | Y | Y[2] | Y[3] | Y[4] | N |
| Photographic and optical | Y | Y | 25 | 30 | N | N |
| Agriculture (except livestock) and forestry | Y | Y[6] | Y[7] | Y[8] | Y[8] | Y[8] |
| Livestock farming and breeding | Y | Y[6] | Y[7] | N | N | N |
| Mining and fishing, resource production and extraction | Y | Y | Y | Y | Y | Y |
| **Recreational** | | | | | | |
| Outdoor sports arenas and spectator sports | Y | Y[5] | Y[5] | N | N | N |
| Outdoor music shells, amphitheaters | Y | N | N | N | N | N |
| Nature exhibits and zoos | Y | Y | N | N | N | N |
| Amusements, parks, resorts and camps | Y | Y | Y | N | N | N |
| Golf courses, riding stables and water recreation | Y | Y | 25 | 30 | N | N |

Numbers in parentheses refer to notes.

**A024**

Sec. A150.103 Use of computer prediction model.

(a) The airport operator shall acquire the aviation operations data necessary to develop noise exposure contours using an FAA approved methodology or computer program, such as the Integrated Noise Model (INM) for airports or the Heliport Noise Model (HNM) for heliports. In considering approval of a methodology or computer program, key factors include the demonstrated capability to produce the required output and the public availability of the program or methodology to provide interested parties the opportunity to substantiate the results.

(b) Except as provided in paragraph (c) of this section, the following information must be obtained for input to the calculation of noise exposure contours:

(1) A map of the airport and its environs at an adequately detailed scale (not less than 1 inch to 2,000 feet) indicating runway length, alignments, landing thresholds, takeoff start-of-roll points, airport boundary, and flight tracks out to at least 30,000 feet from the end of each runway.

(2) Airport activity levels and operational data which will indicate, on an annual average-daily-basis, the number of aircraft, by type of aircraft, which utilize each flight track, in both the standard daytime (0700–2200 hours local) and nighttime (2200–0700 hours local) periods for both landings and takeoffs.

(3) For landings—glide slopes, glide slope intercept altitudes, and other pertinent information needed to establish approach profiles along with the engine power levels needed to fly that approach profile.

(4) For takeoffs—the flight profile which is the relationship of altitude to distance from start-of-roll along with the engine power levels needed to fly that takeoff profile; these data must reflect the use of noise abatement departure procedures and, if applicable, the takeoff weight of the aircraft or some proxy for weight such as stage length.

(5) Existing topographical or airspace restrictions which preclude the utilization of alternative flight tracks.

(6) The government furnished data depicting aircraft noise characteristics (if not already a part of the computer program's stored data bank).

(7) Airport elevation and average temperature.

(c) For heliports, the map scale required by paragraph (b)(1) of this section shall not be less than 1 inch to 2,000 feet and shall indicate heliport boundaries, takeoff and landing pads, and typical flight tracks out to at least 4,000 feet horizontally from the landing pad. Where these flight tracks cannot be determined, obstructions or other limitations on flight tracks in and out of the heliport shall be identified within the map areas out to at least 4,000 feet horizontally from the landing pad. For static operation (hover), the helicopter type, the number of daily operations based on an annual average, and the duration in minutes of the hover operation shall be identified. The other information required in paragraph (b) shall be furnished in a form suitable for

input to the HNM or other FAA approved methodology or computer program.

Sec. A150.105 Identification of public agencies and planning agencies.

(a) The airport proprietor shall identify each public agency and planning agency whose jurisdiction or responsibility is either wholly or partially within the $L_{dn}$ 65 dB boundary.

(b) For those agencies identified in (a) that have land use planning and control authority, the supporting documentation shall identify their geographic areas of jurisdiction.

Part C—Mathematical Descriptions

Sec. A150.201 General.

The following mathematical descriptions provide the most precise definition of the yearly day-night average sound level ($L_{dn}$), the data necessary for its calculation, and the methods for computing it.

Sec. A150.203 Symbols.

The following symbols are used in the computation of $L_{dn}$;

| Measure (in dB) | Symbol |
|---|---|
| Average Sound Level, During Time T ........................................................................................................ | $L_T$ |
| Day-Night Average Sound Level (individual day) ........................................................................................ | $L_{dni}$ |
| Yearly Day-Night Average Sound Level ....................................................................................................... | $L_{dn}$ |
| Sound Exposure Level ................................................................................................................................... | $L_{AE}$ |

Sec. A150.205 Mathematical computations.

(a) Average sound level must be computed in accordance with the following formula:

$$L_T = 10 \log_{10} \left[ \frac{1}{T} \int_0^T 10^{L_A(t)/10} \, dt \right] \quad (1)$$

where T is the length of the time period, in seconds, during which the average is taken; $L_A(t)$ is the instantaneous time varying A-weighted sound level during the time period T.

Note: When a noise environment is caused by a number of identifiable noise events, such as aircraft flyovers, average sound level may be conveniently calculated from the sound exposure levels of the individual events occurring within a time period T:

$$L_T = 10 \log_{10} \left[ \frac{1}{T} \sum_{i=1}^n 10^{L_{AEi}/10} \right] \quad (2)$$

where $L_{AEi}$ is the sound exposure level of the i-th event, in a series of n events in time period T, in seconds.

Note: When T is one hour, $L_T$ is referred to as one-hour average sound level.

(b) Day-night average sound level (individual day) must be computed in accordance with the following formula:

$$L_{dn} = 10 \log_{10} \left[ \frac{1}{86400} \left( \int_{0000}^{0700} 10^{[L_A(t)+10]/10} \, dt + \int_{0700}^{2200} 10^{L_A(t)/10} \, dt + \int_{2200}^{2400} 10^{[L_A(t)+10]/10} \, dt \right) \right] \quad (3)$$

Time is in seconds, so the limits shown in hours and minutes are actually interpreted in seconds. It is often convenient to compute day-night average sound level from the one-hour average sound levels obtained during successive hours.

(c) Yearly day-night average sound level must be computed in accordance with the following formula:

$$L_{dn} = 10 \log_{10} \frac{1}{365} \sum_{i=1}^{365} 10^{L_{dni}/10} \quad (4)$$

where $L_{dni}$ is the day-night average sound level for the i-th day out of one year.

(d) Sound exposure level must be computed in accordance with the following formula:

A027

$$L_{AE} = 10 \log_{10}\left(\frac{1}{t_o}\int_{t_1}^{t_2} 10^{L_A(t)/10}\, dt\right) \quad (5)$$

where $t_o$ is one second and $L_A(t)$ is the time-varying A-weighted sound level in the time interval $t_1$ to $t_2$.

The time interval should be sufficiently large that it encompasses all the significant sound of a designated event.

The requisite integral may be approximated with sufficient accuracy by integrating $L_A(t)$ over the time interval during which $L_A(t)$ lies within 10 decibels of its maximum value, before and after the maximum occurs.

**Credits**

[50 FR 5064, Feb. 6, 1985; Amdt. 150–1, 53 FR 8724, March 16, 1988; 68 FR 6608, Feb. 10, 2003; Amdt. 150–4, 69 FR 57626, Sept. 24, 2004; 69 FR 61438, Oct. 18, 2004]

SOURCE: Docket Nos. 16279 and 18691, 46 FR 8338, Jan. 26, 1981; 49 FR 49269, Dec. 18, 1984; 53 FR 8723, March 16, 1988; 54 FR 46724, Nov. 7, 1989; Amdt. 150–3, 60 FR 67256 Dec. 28, 1995, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106(g), 40113, 44715, 47101, 47501–47504.

Current through January 20, 2022; 87 FR 3049.

Footnotes

[a]   The designations contained in this table do not constitute a Federal determination that any use of land covered by the program is acceptable or unacceptable under Federal, State, or local law. The responsibility for determining the acceptable and permissible land uses and the relationship between specific properties and specific noise contours rests with the local authorities. FAA determinations under part 150 are not intended to substitute federally determined land uses for those determined to be appropriate by local authorities in response to locally determined needs and values in achieving noise compatible land uses.

Key to Table 1

SLUCM=Standard Land Use Coding Manual.

Y (Yes)=Land Use and related structures compatible without restrictions.

N (No)=Land Use and related structures are not compatible and should be prohibited.

NLR=Noise Level Reduction (outdoor to indoor) to be achieved through incorporation of noise attenuation into the design and construction of the structure.

25, 30, or 35=Land use and related structures generally compatible; measures to achieve NLR of 25, 30, or 35 dB must be incorporated into design and construction of structure.

Notes for Table 1

(1) Where the community determines that residential or school uses must be allowed, measures to achieve outdoor to indoor Noise Level Reduction (NLR) of at least 25 dB and 30 dB should be incorporated into building codes and be considered in individual approvals. Normal residential construction can be expected to provide a NLR of 20 dB, thus, the reduction requirements are often stated as 5, 10 or 15 dB over standard construction and normally assume mechanical ventilation and closed windows year round. However, the use of NLR criteria will not eliminate outdoor noise problems.

(2) Measures to achieve NLR 25 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.

(3) Measures to achieve NLR of 30 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.

(4) Measures to achieve NLR 35 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal level is low.

(5) Land use compatible provided special sound reinforcement systems are installed.

(6) Residential buildings require an NLR of 25.

(7) Residential buildings require an NLR of 30.

(8) Residential buildings not permitted.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**A029**

**Council on Environmental Quality**
**Executive Office of the President**

# REGULATIONS

**For Implementing The Procedural Provisions Of The**

# NATIONAL
# ENVIRONMENTAL
# POLICY ACT



**Reprint**
**40 CFR Parts 1500-1508**
**(2005)**

**A030**

## §1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the federal government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by federal officials in conjunction with other relevant material to plan actions and make decisions.

## §1502.2 Implementation.

To achieve the purposes set forth in §1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## §1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§1508.11) are to be included in every recommendation or report.
On proposals (§1508.23).
For legislation and (§1508.17).
Other major federal actions (§1508.18).
Significantly (§1508.27).
Affecting (§§1508.3, 1508.8).
The quality of the human environment (§1508.14).

## §1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad federal actions such as the adoption of new agency programs or regulations (§1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one

agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§1501.7), tiering (§1502.20), and other methods listed in §§1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

### §1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable state or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

### §1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§1501.7).

### §1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of §1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

### §1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### §1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in §1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

### §1502.10 Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of agencies, organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§1502.11 through 1502.18, in any appropriate format.

### §1502.11 Cover sheet.

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the state(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA

10

under §1506.10). The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

## §1502.12 Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

## §1502.13 Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

## §1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## §1502.15 Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The description shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

## §1502.16 Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under §1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

11

**A034**

(c) Possible conflicts between the proposed action and the objectives of federal, regional, state, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under §1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### §1502.17 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### §1502.18 Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### §1502.19 Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in §1502.18(d) and unchanged statements as provided in §1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate federal, state or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft. If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### §1502.20 Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or

environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

### §1502.21 Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

### §1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are

not known, the agency shall include within the environmental impact statement: (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

### §1502.23 Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are

Source: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

### §1506.1 Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in §1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for federal, state or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

### §1506.2 Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with state agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with state and local agencies to the fullest extent possible to reduce duplication between NEPA and state and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with state and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more federal agencies and one or more state or local agencies shall be joint lead agencies. Where state laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, federal agencies shall cooperate in fulfilling these requirements as well as those of federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into state or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved state or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

### §1506.3 Adoption.

(a) An agency may adopt a federal draft or final environmental impact statement or portion

in a proposal (or a reasonable alternative) for legislation or other major federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A state or local agency of similar qualifications or, when the effects are on a reservation, an Indian tribe, may by agreement with the lead agency become a cooperating agency.

### §1508.6 Council.

"Council" means the Council on Environmental Quality established by title II of the Act.

### §1508.7 Cumulative impact.

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

### §1508.8 Effects.

"Effects" include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

### §1508.9 Environmental assessment.

"Environmental assessment":

(a) Means a concise public document for which a federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

### §1508.10 Environmental document.

"Environmental document" includes the documents specified in §1508.9 (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent).

### §1508.11 Environmental impact statement.

"Environmental impact statement" means a detailed written statement as required by section 102(2)(C) of the Act.

### §1508.12 Federal agency.

"Federal agency" means all agencies of the federal government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations states and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

uses of federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

### §1508.19 Matter.

"Matter" includes for purposes of Part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### §1508.20 Mitigation.

"Mitigation" includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### §1508.21 NEPA process.

"NEPA process" means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### §1508.22 Notice of intent.

"Notice of intent" means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### §1508.23 Proposal.

"Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### §1508.24 Referring agency.

"Referring agency" means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### §1508.25 Scope.

"Scope" consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) direct; (2) indirect; (3) cumulative.

### §1508.26 Special expertise.

"Special expertise" means statutory responsibility, agency mission, or related program experience.

### §1508.27 Significantly.

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

**A040**

# OTHER AUTHORITIES

59 FR 7629, Exec. Order No. 12898, 1994 WL 16189208(Pres.)

Executive Order 12898

# Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

February 11, 1994

**\*7629 By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:**

**Section 1-1.** Implementation.

**1-101.** *Agency Responsibilities.* To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Mariana Islands.

**1-102.** *Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (i) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (l) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate. The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b) The Working Group shall: (1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1-103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3-3 of this order;

(4) assist in coordinating data collection, required by this order;

**\*7630** (5) examine existing data and studies on environmental justice;

(6) hold public meetings as required in section 5-502(d) of this order; and

(7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

A042

**1-103.** *Development of Agency Strategies.* (a) Except as provided in section 6-605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)-(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum: (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations; (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations. In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform the Working Group of the process.

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

**1-104.** *Reports to the President.* Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1-103(e) of this order.

**Sec. 2-2.** Federal Agency Responsibilities for Federal Programs. Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) **\*7631** to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

**Sec. 3-3.** Research, Data Collection, and Analysis.

**3-301.** *Human Health and Environmental Research and Analysis.* (a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

(b) Environmental human health analyses, whenever practicable and appropriate, shall identify multiple and cumulative exposures.

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

**3-302.** *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. section 552a): (a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;
(b) In connection with the development and implementation of agency strategies in section 1-103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public, unless prohibited by law; and

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001-11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public, unless prohibited by law.

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

**Sec. 4-4.** Subsistence Consumption of Fish and Wildlife.

**4-401.** *Consumption Patterns.* In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. Federal agencies shall communicate to the public the risks of those consumption patterns.

**\*7632 4-402.** *Guidance.* Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or wildlife. Agencies shall consider such guidance in developing their policies and rules.

**Sec. 5-5.** Public Participation and Access to Information. (a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies. Each Federal agency shall convey such recommendations to the Working Group.
(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice. The Working Group shall prepare for public review a summary of

the comments and recommendations discussed at the public meetings.

**Sec. 6-6.** General Provisions.

**6-601.** *Responsibility for Agency Implementation.* The head of each Federal agency shall be responsible for ensuring compliance with this order. Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

**6-602.** *Executive Order No. 12250.* This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance. Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

**6-603.** *Executive Order No. 12875.* This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

**6-604.** *Scope.* For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment. Independent agencies are requested to comply with the provisions of this order.

**6-605.** *Petitions for Exemptions.* The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

**6-606.** *Native American Programs.* Each Federal agency responsibility set forth under this order shall apply equally to Native American programs. In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

**6-607.** *Costs.* Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

**6-608.** *General.* Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

**6-609.** *Judicial Review.* This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, **\*7633** enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.

WILLIAM CLINTON

THE WHITE HOUSE,February 11, 1994.

End of Document                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**A045**



116TH CONGRESS
1ST SESSION

# H. R. 3001

To reestablish the Office of Noise Abatement and Control in the
Environmental Protection Agency, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

MAY 23, 2019

Ms. MENG (for herself, Mrs. NAPOLITANO, Ms. SCHAKOWSKY, Ms. NORTON,
Ms. MOORE, Mr. ROUDA, Ms. LEE of California, Mr. LYNCH, Ms.
SPEIER, Mr. SUOZZI, Mr. GALLEGO, Mr. LIPINSKI, Ms. BROWNLEY of
California, Miss RICE of New York, Mr. RUPPERSBERGER, Mr. CASE,
Mr. FITZPATRICK, Mr. RASKIN, Mrs. LOWEY, Ms. JAYAPAL, Mr. SAR-
BANES, Mr. BEYER, Mr. SHERMAN, Mr. PETERS, Mr. TED LIEU of Cali-
fornia, Ms. JUDY CHU of California, Ms. CLARKE of New York, Mr.
BROWN of Maryland, Ms. CLARK of Massachusetts, and Mr. ESPAILLAT)
introduced the following bill; which was referred to the Committee on En-
ergy and Commerce, and in addition to the Committee on Transportation
and Infrastructure, for a period to be subsequently determined by the
Speaker, in each case for consideration of such provisions as fall within
the jurisdiction of the committee concerned

---

# A BILL

To reestablish the Office of Noise Abatement and Control
in the Environmental Protection Agency, and for other
purposes.

1     *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Quiet Communities Act of 2019".

**SEC. 2. FINDINGS.**

Congress finds that:

(1) Approximately 28,000,000 Americans are afflicted with some hearing loss and it has been estimated that 10,000,000 of these impairments are at least partially attributable to damage from exposure to noise.

(2) For millions of Americans, noise from aircraft, vehicular traffic, and a variety of other sources is a constant source of torment. Millions of Americans are exposed to noise levels that can lead to sleep loss, psychological and physiological damage, and work disruption.

(3) Chronic exposure to noise has been linked to increased risk of cardiovascular disorders, learning deficits in children, stress, and diminished quality of life.

(4) Excessive noise leading to sleep deprivation and task interruptions can result in untold costs on society in diminished worker productivity.

(5) Pursuant to authorities granted under the Clean Air Act of 1970, the Noise Control Act of 1972, and the Quiet Communities Act of 1978, the

Environmental Protection Agency established an Office of Noise Abatement and Control. Its responsibilities included promulgating noise emission standards, requiring product labeling, facilitating the development of low emission products, coordinating Federal noise reduction programs, assisting State and local abatement efforts, and promoting noise education and research. However, funding for the Office of Noise Abatement and Control was terminated in 1982 and no funds have been provided since.

(6) Because the Environmental Protection Agency remains legally responsible for enforcing regulations issued under the Noise Control Act of 1972 even though funding for these activities were terminated, and because the Noise Control Act of 1972 prohibits State and local governments from regulating noise sources in many situations, noise abatement programs across the country lie dormant.

(7) As population growth and air and vehicular traffic continue to increase, noise pollution is likely to become an even greater problem in the future. The health and welfare of our citizens demands that the Environmental Protection Agency, the lead Federal agency for the protection of public health and

1    welfare, once again assume a role in combating noise
2    pollution.

**SEC. 3. REESTABLISHMENT OF OFFICE OF NOISE ABATE-**
**MENT AND CONTROL.**

5    (a) REESTABLISHMENT.—The Administrator of the
6    Environmental Protection Agency shall reestablish within
7    the Environmental Protection Agency an Office of Noise
8    Abatement and Control.

9    (b) DUTIES.—The responsibilities of the Office in-
10   clude the following:

11       (1) To promote the development of effective
12   State and local noise control programs by providing
13   States with technical assistance and grants to de-
14   velop the programs, including the purchase of equip-
15   ment for local communities.

16       (2) To carry out a national noise control re-
17   search program to assess the impacts of noise from
18   varied noise sources on mental and physical health.

19       (3) To carry out a national noise environmental
20   assessment program to identify trends in noise expo-
21   sure and response, ambient levels, and compliance
22   data and to determine the effectiveness of noise
23   abatement actions, including actions for areas
24   around major transportation facilities (such as high-
25   ways, railroad facilities, and airports).

1      (4) To develop and disseminate information and
2   educational materials to the public on the mental
3   and physical effects of noise and the most effective
4   means for noise control through the use of materials
5   for school curricula, volunteer organizations, radio
6   and television programs, publications, and other
7   means.

8      (5) To develop educational and training mate-
9   rials and programs, including national and regional
10  workshops, to support State and local noise abate-
11  ment and control programs.

12     (6) To establish regional technical assistance
13  centers which use the capabilities of university and
14  private organizations to assist State and local noise
15  control programs.

16     (7) To undertake an assessment of the effec-
17  tiveness of the Noise Control Act of 1972.

18  (c) PREFERRED APPROACHES.—In carrying out its
19 duties under this section, the Office shall emphasize noise
20 abatement approaches that rely on local and State activi-
21 ties, market incentives, and coordination with other public
22 and private agencies.

23  (d) STUDY.—

24     (1) IN GENERAL.—Using funds made available
25  to the Office, the Administrator shall carry out a

1  study of airport noise. The Administrator shall carry
2  out the study by entering into contracts or other
3  agreements with independent scientists with exper-
4  tise in noise measurements, noise effects, and noise
5  abatement techniques to conduct the study.

6      (2) CONTENTS.—The study shall examine the
7  selection of noise measurement methodologies by the
8  Federal Aviation Administration, the threshold of
9  noise at which health impacts are felt, and the effec-
10  tiveness of noise abatement programs at airports
11  around the Nation.

12      (3) REPORT.—Not later than 24 months after
13  the date of enactment of this Act, the Administrator
14  shall transmit to Congress a report on the results of
15  the study, together with specific recommendations
16  on new measures that can be implemented to miti-
17  gate the impact of aircraft noise on surrounding
18  communities.

19  **SEC. 4. GRANTS UNDER QUIET COMMUNITIES PROGRAM.**

20      Section 14(c)(1) of the Noise Control Act of 1972
21  (42 U.S.C. 4913(c)(1)) is amended—

22      (1) by striking "and" at the end of subpara-
23  graph (C); and

24      (2) by adding at the end the following:

1     "(E) establishing and implementing train-
2    ing programs on use of noise abatement equip-
3    ment; and

4     "(F) implementing noise abatement
5    plans;".

**6 SEC. 5. AUTHORIZATION OF APPROPRIATIONS.**

7  There is authorized to be appropriated for each of
8 fiscal years 2020 through 2024 $21,000,000 for activities
9 of the Office of Noise Abatement and Control reestab-
10 lished under section 3.

○