No. 21-71170

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

CITY OF LOS ANGELES,
*Petitioner*,

v.

FEDERAL AVIATION ADMINISTRATION, et al.,
*Respondents*.

---

On Petition for Review of an Order
of the Federal Aviation Administration

---

**ANSWERING BRIEF OF RESPONDENT
FEDERAL AVIATION ADMINISTRATION**

---

TODD KIM
*Assistant Attorney General*
ANNA T. KATSELAS
JUSTIN D. HEMINGER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

Of Counsel:

JOSEPH MANALILI
CATHERINE M. BASIC
*Attorneys*
Office of the Chief Counsel
Federal Aviation Administration

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY .............................................................................................. x

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 2

STATEMENT OF THE ISSUES .................................................................. 2

PERTINENT STATUTES AND REGULATIONS ....................................... 2

STATEMENT OF THE CASE ..................................................................... 3

     A.    Statutory and regulatory background .................................... 3

          1.    Airport and Airway Improvement Act ..................... 3

          2.    National Environmental Policy Act ........................ 3

     B.    Factual background ............................................................ 5

          1.    Hollywood Burbank Airport ................................... 5

          2.    The terminal replacement project ........................... 8

          3.    FAA's environmental review ................................. 12

SUMMARY OF ARGUMENT .................................................................. 14

STANDARD OF REVIEW ....................................................................... 16

ARGUMENT ........................................................................................... 17

I.    Los Angeles lacks standing to pursue its NEPA claims ................ 17

II.    FAA did a proper alternatives analysis ....................................... 20

     A.    FAA reasonably defined the Project's purpose and need ..... 20

B.     FAA considered a reasonable range of alternatives............................26

C.     FAA did not predetermine the outcome of its NEPA review ...................................................................................34

III.    FAA took a hard look at the Project's potential environmental impacts ...............................................................................36

     A.     FAA rationally analyzed construction impacts ...................38

          1.     FAA studied two distinct areas to evaluate the direct and indirect impacts from the Project............................38

          2.     FAA studied and disclosed noise impacts from construction ..................................................................41

          3.     FAA adequately analyzed construction truck trips...................48

          4.     FAA appropriately addressed potential vibration impacts ......................................................................51

     B.     FAA properly evaluated cumulative noise impacts ............................53

     C.     FAA carefully weighed environmental justice issues........................59

          1.     FAA rationally found that no environmental justice population would face disproportionately high and adverse effects........................................................59

          2.     FAA reasonably defined the environmental justice study area ...................................................................60

          3.     FAA used reliable data to identify environmental justice populations....................................................62

CONCLUSION .........................................................................67

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Airport Neighbors Alliance, Inc. v. United States,*
90 F.3d 426 (10th Cir. 1996) ..........................................................................32

*Alaska Survival v. Surface Transp. Board,*
705 F.3d 1073 (9th Cir. 2013) ..................................................23, 24, 29, 30

*California v. U.S. Dep't of Interior,*
767 F.3d 781 (9th Cir. 2014) ........................................................................27

*Citizens Against Burlington v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) ..............................................................23, 25, 28

*City of Bridgeton v. FAA,*
212 F.3d 448 (8th Cir. 2000) ........................................................................27

*City of Grapevine v. Dep't of Transp.,*
17 F.3d 1502 (D.C. Cir. 1994) ......................................................................32

*City of Mukilteo v. U.S. Department of Transportation,*
815 F.3d 632 (9th Cir. 2016) ........................................................................16

*City of Sausalito v. O'Neill,*
386 F.3d 1186 (9th Cir. 2004) ..........................................................16, 18, 19

*City of S. Pasadena v. Goldschmidt,*
637 F.2d 677 (9th Cir. 1981) ........................................................................52

*Communities Against Runway Expansion, Inc. v. FAA,*
355 F.3d 678 (D.C. Cir. 2004) ......................................................................59

*Earth Island Inst. v. U.S. Forest Service,*
351 F.3d 1291 (9th Cir. 2003) ......................................................................50

*Envtl. Prot. Info. Center v. U.S. Forest Serv.,*
451 F.3d 1005 (9th Cir. 2006) ......................................................................27

*Fath v. Texas Dep't of Transp.*,
  924 F.3d 132 (5th Cir. 2018) ..........................................................56

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ......................................................................16

*Forest Guardians v. U.S. Fish & Wildlife Service*,
  611 F.3d 692 (10th Cir. 2010) .......................................................35

*Friends of Richards-Gebaur Airport v. FAA*,
  251 F.3d 1178 (8th Cir. 2001) .......................................................52

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
  887 F.3d 906 (9th Cir. 2018) ........................................................56

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
  860 F.3d 1244 (9th Cir. 2017) ......................................................64

*HonoluluTraffic.com v. Federal Transit Administration*,
  742 F.3d 1222 (9th Cir. 2014) ................................................21, 22

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
  481 F.2d 122 (9th Cir. 1973) ........................................................18

*Informing Citizens Against Runway Airport Expansion v. FAA*,
  757 F. App'x 568 (9th Cir. 2018) ............................................22, 23

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ......................................................................53

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994) ..........................................................26

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway
  Admin.*,
  756 F.3d 447 (6th Cir. 2014) ........................................................33

*League of Wilderness Defenders v. U.S. Forest Service*,
  689 F.3d 1060 (9th Cir. 2012) ................................................27, 30

*Los Angeles v. Benedict Hills Estates Association*,
No. 19-73164, 2021 WL 4958990 (9th Cir. Oct. 26, 2021) ........................... 7

*Los Angeles v. FAA*,
138 F.3d 806 (9th Cir. 1998) ........................................................... 11, 36, 66

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................. 17, 19

*Metcalf v. Daly*,
214 F.3d 1135 (9th Cir. 2000) ............................................................ 34, 35

*Minisink Residents for Envtl. Pres. & Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014) ...................................................................... 56

*Morongo Band of Mission Indians v. FAA*,
161 F.3d 569 (9th Cir. 1998) ...................................................................... 59

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile
Insurance Co.*,
463 U.S. 29 (1983) ..................................................................................... 16

*N. Buckhead Civic Ass'n v. Skinner*,
903 F.2d 1533 (11th Cir. 1990) ................................................................. 28

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Management*,
606 F.3d 1058 (9th Cir.2010) ........................................................ 21, 24, 25

*Northern Plains Resource Council, Inc. v. Surface Transportation
Board*,
668 F.3d 1067 (9th Cir. 2011) ............................................................ 57, 65

*Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*,
460 F.3d 1125 (9th Cir. 2006) ............................................................ 55, 57

*NRDC v. FAA*,
564 F.3d 549 (2d Cir. 2009) ...................................................................... 33

*NRDC v. U.S. Forest Service*,
421 F.3d 797 (9th Cir. 2005) ...................................................................... 53

*Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*,
    457 F.3d 941 (9th Cir. 2006) .........................................................................18

*Pit River Tribe v. U.S. Forest Service*,
    615 F.3d 1069 (9th Cir. 2010) ....................................................................35

*Protect Our Communities Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ......................................................4, 32, 37, 38

*Protect Our Communities Found. v. LaCounte*,
    939 F.3d 1029 (9th Cir. 2019) ..............................................................31, 58

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989).....................................................................................3

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*,
    651 F.3d 202 (1st Cir. 2011)........................................................................34

*Save Lake Washington v. Frank*,
    641 F.2d 1330 (9th Cir. 1981) ......................................................................4

*Seattle Audubon Soc. v. Moseley*,
    80 F.3d 1401 (9th Cir. 1996) .................................................................33, 34

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ....................................................................53

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016).......................................................................56

*Simmons v. U.S. Army Corps of Engineers*,
    120 F.3d 664 (7th Cir. 1997) .................................................................24, 25

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009)...................................................................................19

*Tongass Conservation Soc. v. Cheney*,
    924 F.2d 1137 (D.C. Cir. 1991)...................................................................28

*Twp. of Bordentown, New Jersey v. FERC,*
    903 F.3d 234 (3d Cir. 2018) .........................................................56

*U.S. Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004)......................................................................4

*Webster v. USDA,*
    685 F.3d 411 (4th Cir. 2012) ..............................................23, 27

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) .......................................................5

*WildWest Inst. v. Bull,*
    547 F.3d 1162 (9th Cir. 2008) ...................................................36

## Statutes and Court Rules

Administrative Procedure Act
    5 U.S.C. § 706..............................................................................16

    5 U.S.C. § 706(2)(A) ...................................................................16

National Environmental Policy Act
    42 U.S.C. §§ 4321, et seq. ............................................................3

    42 U.S.C. § 4332(C) .....................................................................4

Airport and Airway Improvement Act of 1982
    49 U.S.C. §§ 47101, et seq. ..........................................................3

    49 U.S.C. § 47101(a)(1) ...........................................3, 21, 22, 24

    49 U.S.C. § 47101(b)..................................................................22

    49 U.S.C. § 47105(b)(3) ...............................................................3

    49 U.S.C. § 47107(a)(16) .........................................3, 22, 24

Federal Aviation Act
    49 U.S.C. § 46110(a) ....................................................................2

**State Statutes**

Cal. Gov't Code § 6546.1 ........................................................31

**Regulations**

14 C.F.R. Part 77........................................................................10

40 C.F.R. Parts 1500–1508 .........................................................4

40 C.F.R. § 1502.2(b) ...............................................................48

40 C.F.R. § 1502.13 ..................................................................21

40 C.F.R. § 1502.14 ..............................................................4, 26

40 C.F.R. § 1502.14(a) ..............................................................26

40 C.F.R. § 1502.14(d) ................................................................4

40 C.F.R. 1502.16(c) .................................................................47

40 C.F.R. § 1506.2(d) ................................................................47

40 C.F.R. § 1506.13 ....................................................................4

40 C.F.R. § 1507.3 ......................................................................5

40 C.F.R. § 1508.7 .........................................................4, 53, 55

40 C.F.R. § 1508.8 ......................................................................4

80 Fed. Reg. 44,208 (July 24, 2015)............................................5

85 Fed. Reg. 43,304 (July 16, 2020)............................................4

87 Fed. Reg. 23,453 (Apr. 20, 2022) ...........................................4

**Other Authorities**

Federal Actions to Address Environmental Justice in Minority
 Populations and Low-Income Populations, Executive Order
 12898 (Feb. 11, 1994)......................................................................................59

Los Angeles World Airports, Airport Basics,
 https://www.lawa.org/lawa-our-lax/airport-basics ..........................................7

Los Angeles World Airports, Airfield & Terminal Modernization
 Project, https://www.lawa.org/atmp ...................................................................8

Los Angeles World Airports, Midfield Satellite Concourse North
 Project Frequently Asked Questions,
 https://www.lawa.org/lawa-msc-north/msc-faq ...............................................7

Los Angeles World Airports, New Tom Bradley International
 Terminal Frequently Asked Questions, https://www.lawa.org/-
 /media/lawa-web/projects-and-reports/files/new-tbit-faq.ashx
 (July 2014) ...........................................................................................................7

Federal Aviation Administration, Finding of No Significant Impact
 and Record of Decision for Proposed Airfield and Terminal
 Modernization Project, https://www.faa.gov/airports/
 environmental/environmentaldocuments/lax/media/FONSI-
 ROD-LAX-CA-Proposed-Airfield-Terminal-Modernization-12-
 2021.pdf (2021) ...................................................................................................8

**GLOSSARY**

APA                    Administrative Procedure Act

CEQA                   California Environmental Quality Act

CNEL                   Community Noise Equivalent Level

EIS                    Environmental Impact Statement

FAA                    Federal Aviation Administration

NEPA                   National Environmental Policy Act

**INTRODUCTION**

Respondent Federal Aviation Administration (FAA) is responsible for the safe and efficient use of the United States' airspace. In fulfilling this responsibility, FAA must balance many competing factors and weigh the often-diverging interests of airports and their surrounding communities. But the heart of FAA's mission has always been safety. And the project at the center of this case will solve a serious safety issue—replacing the outdated passenger terminal at Hollywood Burbank Airport because it is too close to the runways.

For four decades, FAA and Intervenor-Respondent Burbank-Glendale-Pasadena Airport Authority have sought to address this safety issue. But they have faced intense opposition from the City of Burbank and Petitioner City of Los Angeles. Finally, the Authority and Burbank reached a compromise that would allow the Authority to replace the existing terminal with a new terminal with the same number of passenger gates. After an exhaustive environmental review under the National Environmental Policy Act (NEPA), FAA approved that project, concluding that it would cause no significant environmental impacts.

Los Angeles challenges FAA's NEPA analysis. But it lacks standing to do so. And its NEPA claims also fail on the merits. FAA evaluated a reasonable range of alternatives and took a hard look at the project's potential environmental impacts. Thus, the petition should be dismissed or denied.

# STATEMENT OF JURISDICTION

Los Angeles properly invokes this Court's exclusive jurisdiction to review FAA orders. 49 U.S.C. § 46110(a). FAA's Record of Decision is such an order, and Los Angeles timely filed its petition for review within 60 days after FAA issued the Decision. 1-ER-76. But as explained in Argument Point I, Los Angeles lacks Article III standing because it has not suffered an injury-in-fact.

# STATEMENT OF THE ISSUES

1.     Whether Los Angeles has standing to challenge FAA's decision approving the terminal replacement project, when the City cannot establish standing based on alleged harm to its inhabitants and has failed to show that the project will cause a concrete and imminent injury to its proprietary interests, as it must.

2.     Whether FAA analyzed a reasonable range of alternatives that could meet the purpose and need for a safer passenger terminal before selecting the preferred alternative of building the replacement terminal.

3.     Whether FAA took a hard look at the potential environmental impacts from the project, when it intensively studied the project's construction and noise related impacts and thoughtfully assessed potential environmental justice impacts.

# PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are in the Addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory and regulatory background

#### 1.     Airport and Airway Improvement Act

Congress granted FAA regulatory authority over airport development and improvements in the Airport and Airway Improvement Act of 1982, as amended and codified in 49 U.S.C. §§ 47101 et seq. Although the Act identifies many federal policies for airport projects, Congress directed that the "safe operation of the airport and airway system is the highest aviation priority." *Id*. § 47101(a)(1).

To remain eligible for federal grants, airport development must comply with FAA's standards. *See id*. § 47105(b)(3). Among these standards, the airport owner must "maintain a current layout plan of the airport" approved by FAA. *Id*. § 47107(a)(16). FAA must approve an airport layout plan and any modifications to it before construction takes place. *Id*.

#### 2.     National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321 et seq., is designed to foster better and more informed decisionmaking by federal agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA ensures that agencies have detailed information about significant environmental impacts when they make their decisions and that this information will be available to the public. *Id*. at 349.

NEPA requires an agency to prepare a comprehensive Environmental Impact Statement, or EIS, for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is the agency's concise evaluation of the direct effects, indirect effects, and cumulative impacts of a range of alternatives, including the proposed action. 40 C.F.R. § 1502.14; *see id*. §§ 1508.7, 1508.8.[1] And the agency must consider the alternative of taking no action. 40 C.F.R. § 1502.14(d).

NEPA's requirements are procedural. They do not "mandate particular results" but simply prescribe the necessary process. *U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756 (2004) (cleaned up); *accord Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 579 (9th Cir. 2016) ("NEPA outlines a series of procedural steps, but it does not impose any particular substantive result on an agency."). NEPA does not "require that the agency elevate environmental concerns over legitimate non-environmental considerations." *Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir. 1981) (cleaned up). Thus, in reviewing an agency's compliance with NEPA, courts "must avoid passing judgment on the

---

[1] In 2020, the Council on Environmental Quality updated the NEPA regulations at 40 C.F.R. Parts 1500–1508. 85 Fed. Reg. 43,304 (July 16, 2020). Recently, the Council amended the 2020 rules to restore some pre-2020 provisions. 87 Fed. Reg. 23,453 (Apr. 20, 2022). The Council is also developing a more comprehensive rulemaking to amend the 2020 rules. *Id*. at 23,456. Because FAA's NEPA process started before September 2020, the agency chose to apply the pre-2020 regulations, and this brief cites those prior regulations. 1-ER-36; *see* 40 C.F.R. § 1506.13.

substance of an agency's decision." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

Agencies may promulgate additional rules for compliance with NEPA. 40 C.F.R. § 1507.3. FAA promulgated supplemental requirements, after public notice and comment, in Order 1050.1F. 80 Fed. Reg. 44,208 (July 24, 2015).

## B. Factual background

### 1. Hollywood Burbank Airport

The Bob Hope "Hollywood Burbank" Airport is a 555-acre medium-sized airport located mainly within the City of Burbank (455 acres), with a smaller portion in Los Angeles (100 acres). 1-ER-100, 4-ER-898-899. The Airport is owned and operated by the Authority. 1-ER-98. The Airport provides substantial economic benefits to the region, estimated in a 2008 study to approach $4 billion. SER-36.

The Airport has one passenger terminal with 14 gates. 1-ER-25. And the Airport has two intersecting runways, Runway 15-33, oriented north-south, and Runway 8-26, oriented east-west. 1-ER-104. The runways divide the Airport into four quadrants, as shown on the map below. 1-ER-100. The existing terminal is in the southeast quadrant, while the northeast quadrant includes a 152-acre undeveloped property. 1-ER-100.



**Legend**

- Northwest Quadrant
- Northeast Quadrant
- Southwest Quadrant
- Southeast Quadrant
- Former Aviall Property and Former Aviall Parking Lot Property
- Lockheed B-6 Site
- Detailed Study Area

1/2 MI

N

*Environmental Impact Statement*
**Bob Hope "Hollywood Burbank" Airport**

**Airport Quadrants with Lockheed and Aviall Property in Northeast Quadrant**

For many decades, noise from the Airport's operations has concerned residents in the surrounding areas of Burbank and Los Angeles. SER-35. The Authority and FAA have sought to address noise impacts from the Airport's operations, but the issue continues to draw significant concern. SER-35; 2-ER-521 (longstanding voluntary curfew); SER-16-24 (Noise Compatibility Program). Recently, Los Angeles sued FAA, alleging noise impacts from flight procedures at the Airport. *See Los Angeles v. Benedict Hills Estates Ass'n*, No. 19-73164, 2021 WL 4958990 (9th Cir. Oct. 26, 2021) (unpublished disposition denying petition for review).

As Los Angeles notes (Brief 17), Hollywood Burbank Airport is one of five regional airports in southern California. What Los Angeles fails to note is that it owns two of those airports, Los Angeles International Airport (LAX) and Van Nuys Airport. Located about 18 miles from Hollywood Burbank Airport, SER-9, LAX is a major international airport that is a "tremendous 'economic engine'" for the region and the country. Los Angeles World Airports, Airport Basics, https://www.lawa.org/lawa-our-lax/airport-basics. In recent decades, LAX has engaged in major capital projects to upgrade and expand its terminals and to add new gates.[2] In December 2021, FAA approved the environmental analysis for

---

[2] *See* https://www.lawa.org/-/media/lawa-web/projects-and-reports/files/new-tbit-faq.ashx; https://www.lawa.org/lawa-msc-north/msc-faq.

LAX's massive Airfield and Terminal Modernization Project, authorizing LAX to decommission more than 15 passenger gates and build a new concourse and a new terminal with up to 23 new gates.[3]

### 2.  The terminal replacement project

The Hollywood Burbank Airport's terminal replacement project has a long and tortuous history. The Airport's existing passenger terminal dates to 1930, when the central part of the building was first constructed. 1-ER-115. After a fire in 1966, the Airport's then-owner, Lockheed Martin, rebuilt the terminal. 1-ER-115. In 1978, the Authority acquired the Airport from Lockheed. 1-ER-115. Soon after, in January 1980, the Authority and FAA identified the need to replace the existing terminal. 1-ER-98.



*Burbank Airport passenger terminal circa 1930 and 2018. SER-5.*

---

[3] *See* https://www.lawa.org/atmp; FAA Record of Decision at 5-6, https://www.faa.gov/airports/environmental/environmental_documents/lax/media/FONSI-ROD-LAX-CA-Proposed-Airfield-Terminal-Modernization-12-2021.pdf.

Although FAA considers the Airport safe to operate, the terminal's location fails to meet FAA's current safety design standards. 1-ER-114-119. In plain terms, the terminal is too close to the runways. 1-ER-115-116. As a result, the terminal fails to meet three FAA airport design standards for runway separation and object free areas. 1-ER-115-116. The following table shows the distances by which the existing terminal fails to meet FAA's safety standards for each runway. 1-ER-115.

| FAA Airport Design Standard | Standard (distance from centerline) | Existing Terminal from Runway 8-26 Centerline | Existing Terminal from Runway 15-33 Centerline |
|---|---|---|---|
| Runway Object Free Area | 400 feet | About 255 feet | About 375 feet |
| Building Restriction Line | 750 feet | About 255 feet | About 375 feet |
| Taxilane Object Free Area | 112.5 feet | About 85 feet | About 110 feet |

Meeting these standards would enhance safety at the Airport by reducing the risks of aircraft collisions with vehicles, objects, and buildings, including when an aircraft deviates from a runway or taxiway. 1-ER-114-117. As the size, weight, and number of aircraft operations have all increased over time, so have FAA's safety concerns about this too-close-to-the-runways terminal. SER-25-39.

The existing terminal's location raises other safety issues too. The building and adjacent parking structure fail to meet FAA's safety standards for navigable airspace in 14 C.F.R. Part 77. 1-ER-118-119 (exhibit showing how the terminal and parking structure penetrate imaginary surfaces for the Airport's runway

approach). Yet another safety concern is runway crossings—the number of times that a plane must cross a runway when taxiing for take-off or after landing. 1-ER-117. For safety and efficiency, FAA seeks to limit or reduce the number of runway crossings that a taxiing plane must make, minimizing the risk of runway incursions. 1-ER-117. The terminal's location in the southeast quadrant, combined with the intersecting runways, requires more runway crossings than would a better-located terminal. 1-ER-117. In addition, the 1966 rebuilt terminal does not meet California's current earthquake design standards. 1-ER-119-120.

Besides the safety issues, the existing terminal has other deficiencies. Its narrow, L-shaped design is inefficient to serve the Airport's passengers. 1-ER-118-120. And the building does not comply with the Americans with Disabilities Act's standards. 1-ER-119.

For decades, the Authority and FAA tried to solve these problems. 1-ER-98-100. At times during the 1980s and 1990s, the Authority and FAA prepared plans and environmental documents for potential solutions, but none panned out. 1-ER-98. Los Angeles and Burbank fought these efforts, including through multiple lawsuits in federal and state court. *See* SER-58-61 (discussing Los Angeles' challenges to the Authority's state environmental analyses). In *Los Angeles v. FAA*, this Court denied Los Angeles' and Burbank's challenge to FAA's environmental analysis for a much larger terminal project with nearly double the number of gates.

138 F.3d 806, 807 (9th Cir. 1998). But in 1999, a state court loss left the Authority

unable to proceed unless Burbank approved of the plan (it did not). 1-ER-98-99.

In 2000, Burbank's residents approved Measure B, which mandated voter

approval before the Authority could relocate or expand the existing terminal. 1-

ER-99. By 2002, then-FAA Administrator Marion Blakey was lamenting the

"difficult history of the project," which had involved "three separate Federal

environmental reviews, separate state environmental analyses, multiple planning

efforts, and extensive negotiations by both Federal and local authorities with all

stakeholders." SER-55-56.

Another decade came and went. Finally in 2015, Burbank agreed to allow a

replacement passenger terminal on certain conditions, including that the Authority

complete a California Environmental Quality Act (CEQA) analysis. 1-ER-99. The

Authority finished its CEQA analysis in July 2016. 1-ER-99. In November 2016,

Burbank's residents voted on Measure B, which asked whether Burbank should

allow the Authority to construct "no more than a 14-gate, 355,000 foot

replacement terminal and ancillary improvements . . . in exchange for governance

changes that provide Burbank a greater voice in the future of the airport." 1-ER-

29-30 & n.3. Measure B passed by roughly 70 percent. 1-ER-99-100.

After Burbank's residents approved Measure B, the Authority submitted an

Airport Layout Plan proposing the Project for FAA's approval. 1-ER-30.

Consistent with Measure B, the Project would replace the existing 14-gate passenger terminal in the southeast quadrant with a new 14-gate terminal in the northeast quadrant, largely on the 152-acre undeveloped property. 1-ER-100 n.12.

### 3.     FAA's environmental review

During a more than two-year period, December 2018 to May 2021, FAA conducted a thorough environmental review of the terminal replacement project. 1-ER-257-268. FAA offered multiple opportunities for public input and participation. For instance, shortly after announcing its environmental review, FAA began a public scoping process to help it identify potentially significant environmental impacts. SER-42-46. FAA held two scoping meetings in early 2019, one for agencies and one for the public. 2-ER-287. When FAA solicited comments on the scoping process, it received hundreds of written comments, including from a Los Angeles councilmember and the City's Department of Transportation. 2-ER-307-311. In August 2020, FAA released a Draft EIS for a 45-day public comment period, which it extended by 22 days after receiving requests from Los Angeles and others. 1-ER-4, 1-ER-399-400. And in September 2020, FAA held two public workshops and a public hearing on the Draft EIS. 1-ER-4.

During the EIS process, FAA identified 10 potential alternatives to evaluate. 1-ER-85. Applying its screening criteria to those alternatives, FAA eliminated from detailed study all alternatives except the Authority's proposed Project and the

no action alternative. 1-ER-85. Then, FAA presented a full analysis of many resource categories to determine whether the Project would cause any significant environmental impacts, addressing air quality, biological resources, climate, noise and noise-compatible land use, socioeconomics, and environmental justice, among other resource categories. 1-ER-87-94.

FAA also considered and responded to hundreds of comments it received. Los Angeles submitted comments on 65 discrete topics, 2-ER-424-465, and FAA provided 52 pages of detailed responses to the City's comments, 2-ER-466-517.

At both the scoping stage and the Draft EIS stage, many commenters focused on concerns about noise from planes flying at the Airport. 2-ER-307-308, 2-ER-312, 2-ER-403-404, 2-ER-416-417, 2-ER-519-520. But as FAA explained, replacing the terminal was a separate action unrelated to the flight procedures and the number of Airport operations. 2-ER-403-413. The replacement terminal would not change the Airport's runway configuration, aircraft fleet mix, number of operations, timing of operations, air traffic procedures, or airspace. 2-ER-404.

Based on its consideration of public comments and its intensive technical analysis in the final EIS, FAA concluded that the Project would *not* cause any significant environmental impacts. 1-ER-87-94. In the Record of Decision, FAA therefore selected the Project as the preferred alternative. 1-ER-95.

Los Angeles' petition for review followed.

# SUMMARY OF ARGUMENT

1.     This case should begin and end with standing. Los Angeles lacks standing to pursue its claims challenging FAA's action. The City cannot sue FAA on its residents' behalf, and it made no attempt to show that it will suffer an imminent and concrete injury-in-fact to its proprietary interests, which it must do. Evidence in the record reinforces the lack of injury to the City's interests. The petition should be dismissed.

2.     On the merits, FAA's alternatives analysis complies with NEPA. Los Angeles' contention that the outcome of FAA's environmental review was a foregone conclusion lacks support.

*First*, FAA reasonably defined the project's purpose and need to solve a serious safety problem by replacing the existing passenger terminal with a new terminal that meets FAA's current safety design standards. In contrast, Los Angeles seeks to obscure the true reason for this project—the word "safety" appears in its brief only once. Brief 19.

*Second*, FAA examined a reasonable range of alternatives. FAA evaluated nine action alternatives but eliminated all but the Airport's proposed Project from detailed study. Los Angeles contends that FAA engineered the alternatives screening process to achieve this result. But the City points to no viable alternative that FAA overlooked or should have studied in more detail.

*Third*, FAA did not predetermine the outcome of its environmental review. To the contrary, FAA kept an open mind and devoted more than two years to painstakingly studying the environmental impacts of the Project.

3.      FAA took a hard look at the potential environmental impacts of the Project, and it rationally concluded that none of those impacts would be significant. Los Angeles objects to the agency's analysis of many impacts— construction noise, truck trip noise, vibration impacts, cumulative noise impacts, and environmental justice impacts. But most of those objections boil down to technical disputes over FAA's analyses—matters on which this Court will defer to the agency's expertise and judgment. And FAA's conclusions are both rational and supported by solid record evidence.

*First*, FAA thoroughly addressed noise issues, while reasonably declining to study noise from truck trips or vibration impacts. *Second*, FAA reasonably declined to conduct an extensive analysis of cumulative noise impacts, when it found that the Project would not produce any significant noise impacts. *Third*, FAA carefully weighed environmental justice issues and rationally concluded that the environmental justice populations near the Airport would not experience any disproportionately high and adverse human health or environmental effects.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA), 5 U.S.C. § 706, "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). This Court reviews FAA's NEPA compliance under the APA's familiar standard to determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004).

This standard is a narrow one under which the Court ensures only that the agency examined the relevant data and articulated a satisfactory explanation for its action. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). The Court may not substitute its judgment for that of the agency and must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Id*. In "areas of agency expertise," this Court defers to FAA's factual determinations. *City of Mukilteo v. U.S. Department of Transportation*, 815 F.3d 632, 637 (9th Cir. 2016).

## ARGUMENT

### I.    Los Angeles lacks standing to pursue its NEPA claims.

As the party invoking this Court's jurisdiction, Los Angeles bears the burden of establishing Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Los Angeles must show that the three elements of standing are met: (1) it has "suffered an injury in fact"—that is, "an invasion of a legally protected interest" that is both (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 560 (cleaned up). Because Los Angeles is not the "object of the government action or inaction," its standing is "ordinarily substantially more difficult to establish." *Id*. at 562 (cleaned up). And to meet this burden, Los Angeles must not simply allege that it has standing; it must offer specific facts "by affidavit or other evidence," *id*. at 561, showing how the Project threatens to harm its proprietary interests.

Los Angeles is silent on any injury to its proprietary interests traceable to the Project. The Authority seeks to demolish the existing 14-gate terminal and construct a safer replacement 14-gate terminal entirely on Airport property. 1-ER-97. As FAA's environmental analysis shows, those construction and demolition activities are expected to cause temporary, non-significant impacts at the Airport

and immediately surrounding areas. 1-ER-43-67. But most of the Airport is within *Burbank*'s city limits, not Los Angeles', including the entire southeast quadrant, where the existing terminal is located, and most of the northeast quadrant, where the replacement terminal would be built. 1-ER-168.

Los Angeles notes that construction will occur "adjacent to the *residential and commercial* uses neighboring the Airport." Opening Brief 39 (emphasis added). But the City cannot establish standing based on generalized concerns about noise and other potential impacts "in the abstract" that are "shared by the public at large." *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 954 (9th Cir. 2006). And importantly, the City cannot sue FAA in a *parens patriae* capacity—that is, it cannot sue FAA on its residents' behalf, and it cannot establish standing based on injuries to its residents. *City of Sausalito*, 386 F.3d at 1197; *see also In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973). Rather, the City must establish harm to its own proprietary interests. *City of Sausalito*, 386 F.3d at 1197. In *City of Sausalito*, for instance, this Court held that a declaration by the city's manager had established a concrete injury to the city's proprietary interests. *Id*. at 1198-99. Unlike *City of Sausalito*, here Los Angeles has offered no declaration or evidence to support a claimed injury. In fact, the City does not even allege that it has standing.

Given the City's silence, FAA is left to speculate on what grounds Los Angeles might assert standing. The City raises concerns about impacts on residents and businesses—for example, noise from the Airport's operations or construction (Brief 40, 47, 53), and alleged impacts on environmental justice populations (Brief 57, 60). But none of these are an injury to the City itself.

It is true that a petitioner asserting a procedural right can "assert that right without meeting all the normal standards for redressability and immediacy." *Defenders of Wildlife*, 504 U.S. at 572 n.7. But the City still must show that it has a concrete interest threatened by FAA's action. *Id.*; *see Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) ("But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing"); *City of Sausalito*, 386 F.3d at 1197. Los Angeles's Opening Brief lacks that demonstration. Without that showing, the Court lacks jurisdiction to reach the merits of Los Angeles' challenge.

## II.     FAA did a proper alternatives analysis.

Even if Los Angeles had standing, its NEPA claims fail on the merits. Los Angeles' challenge to FAA's alternatives analysis is incorrect for three reasons. *First*, FAA adopted a rational purpose and need statement to replace the existing passenger terminal with a safer terminal. Although Los Angeles asserts in cursory fashion that FAA's purpose and need were improper, the City never directly challenges that statement. *Second*, FAA evaluated a reasonable range of alternatives, screening out alternatives that either failed to meet the purpose and need or were infeasible. Los Angeles has not shown that FAA prematurely eliminated a viable alternative from detailed analysis. *Third*, FAA did not predetermine the outcome of its NEPA review. Instead, FAA kept an open mind through more than two years' of careful study before approving the Project.

### A.     FAA reasonably defined the Project's purpose and need.

Before conducting a NEPA alternatives analysis, an agency must properly identify the purpose and need for the proposed action. FAA did so here. FAA reasonably defined the purpose and need for the Project as improving Airport safety by replacing the passenger terminal. At the same time, FAA appropriately accounted for the Authority's related goals. Los Angeles does not directly challenge FAA's purpose and need statement. Instead, the City mixes the purpose

and need statement with the alternatives analysis, sowing confusion and offering no grounds to second-guess FAA's statement.

NEPA's implementing regulations instruct an agency to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Courts evaluate an agency's statement of purpose and need under a reasonableness standard. *HonoluluTraffic.com v. Federal Transit Administration*, 742 F.3d 1222, 1230 (9th Cir. 2014). Agencies enjoy "'considerable discretion' in defining the purpose and need of a project, but they may not define the project's objectives in terms so 'unreasonably narrow' that only one alternative would accomplish the goals of the project." *Id*. (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058, 1070 (9th Cir.2010)).

FAA's purpose and need statement meets this standard. 1-ER-113-120. Both elements of the statement are straightforward. FAA's *purpose* for the proposed action was "to provide a passenger terminal building that meets current FAA Airport Design Standards, passenger demand, and building requirements as well as improve utilization and operational efficiency of the passenger terminal building." 1-ER-114. And FAA explained that its *need* for the proposed action was (1) "to ensure that the Airport operates in a safe manner" under the Airport and Airway Improvement Act, 49 U.S.C. § 47101(a)(1), and (2) to decide whether to approve

the Airport Layout Plan submitted by the Authority under the Improvement Act, *id*. § 47107(a)(16). 1-ER-114. In other words, FAA's need flowed from the relevant statutory framework. *See HonoluluTraffic.com*, 742 F.3d at 1230 (when assessing the reasonableness of a purpose and need statement, courts "must consider the statutory context of the federal action at issue").

As to need, FAA identified multiple, serious, and longstanding safety issues with the existing passenger terminal. 1-ER-113-120. Among these issues, the terminal did not meet FAA's safety standards because of its close proximity to the Airport's two runways and did not comply with California's earthquake design requirements. *See* pp. 9-10 (describing safety issues). Logically, FAA's primary purpose was to solve these safety issues by replacing the terminal in some form. *See Informing Citizens Against Runway Airport Expansion v. FAA*, 757 F. App'x 568, 571 (9th Cir. 2018) (unpublished memorandum disposition) (affirming FAA's statement of purpose and need and recognizing that "FAA has a statutory mandate to promote 'the safe operation of the airport and airway system' and efficient air transportation") (citing 49 U.S.C. §§ 47101(a)(1), (b)).

Of course, FAA also considered the Authority's objectives. 1-ER-114; 1-ER-120. This too is proper. When an agency is asked to authorize a private project (for example, to grant a permit or license, or to approve the Airport Layout Plan here), the agency's purpose and need statement "should take into account the needs

and goals of the parties involved in the application." *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196, 199 (D.C. Cir. 1991). This Court and others agree with this approach. *See, e.g.*, *Informing Citizens Against Runway Airport Expansion*, 757 F. App'x at 571 ("An agency may allow a private interest to give context to its statement of purpose and need"); *Alaska Survival v. Surface Transp. Board*, 705 F.3d 1073, 1085 (9th Cir. 2013) (affirming that the factors relevant to definition of purpose can include private goals, especially when the agency is deciding whether to issue a permit or license); *Webster v. USDA*, 685 F.3d 411, 423 (4th Cir. 2012) ("In deciding on the purposes and needs of a project, it is entirely appropriate for an agency to consider the applicant's needs and goals.").

And the Authority's primary objective directly aligned with FAA's purpose and need: to replace the existing terminal with a safer terminal. 1-ER-98 (noting that "FAA and the Authority have discussed the need for a replacement passenger terminal building since January 1980" because of safety concerns). Given the 40-year history of collaboration on this safety issue, it is no surprise that FAA's and the Authority's main objectives overlapped. This is not because FAA blindly adopted the Authority's "narrow goals," as Los Angeles claims (Brief 34), but because the Authority properly deferred to FAA's expertise and authority on safety at the Airport.

Los Angeles misplaces reliance on two decisions, *National Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir. 2010), and *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997). Brief 34-36. In *National Parks*, this Court held that the Bureau of Land Management had unreasonably defined its objectives too narrowly so that it would exclude any alternatives that did not meet the private party's three specific objectives, which could only be satisfied by approving that party's requested land exchange. 606 F.3d at 1070-72. And in *Simmons*, the Seventh Circuit faulted the Army Corps for its "wholesale acceptance" of the purpose and need definition submitted by the private party, which improperly restricted the agency's alternatives analysis. 120 F.3d at 669-70.

Leaning on *National Parks* and *Simmons*, Los Angeles asserts that "FAA adopted another party's narrow goals (Burbank's goals, as specifically approved by Measure B) and used those goals in a way that guaranteed no alternative could survive the EIS's screening process." Brief 34. But FAA did *not* blindly adopt the Authority's goals. 1-ER-113-120. To the contrary, FAA studied the safety issues and identified objectives based on its responsibilities under the Airport and Airway Improvement Act, 49 U.S.C. §§ 47101(a), 47107(a)(16). 1-ER-113-120; *see Alaska Survival*, 705 F.3d at 1085 ("But when granting a license or permit, the

agency has discretion to determine the best way to implement its statutory objectives, in light of the goals stated by the applicant.").

*Citizens Against Burlington* is more instructive than the City's precedent. There, the D.C. Circuit emphasized that an agency's statement of purpose provides boundaries for identifying reasonable alternatives to a private party's proposed project. 938 F.2d at 195. The court stressed that "an agency should always consider the views of Congress" as expressed "in the agency's statutory authorization to act" and other statutes. *Id*. at 196. At the same time, the court noted that "Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action." *Id*. at 199.

As in *Citizens Against Burlington*, FAA heeded Congress' views in the Airport and Airway Improvement Act, and it considered the Authority's reasons for seeking to replace the existing terminal. 1-ER-113-120. And unlike *National Parks* and *Simmons*, FAA defined the purpose and need for a safer replacement terminal in terms that were broad enough to be met by a range of reasonable alternatives. 1-ER-113-120. This flexibility is underscored by the EIS's alternatives analysis, discussed next, in which FAA identified four action alternatives that would achieve the objectives of the purpose and need. 1-ER-151.

**B. FAA considered a reasonable range of alternatives.**

An agency's evaluation of alternatives is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. In the EIS for the terminal replacement project, FAA considered a broad range of alternatives—nine action alternatives, plus the no-action alternative. And FAA rationally explained why it eliminated eight of those action alternatives from detailed study through a two-step screening process. Los Angeles' contentions lack grounding in NEPA and in the record.

FAA considered a reasonable range of alternatives. Los Angeles contends that the EIS is flawed because none of the action alternatives other than the Project survived FAA's screening process. Brief 22, 33, 37, 38. This contention misapprehends NEPA. An agency need not conduct a detailed study of alternatives for its own sake. An agency's obligation in an EIS is to "[r]igorously explore and objectively evaluate all *reasonable* alternatives" and "for alternatives which were eliminated from detailed study, *briefly* discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (emphases added). Thus, as this Court has affirmed, "all NEPA requires" is that an EIS "discusses in detail all the alternatives that were feasible and briefly discusses the reasons others were eliminated." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994). And "there is no minimum number of alternatives that must be discussed." *Id*. The critical point is not how many alternatives are discussed but whether FAA has

offered a rational explanation for how it treated those alternatives. *See Envtl. Prot. Info. Center v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) (agency adequately considered alternatives because its reasons for eliminating alternatives "were not arbitrary or capricious").

In so many words, Los Angeles' position is that FAA cannot conduct a proper NEPA analysis if it did a detailed study of only one action alternative. But this Court has affirmed that an agency may comply with NEPA by doing a detailed study in an EIS of only one or a small handful of alternatives. *See California v. U.S. Dep't of Interior*, 767 F.3d 781, 797-798 (9th Cir. 2014) (affirming the agency's decision in an EIS to "discuss only one alternative—no action" in comparison to action alternative); *Laguna Greenbelt*, 42 F.3d at 524 (approving of agency's EIS evaluating in detail two similar action alternatives and a "no project" alternative); *League of Wilderness Defenders v. U.S. Forest Service*, 689 F.3d 1060, 1071-73 (9th Cir. 2012) (upholding EIS that considers in detail two action alternatives and the no action alternative).

Sister circuits concur. *See, e.g.*, *Webster*, 685 F.3d at 427 (agency complied with NEPA when it eliminated numerous alternatives for "technical feasibility, pecuniary costs, and effectiveness in achieving the purposes of the action" and examined in detail the no action alternative and a single action alternative); *City of Bridgeton v. FAA*, 212 F.3d 448, 455-459 (8th Cir. 2000) (affirming FAA's

detailed study of two action alternatives and the no action alternative for airport expansion project); *Citizens Against Burlington*, 938 F.2d at 197 (upholding FAA's detailed study of the proposed plan and no-action alternative); *Tongass Conservation Soc. v. Cheney*, 924 F.2d 1137, 1142 (D.C. Cir. 1991) (screening out 13 of 14 facilities and considering one site feasible); *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541-43 (11th Cir. 1990) (EIS with two alternatives studied in detail was sufficient).

Consistent with these principles, FAA considered nine action alternatives. 2-ER-500. And it applied a two-step screening process to eliminate all but the Project from detailed study. 1-ER-131-151.

At the first step, FAA considered whether an action alternative would meet the purpose and need for the project. 1-ER-133. FAA eliminated five action alternatives at step one, finding that they would not achieve the objectives of FAA's purpose and need statement. 1-ER-134-147. At the second step, FAA asked whether the alternative was practical and feasible to implement and accorded with Measure B—the November 2016 Burbank-voter-approved requirements for a terminal project. 1-ER-147-151. FAA eliminated three action alternatives at step two—construction of a new airport, construction of a remote landside facility, and construction of a replacement passenger terminal building in the southeast

quadrant. 1-ER-148. At both screening steps, FAA complied with NEPA by briefly explaining why it was eliminating alternatives from detailed study. 1-ER-134-150.

Los Angeles does not directly challenge FAA's explanations. Brief 30-38. Instead, the City asserts that by including Measure B as one of the criteria at step two of the screening process, FAA improperly eliminated "potentially viable alternatives." Brief 36. This assertion fails for three reasons.

*First*, Los Angeles has not shown that FAA eliminated any viable alternative from detailed study. The "failure to examine a reasonable alternative renders an EIS inadequate." *Alaska Survival*, 705 F.3d at 1087 (cleaned up). But an EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Id*. (cleaned up). On this score, parties "challenging the failure to consider an alternative have a duty to show that the alternative is viable." *Id*. (cleaned up).

Los Angeles has not met this duty, nor even acknowledged it. The City asserts vaguely that FAA "failed to consider *potentially* viable alternatives that would have fewer or less severe adverse environmental effects." Brief 36 (emphasis added). But the City never elaborates on this assertion, nor does it offer record evidence showing that FAA erroneously eliminated a viable alternative. *Id*. at 36-37. Elsewhere, Los Angeles claims that FAA "ignored the concerns of the City and the neighboring communities by refusing to consider less impactful alternatives, such as the 'New Airport' and 'Remote Landside' alternatives that

would meet the Project's purpose and need but in ways that are less disruptive to the City and less environmentally degrative." Brief 35. Again, Los Angeles offers no evidence for these claims. And the City's assertion that building a new airport or remote landside facility would be "less impactful" and "less environmentally" degradative is not just unsupported, it defies commonsense.

Indeed, the only evidence the City cites is FAA's explanation for eliminating the alternatives. Brief 33, 34, 37 (citing 1-ER-147-150). Just mentioning an alternative does not satisfy Los Angeles' "duty to show that the alternative is viable." *Alaska Survival*, 705 F.3d at 1087 (cleaned up); *id*. ("Petitioners merely contend but do not show that a no-access-road is a feasible option that should have been considered by" the agency). So the City has "failed to identify a viable but unexamined alternative that would satisfy" the purpose and need statement. *League of Wilderness Defenders*, 689 F.3d at 1072-73 (cleaned up).

*Second*, although Los Angeles mentions the New Airport and Remote Landside alternatives in its brief, it did not raise either alternative in its comments on the Draft EIS. 2-ER-448-449. In those comments, Los Angeles mentioned a *different* alternative—an airfield reconfiguration. 2-ER-449. FAA responded by explaining why an airfield reconfiguration would not meet the purpose and need. 2-ER-500-501. But the City made no similar comment about the New Airport or Remote Landside alternative. 2-ER-448-449. No commenter suggested that either

alternative was viable enough to warrant in-depth study. Only in its brief has Los Angeles floated the New Airport and Remote Landside alternatives as potentially viable alternatives that FAA should have studied in detail. Brief 34-36. That is too little, too late. *See Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1036-37 (9th Cir. 2019) (parties must structure their participation in the NEPA process to alert the agency to the parties' position and contentions, so the agency can give an issue meaningful consideration).

*Third*, FAA gave rational reasons for eliminating the New Airport and Remote Landside alternatives from further study in the EIS. 1-ER-148. Los Angeles criticizes Measure B as a screening criteria, but FAA identified other, independent barriers that made these alternatives impractical or infeasible. FAA explained that the New Airport alternative was "not reasonable because the Joint Powers Agreement that forms the Burbank-Glendale-Pasadena Airport Authority does not provide the authority for the airport sponsor to construct a replacement airport and close the existing airport." 1-ER-148; SER-13 (confirming that the New Airport alternative "is not practical and feasible to implement and was eliminated from further consideration"). In simple terms, the Authority has power to operate the Hollywood Burbank Airport, not to abandon it and construct a new airport. *See* California Gov't Code § 6546.1.

As for the Remote Landside alternative, FAA observed that implementation "would be difficult in the Burbank area because of the highly urbanized development pattern." 1-ER-148. FAA noted that there "is no open space near the Airport for the type and size of remote landside facility that would be needed." 1-ER-148. And the Authority would need to acquire more off-Airport property, which raised additional uncertainties, including identifying a willing seller or seeking to condemn property. 1-ER-148.

Both the New Airport and Remote Landside alternatives posed many legal and practical obstacles, none of which were presented by the more modest and logical alternative of building a safer terminal at the Airport. FAA "is not required to give exhaustive consideration to an alternative that it appropriately deems remote and speculative." *Protect Our Communities Found.*, 825 F.3d at 581. FAA gave sound reasons for rejecting these alternatives, and Los Angeles has pointed to no evidence casting doubt on the agency's conclusions. *See, e.g.*, *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (affirming FAA's decision to eliminate "off-site alternatives," including a new airport, and to focus detailed study on the only "viable alternatives"); *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996) (affirming FAA's decision to reject as infeasible the alternatives of a parallel runway and new airport).

To be sure, FAA identified Measure B as *another* reason why these alternatives should be eliminated. 1-ER-148. This is sensible because it reflects the historical and legal backdrop for this project. The Authority spent decades seeking an acceptable solution to the safety issues posed by the existing terminal. 1-ER-98-100. Los Angeles and Burbank stymied those efforts. In 1999, the Authority lost state court litigation based on state law that required Burbank to approve any land acquisition for the Airport. 1-ER-98-99. The state court decision put Burbank firmly in control of the future of the project. Then in 2015, "after decades of disagreements," the Authority and Burbank finally reached a carefully crafted compromise to allow the Authority to build a replacement terminal. 1-ER-99. That compromise was affirmed by Burbank's voters, who by a roughly 70 percent majority passed Measure B. 1-ER-100.

Given these longstanding barriers, FAA rationally included Measure B in its screening criteria. *See, e.g.*, *NRDC v. FAA*, 564 F.3d 549, 557 (2d Cir. 2009) (approving of FAA's eliminating alternatives because the agency was "unlikely to secure permit approval" from the state agency); *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 470 (6th Cir. 2014) (concluding that "it is not a violation of NEPA for an agency to decline to consider further an alternative if the agency is unlikely to secure required approval to move forward with that alternative"). "An agency is under no obligation to consider

every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996).

At bottom, FAA's decision to eliminate the other action alternatives from detailed study and to select the Project as both a safe and feasible alternative is a "judgment call" that falls "within the purview of the FAA's expertise." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 211 (1st Cir. 2011). In short, FAA's alternatives analysis is reasonable.

### C.  FAA did not predetermine the outcome of its NEPA review.

Los Angeles also contends that FAA "predetermined" the outcome of its NEPA analysis. Brief 34, 38. But the City does not even address the legal standard for predetermination. Nor is it met here.

Predetermination—a specific type of NEPA violation—occurs when an agency makes an "irreversible and irretrievable commitment of resources" *before* completing its NEPA review. *Metcalf v. Daly*, 214 F.3d 1135 (9th Cir. 2000). In *Metcalf*, this Court held that the agency had predetermined the outcome of its NEPA review when it signed a contract committing it to support an Indian tribe's whaling plan before finishing its environmental analysis of that plan. *Id*. at 1143-44; *id*. at 1144 ("By the time the Federal Defendants completed the final [Environmental Assessment] in 1997, the die already had been cast."). Although

Los Angeles cites *Metcalf*, Brief 31, 38, the City does not acknowledge *Metcalf*'s specific and demanding standard to prove predetermination. 214 F.3d at 1143-44; *see also Forest Guardians v. U.S. Fish & Wildlife Service*, 611 F.3d 692, 714 (10th Cir. 2010) ("a petitioner must meet a high standard to prove predetermination"). Nor has Los Angeles identified any irreversible and irretrievable commitment of resources by FAA before the agency completed its environmental review.

That is because there is none. Before completing its environmental review, FAA did not commit to anything, let alone irretrievably commit resources to a particular outcome. *See Pit River Tribe v. U.S. Forest Service*, 615 F.3d 1069, 1082-83 (9th Cir. 2010) (distinguishing *Metcalf* and observing that while "bureaucratic inertia may be a risk, we presume that agencies will follow the law"); *cf. Metcalf*, 214 F.3d at 1144 (finding predetermination when the agency made a written commitment to the tribe and took "concrete efforts on their behalf" before completing its environmental review). In the EIS, FAA identified potential irreversible and irretrievable commitments of resources that would occur, but it found those commitments would result from *implementing* the Project, not before. 1-ER-66-67. And to avoid even the *appearance* of pre-judging the Project, FAA adhered to its requirement that plans or designs for a proposed action must be no more than 25 percent finished before concluding the NEPA process. SER-47-48; 2-ER-466-467.

Underlying Los Angeles' position is the insinuation that FAA's entire environmental review was a sham. But FAA conducted its review in good faith and with an open mind, devoting substantial agency resources for over two years to studying the alternatives to, and environmental impacts of, the Project. Along the way FAA solicited the views of many stakeholders, including Los Angeles, and responded to that public input. And FAA retained its authority to reject or deny the Authority's Project until May 2021, when the agency issued its final EIS and Record of Decision approving the Authority's updated Airport Layout Plan. 1-ER-75-76; *see WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (no irretrievable commitment when the agency "clearly retained the authority to change course or to alter the plan it was considering implementing"). Thus, FAA did not predetermine the outcome of its environmental review, nor did it prematurely commit resources to the Project. All in all, FAA did a reasonable alternatives analysis that complied with NEPA.

## III. FAA took a hard look at the Project's potential environmental impacts.

NEPA requires agencies to take a hard look at the environmental consequences of the decisions they make. *Los Angeles*, 138 F.3d at 807. So long as FAA "discusses the main environmental effects reasonably thoroughly, that's enough." *Id*. at 807 (cleaned up). Consistent with these requirements, FAA prepared an EIS that took a hard look at the Project's potential environmental

impacts. FAA studied impacts across fourteen broad environmental resource categories, including air quality; biological resources; climate; hazardous materials, solid waste, and pollution prevention; historical, architectural, archeological, and cultural resources; noise and noise-compatible land use; and socioeconomics, environmental justice, and children's environmental health and safety risks. 1-ER-155. In more than 300 pages of the EIS and more than 1,000 pages of supporting appendices, FAA fully analyzed and disclosed the Project's potential impacts. Based on this intensive study, FAA concluded that the Project— which would improve the Airport's safety while maintaining the same number of gates as the existing passenger terminal—would *not* cause any significant environmental impacts. 1-ER-25-76.

Los Angeles declines to give FAA credit for this extensive analysis, devoting one cursory paragraph to the topic. Brief 25. In contrast, the City devotes nearly half of its brief (at 33-72) to a host of technical objections to FAA's analysis of a handful of specific impacts. Los Angeles criticizes FAA's evaluation of (1) construction noise and vibration impacts, (2) cumulative noise impacts, and (3) environmental justice impacts.

The City's objections reflect its disagreement with FAA's expert judgment and conclusions, not deficiencies in FAA's analyses. And on review by this Court, FAA's technical determinations "merit particular deference." *Protect Our*

*Communities Found.*, 825 F.3d at 581. FAA's technical determinations are rational and supported by the record. And none of the minor and temporary impacts that FAA identified outweighed the pressing need to replace an outdated terminal that for decades has failed to meet FAA's safety standards.

## A. FAA rationally analyzed construction impacts.

Describing the Project as a "mammoth construction effort," Los Angeles claims that FAA failed to adequately consider noise and vibration impacts from construction. Brief 39-40. But FAA thoroughly studied the potential environmental impacts from construction activities and found no significant impacts.

### 1. FAA studied two distinct areas to evaluate the direct and indirect impacts from the Project.

At the start, it is vital to distinguish between the two areas that FAA studied in the EIS: the Detailed Study Area and the General Study Area. This distinction, which Los Angeles overlooks, provides needed context for the City's objections.

FAA defined the Detailed Study Area as the entire Airport property, roughly 555 acres. 1-ER-156. The *direct* impacts from construction of the Project, such as physical ground disturbance, would occur within that Detailed Study Area, on the Airport's property. 1-ER-156. In its brief, Los Angeles never mentions the Detailed Study Area, where most of the Project's impacts would be concentrated. Instead, Los Angeles' contentions about construction noise and vibration impacts all relate to the broader General Study Area that FAA analyzed.

FAA also studied this much larger General Study Area, comprising about 4,900 acres that includes the Detailed Study Area as well as parts of Los Angeles and Burbank surrounding the Airport. 1-ER-156. Although FAA Order 1050.1F gave FAA discretion to define the General Study Area to track more narrowly to the 65 decibel noise contour around the Airport, the agency chose to expand the General Study Area's boundaries to follow major roadways in the area. 1-ER-156-158, 2-ER-394. FAA defined the General Study Area to evaluate *indirect* impacts that could occur in the surrounding communities, such as effects on air quality, noise-sensitive land uses, and socioeconomic conditions. 1-ER-156.

Although the General Study Area includes residential areas, none of those areas are next to the Project. This point is reflected in the Authority's plans for the Project. 5-ER-997. The areas immediately surrounding the Airport's northeast quadrant, where the replacement terminal would be built, are commercial areas devoted to manufacturing that are not zoned for noise-sensitive uses. 1-ER-166-168; 1-ER-103, 122, 123 (satellite photographs depicting parking lots and commercial buildings near the Airport). The nearest noise-sensitive land use is a residential property *north* of San Fernando Boulevard, about 930 feet from the boundary of the Detailed Study Area. 2-ER-491-492. This is shown on the following map. 2-ER-491.



CITY OF LOS ANGELES

CITY OF BURBANK

SUNLAND BLVD

METROLINK

5

LAUREL CANYON BLVD

LANKERSHIM BLVD

STRATHERN ST

Detailed Study Area

SATICOY ST

Closest Residential Uses to Northeast Quadrant

TUL

SHERMAN WAY

AMTRAK

Closest Residential Uses to Southeast Quadrant

VANOWEN ST

TUJUNGA AVE

VINELAND AVE

THORNTON AVE

W EMPIRE AVE

170

VICTORY BLVD

BURBANK BLVD

CLYBOURN AVE

General Study Area

### Legend

**CITY OF LOS ANGELES**
- Low Density Residential
- Medium Density Residential
- Public Facilities
- Open Space
- Light Manufacturing
- Limited Manufacturing
- Commercial
- Neighborhood Commercial
- Highway Oriented Commercial
- General Study Area
- Detailed Study Area
- City Limit

**CITY OF BURBANK**
- Low Density Residential
- Medium Density Residential
- High Density Residential
- Open Space
- Institutional
- Corridor Commercial
- Regional Commercial
- Downtown Commercial
- North Victory Commercial/Industrial
- Golden State Commercial/Industrial

1 MI

N

*Environmental Impact Statement*
**Bob Hope "Hollywood Burbank" Airport**

## Closest Residential Uses to Proposed Project Site

In practical terms, when Los Angeles raises concerns about noise and vibration impacts from construction, it is objecting to FAA's analysis of *indirect* effects. Those indirect effects could travel beyond the Airport's boundaries and reach communities that are located some distance from the Project. As discussed next, FAA's technical analyses confirmed that none of those potential impacts would be significant when compared to the no action alternative.

## 2. FAA studied and disclosed noise impacts from construction.

FAA did extensive noise analysis that confirmed the Project would cause no significant noise impacts from the Airport's operations or construction.

First, FAA studied whether the Project would cause increased noise from air traffic at the Airport, both in the near term in 2024 and longer term in 2029. 1-ER-231-237. Based on its noise modeling, FAA concluded that the Project would not cause any significant noise impact compared to the no action alternative. 1-ER-236-237. FAA also found that the noise contours around the Airport would not change as a result of the Project. 1-ER-235-237.[4] As FAA noted, the Project would "not result in changes to the Airport's runway configuration, aircraft fleet mix, number of operations, timing of operations, air traffic procedures, or airspace." 1-

---

[4] FAA uses noise contours to measure areas at and immediately around an airport that experience at least 65, 70, or 75 decibels of sound using the Community Noise Equivalent Level (CNEL) standard. 1-ER-232-234.

ER-236. The Airport would continue to operate as it had before, just with a safer replacement passenger terminal.

FAA also assessed noise from construction and demolition. Unlike modeling airplane noise, FAA lacks a proprietary model for construction noise, so it had to select an accepted methodology from another source. 1-ER-1206-1207. FAA chose data from the Federal Highway Administration's national model for predicting construction noise, the Roadway Construction Noise Model. 1-ER-237-239; SER-49-53. Using that data, FAA calculated noise impacts for all construction equipment types that would likely be used for the Project. 1-ER-233, 237-238.

Adopting a conservative approach, FAA's analysis showed that even the *loudest* construction equipment (a jackhammer) would attenuate to no more than 64 decibels at the *closest* noise sensitive land use. 1-ER-237-238, 2-ER-491-492. The closest residential property was about 930 feet northeast of the construction site, on the *other* side of San Fernando Boulevard. 1-ER-237-238; 2-ER-491-492; *see* p. 40 (map showing residential properties closest to the Project).

FAA also projected that the actual noise impacts on the nearest noise-sensitive land uses would be *less* than this maximum 64-decibel estimate for two reasons. First, noise from construction and demolition equipment would be attenuated by buildings at the Airport and other commercial or industrial buildings between the Airport and the closest noise-sensitive land uses. 1-ER-237-238, 2-

ER-493, SER-54. Second, construction and demolition noise would be temporary and intermittent, depending on the construction equipment needed. 1-ER-238. And the residential properties closest to the Airport were also within the 70 decibel noise contour for Interstate 5 and were thus likely to experience background noise from the freeway. 1-ER-238-239; *see* p. 40 (map showing closest residential properties and Interstate 5).

Based on this analysis, FAA concluded that noise from construction and demolition activities would be minimal for the closest noise-sensitive land uses and would not be a significant impact under NEPA. 1-ER-238-239; 2-ER-492. Besides being technically correct, this conclusion makes intuitive sense because construction noise will be concentrated on the Airport's property and immediately surrounding areas, none of which are noise-sensitive uses.

Los Angeles' criticisms are flawed. *First*, the City states that "construction will occur for at least six years, six days per week, eight hours per day." Brief 40. The image that the City attempts to paint is of an army of jackhammers, pile drivers, and backhoes causing nonstop, earsplitting noise for six years straight. The reality is far from that. What FAA said in the EIS was that "construction activities are expected to occur *with varying degrees of intensity* over the six-year span, 2021 through 2026." 1-ER-207 (emphasis added). As the construction schedule shows, constructing the replacement passenger terminal will take about four years from

43

start to finish (2021-2024) and, for obvious reasons, would be *followed* by demolition of the existing terminal, which would take one year (2025). 1-ER-209. Granted, FAA calculated construction emissions based on an 8-hour workday, 6 days per week. 1-ER-209. But that is a conservative assumption, not the actual anticipated level of construction activities.

*Second*, Los Angeles claims that for construction noise, FAA (1) failed to "articulate a rational basis for its significance conclusion," (2) "did not provide any technical analysis or information to support its conclusion," and (3) failed to perform "any construction noise calculations." Brief 42, 44, 45. But FAA did precisely that with its calculations based on the Federal Highway Administration's construction noise model. To be sure, FAA acknowledged that the Authority had not yet developed detailed construction plans, and therefore "specific construction details are not known at this time." 2-ER-467, 490. But based on the available data, FAA analyzed construction noise and determined that the Project would not cause any significant impacts. 1-ER-238-239; 2-ER-492.

*Third*, Los Angles misapprehends the noise standards that FAA applies. Brief 40-46. The City references FAA's noise standards in Appendix B to FAA Order 1050.1F, but those standards address *aircraft* noise. 5-ER-1201-1206. Thus, for "aviation noise analyses," FAA has identified the Community Noise Equivalent Level (CNEL) as a proper standard for FAA actions in California. 5-ER-1201.

Adhering to Order 1050.1F, FAA set CNEL 65 decibels as the threshold of significance for airport noise. 1-ER-44, 5-ER-1130. Finally, FAA modeled aircraft noise and concluded that the Project would cause no increases of CNEL 1.5 decibels or more for any noise sensitive site within the CNEL 65 decibel noise contour around the Airport. 1-ER-231-237.

Construction noise is different. Noise from construction activities is both temporary and intermittent, depending on what equipment is needed. 1-ER-238. And FAA does not have a separate NEPA significance threshold for this impact. 1-ER-232. Los Angeles selectively quotes and highlights snippets in FAA Order 1050.1F about construction noise. Brief 43 (highlighting 5-ER-1206). But in that same section of the Order, FAA explains that including in the noise analysis sources "other than aircraft departures and arrivals," such as construction noise, "should be considered on a case-by-case basis, as appropriate." 1-ER-1206. The Order then directs that an "analysis of surface transportation impacts, including construction noise, should be conducted using accepted methodologies from the appropriate modal administration, such as the Federal Highway Administration for highway noise." 5-ER-1206-1207. FAA followed this direction when it used data from the Federal Highway Administration's model.

For similar reasons, FAA did not use the CNEL metric to measure construction noise. The CNEL metric averages sound levels over a complete 24-

hour period, with a 10 decibel penalty added to nighttime noise events for increased sensitivity to noise during night time hours. 5-ER-1234; 2-ER-369-370 (Figure J-4); 1-ER-156 n.4. But the construction activities here would *not* occur 24 hours a day, 365 days a year, so the CNEL metric is inappropriate for reporting construction noise. The Federal Highway Administration's construction noise model employs a more accurate metric (Lmax), which measures the highest weighted sound level during a single event. 5-ER-1244. Thus, when FAA analyzed construction noise using the Lmax metric, the results in decibels are actually lower than results under the CNEL metric.[5]

That is also why Los Angeles is wrong when it speculates that combining noise from two pieces of construction equipment (which FAA calculated under the Lmax metric) would cause a 3 decibel increase that would exceed the *CNEL* 1.5 decibel threshold. Brief 44-45. Because the metrics are different, they produce different results—a point Los Angeles fails to appreciate.

*Fourth*, Los Angeles asserts incorrectly that FAA should have applied the *City*'s noise standards. Brief 40-43. The City emphasizes FAA's statement in the

---

[5] Although the results in Table 4.11-1 of the EIS are accurate, the Table incorrectly states that the results are measured by the Leq metric. 1-ER-238. But the Federal Highway Administration's model relies on data measured with the Lmax metric. SER-52-53. Correcting this minor error makes FAA's conclusion *more* conservative because reporting the results with the Leq metric suggested that the noise would occur continuously over time, even though no construction equipment would run continuously over a workday.

agency's nonbinding Desk Reference that local noise standards "must be disclosed to the extent required under" NEPA regulations, 40 C.F.R. §§ 1502.16(c) and 1506.2(d). Brief 43 (quoting 5-ER-1202). But the City omits the following sentence: "However, the FAA does not use local land use compatibility standards to determine the significance of noise impacts." 5-ER-1202. And the City's local noise standards are based on the CNEL metric, while FAA measured construction noise using the Lmax metric. 5-ER-1022.

Besides, the Authority addressed Los Angeles' noise standards in its CEQA environmental review. 5-ER-1022-1025. That analysis reveals that Los Angeles' guidance on the CEQA significance threshold for *airport* noise is more lenient than its local standards and similar to FAA's significance threshold for aircraft noise under NEPA. *Compare* 5-ER-1025 *with* 1-ER-231. And the Authority's CEQA analysis projected even *lower* construction noise estimates than FAA calculated. 5-ER-1048.

*Fifth* and finally, because FAA rationally concluded that construction noise impacts on noise-sensitive land uses would be minimal and that the Project would not exceed or expand the Airport's CNEL 65 decibel noise contour, FAA also properly concluded that no mitigation was required. 1-ER-49-50; *cf.* Brief 46 (citing cases in which FAA's action exceeded or expanded the noise contour).

### 3. FAA adequately analyzed construction truck trips.

FAA considered the potential impact of construction truck trips in the EIS. 2-ER-243-244, 2-ER-466-476, 2-ER-480-483. Los Angeles contends (at 46-49) that FAA also should have done a separate *noise* analysis for those truck trips, but FAA declined to so do. This is reasonable.

FAA extensively analyzed surface traffic in the General Study Area, studying 42 intersections and four segments of Interstate 5. 1-ER-180-187. And in response to Los Angeles' comments, 2-ER-435, FAA provided more detailed information about estimated construction traffic. 2-ER-480-483. FAA concluded that construction traffic would not cause a significant impact by disrupting local traffic patterns or substantially reducing levels of service on roads around the Airport, including the intersections about which Los Angeles expressed specific concern. 2-ER-480-483. And having concluded that the construction traffic would not have a significant impact, FAA reasonably declined to do an associated noise analysis. 2-ER-489-490, 2-ER-480-483. FAA's decision accords with NEPA, which does not require detailed study of every possible impact, however remote and insignificant. *See* 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance. There shall only be brief discussion of other than significant issues.").

FAA's decision also tracks its Order 1050.1F, which says that the agency should consider noise from sources other than aircraft operations "on a case-by-case basis, as appropriate." 1-ER-1206; 2-ER-480. Here, it was not feasible for FAA to study construction truck trip noise because the Authority has not yet prepared detailed construction plans to show where trucks would go. 2-ER-466-467. On this score, Los Angeles is incorrect when it states that "*data already exists*." Brief 49 (emphasis original).

Instead, FAA noted that the Authority has agreed to prepare a construction traffic management plan that would (1) specify street routes for construction vehicles designated by Burbank and Los Angeles, and (2) establish communication protocols with both Cities. 2-ER-243, 4-ER-483. FAA rationally concluded that the Authority's construction traffic management plan, once prepared, would also reduce impacts from construction traffic. 2-ER-483.

On this topic, three of Los Angeles' points call for a response. *First*, Los Angeles has inflated the amount of truck traffic. The City discusses haul and vendor trips in 2022 and 2025, and then states that "[t]his construction traffic will persist for at least six years." Brief 46-47. That is incorrect. Table M.5-1, on which Los Angeles relies, shows that most of the haul and vendor trips would be concentrated in those two years: 2022 (during grading and building construction for the replacement passenger terminal) and 2025 (during demolition of the

existing passenger terminal and grading and construction of the taxiways). 2-ER-481. For three years (2023, 2024, and 2026), Table M.5-1 shows no haul or vendor trips—*none*. 2-ER-481.

Even for the two years during which most haul and vendor truck trips will occur, FAA reasonably found that there will be no significant impacts on local traffic. 2-ER-481-482. Los Angeles stresses that in 2025, there will be up to 690 daily haul truck trips during grading work. Brief 47. But to put this number in perspective, in 2017, the two major roads near the Airport had about *170,000* daily trips (Interstate 5) and *150,000* daily trips (State Route 170) in or near the General Study Area—for a total of 320,000 daily trips. SER-7. The truck trips are a drop in the bucket that is far from a "significant aspect of the environmental impact of a proposed action." *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1300 (9th Cir. 2003); *cf.* Brief 48 (quoting *Earth Island Inst.*, 351 F.3d at 1300).

*Second*, Los Angeles claims that "FAA is well aware that truck trips create substantial noise," citing the Authority's CEQA analysis for the Project. Brief 47 (citing 5-ER-1049). But the CEQA analysis shows that construction truck trips on Hollywood Way would cause noise levels of just 55 decibels, which would "not be perceptible" against the area's ambient noise level of 70 decibels. 5-ER-1049; 5-ER-1038 (existing traffic noise on nearby streets). Thus, "off-site construction traffic noise impacts would be less than significant." 5-ER-1049.

*Third*, Los Angeles' reliance on "[a]irport-related noise disturbances" is inapt. Brief 47. All of the City's record citations are complaints from residents about *airplane* noise, which FAA concluded would not be increased by the Project. 1-ER-231-237.

### 4. FAA appropriately addressed potential vibration impacts.

Continuing on a theme, Los Angeles contends that FAA also should have analyzed construction-related *vibration* impacts. Brief 49-51. But FAA reasonably declined to do so.

Under Order 1050.1F, FAA need not study construction-related vibration impacts. 5-ER-1123, 5-ER-492. Nor does FAA have a significance threshold for construction vibration. 5-ER-492. Consistent with FAA's non-binding Desk Reference, FAA may *consider* construction vibration impacts on certain resources protected under Section 106 of the National Historic Preservation Act or Section 4(f) of the Department of Transportation Act. 5-ER-489. But FAA explained that during the public scoping process, no one suggested that vibration impacts may be a concern for any resource category. 5-ER-489; *but cf.* 2-ER-312 (stating vaguely that the "EIS must fully address and evaluate noise and vibration impacts"). And in its comments on the Draft EIS, Los Angeles devoted only a few sentences to opining that FAA should study vibration impacts. 2-ER-435.

Even so, FAA responded to Los Angeles' comment. 2-ER-489-490, 2-ER-492. FAA reviewed the vibration analysis in the Authority's Environmental Impact Report prepared under CEQA. 2-ER-490. That Report concluded that there would be no significant vibration impacts because the closest residential land use was 1,400 feet from the Airport property, and at that distance the "most vibration-intensive activities associated with construction of the proposed project" would "attenuate to well below" the federal threshold of significance set by the Federal Transit Administration. 5-ER-1042-1043; *see also* 5-ER-1020-1022, 5-ER-1033. FAA's reliance on this analysis is an appropriate way to address this potential impact.

Los Angeles correctly notes that NEPA and CEQA impose different standards. Brief 50. CEQA may impose *more* stringent requirements than NEPA. *See City of S. Pasadena v. Goldschmidt*, 637 F.2d 677, 680 n.4 (9th Cir. 1981) ("CEQA obligations may exceed those imposed by NEPA"). But that does not mean that FAA cannot consider and rely on a technical analysis in a CEQA document. *See, e.g.*, *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1189 (8th Cir. 2001) (agreeing that FAA could rely on the analysis and conclusions of a state agency expressed in an environmental report). Los Angeles claims (Brief 50) that the EIS "repeatedly disavows" the CEQA Report, but FAA did no such thing in the cited passages. *See* 2-ER-510-511 (noting that "due to differences in

the methodology of CEQA and NEPA documents . . . impacts *may* not be the same between the two documents and FAA is under no regulatory or statutory obligation to reconcile any differences" (emphasis added)); 2-ER-402 (similar). Besides, the only technical evidence in the record about vibration impacts is in the CEQA Report—evidence that refutes Los Angeles' claim that construction-related vibration is a potentially significant impact.

### B. FAA properly evaluated cumulative noise impacts.

NEPA requires agencies to consider cumulative effects that could "result[] from the incremental impact of the action when added to other past, present and reasonably foreseeable actions." *NRDC v. U.S. Forest Service*, 421 F.3d 797, 814 (9th Cir. 2005) (cleaned up); *see also* 40 C.F.R. § 1508.7 (defining cumulative impacts). Neither NEPA nor its regulations define how a cumulative impacts analysis must be framed. Instead, agencies have discretion to exercise their expertise when defining the appropriate scope of the cumulative effects analysis for particular projects. *See Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1030 (9th Cir. 2007) (determining extent and effect of cumulative impact analysis "is a task assigned to the special competency of the appropriate agencies").

FAA consulted with Los Angeles and Burbank, as well as the Authority, to identify other projects that had occurred, or would occur, in the General Study

Area. 2-ER-420. Then FAA analyzed the cumulative impacts of the Project when combined with those other past, present, and reasonably foreseeable actions. 1-ER-197-201 (listing cumulative actions); 1-ER-248-256 (cumulative impacts analysis); 2-ER-403-404, 2-ER-419-422 (responding to comments). Los Angeles contends that FAA violated NEPA "by failing to include *any* actual discussion of cumulative noise impacts." Brief 52. But the City misapprehends FAA's analysis and conclusion, which are consistent with NEPA.

FAA modeled potential noise impacts from the Airport's aircraft operations. 1-ER-231-237; 1-ER-364-378 (Appendix J providing additional noise data and analysis). This modeling projected noise contours for 2024 and 2029, so it accounts for both the Project and other actions at the Airport and in the General Study Area. 1-ER-197-200. FAA's conclusion was that the noise contours for Airport operations would be the same for both the no action alternative and the Project for 2024 and 2029. 1-ER-231-237. In other words, the Project would cause *no* increase in noise from the Airport's operations. FAA also explained *why* this modeling was correct: the Project would not alter or expand the Airport's "runway configuration, aircraft fleet mix, number of operations, timing of operations, air traffic procedures, or airspace." 1-ER-236. Changes to those operational elements can affect the Airport's noise contours, but FAA confirmed that these variables are the same for both the Project and the no action alternative. 1-ER-236. Similarly,

FAA found that construction noise would be intermittent and temporary, would have a minimal effect on the closest noise-sensitive land uses, and would not be a significant impact. 1-ER-237-239.

Because the Project would not cause *any* noise impacts from Airport operations and only minimal impacts from construction noise, FAA's analysis of cumulative noise impacts was straightforward. FAA explained that "[e]nvironmental resource categories that would not result in potential adverse effects as a result of the Proposed Project cannot result in cumulative impacts." 1-ER-248; 1-ER-66. This included the resource category for Noise and Noise-Compatible Land Use. 1-ER-248. FAA's conclusion aligns with NEPA's implementing regulation, which defines cumulative impacts as "the *incremental* impact of the action when *added* to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (emphasis added). Because the Project had only minimal noise impacts from construction and no noise impacts from Airport operations, combining the Project with other actions would produce no cumulative noise impacts of any significance.

FAA's conclusion squares with precedent on cumulative impacts. This Court has affirmed that when a proposed action causes minimal impacts, an agency may properly decline to further analyze that cumulative impact. *See, e.g.*, *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1139-40 (9th Cir. 2006)

(when EIS found that project would have small direct environmental impacts, agency need not further discuss cumulative impacts); *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 926 (9th Cir. 2018) (holding that when project was not likely to affect endangered fish, agency properly concluded that the project would not cause significant cumulative water quality impacts to the fish).

Other circuits agree. *See Twp. of Bordentown, New Jersey v. FERC*, 903 F.3d 234, 256 (3d Cir. 2018) ("Given that the petitioners failed to show anything more than minimal impacts from the Project itself, they have failed to show that FERC acted arbitrarily or capriciously in determining that the Project would likewise not contribute to significant cumulative impacts . . . ."); *Fath v. Texas Dep't of Transp.*, 924 F.3d 132, 139-140 (5th Cir. 2018) ("If the project would have no significant impact by itself, it is unlikely to change the environmental status quo when 'added' to other actions."); *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 113 (D.C. Cir. 2014) (upholding cumulative-impact analysis finding "no significant cumulative impacts were expected" when the project "itself was expected to have minimal impacts"); *Sierra Club v. FERC*, 827 F.3d 36, 50 (D.C. Cir. 2016) (agency appropriately analyzed cumulative effects given "scant record evidence" of effects from the projects themselves).

Los Angeles contends that *Northern Plains Resource Council, Inc. v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011) is on point. Brief 55. But *Northern Plains* reinforces FAA's position. In that case, this Court reaffirmed the principle that "where a proposed project has 'virtually no effect' on water quality, the agency is not required to examine cumulative impacts from other projects because it would not provide an informed analysis." 668 F.3d at 1082 (quoting *Northwest Environmental Advocates*, 460 F.3d at 1140). But the Court disagreed with the agency's cumulative impacts analysis "in this instance" because the agency had assumed that railroad and well construction would not occur at the same time, when the Court found that "there may well be simultaneous construction." 668 F.3d at 1082; *see also id*. at 1077-79, 1082-83. In contrast, FAA made no such faulty assumption. Rather, FAA conducted its noise modeling with the express understanding that the Airport's operations would continue throughout the construction period and thus included those operations in its noise analysis. 1-ER-231-237; 1-ER-237-239; 2-ER-419-422.

Los Angeles also misstates the record. The City asserts that "FAA assured the public that it would address cumulative noise impacts in the EIS." Brief 53. All FAA said was that an "evaluation of cumulative impacts will be included in the Cumulative Impacts section of the Draft EIS." 2-ER-308. And FAA did that in the Draft EIS and final EIS.

Similarly, the City claims that FAA provided "*no response* to the City's comments that the [Draft EIS]'s cumulative noise impact was inadequate." Brief 56 (emphasis original). But FAA *did* respond to Los Angeles' comment. 2-ER-497; 2-ER-403-404. Los Angeles urged FAA to evaluate cumulative impacts from the replacement passenger terminal along with proposed changes to two flight procedures. 2-ER-444; Brief 53. FAA explained that the Project would not affect flight procedures, and changes to flight procedures identified in the cumulative projects list had occurred *outside* the General Study Area. 2-ER-404. And FAA was already preparing a NEPA environmental assessment for the proposed amendments to the Airport's existing flight departure routes, which were independent of the Project. 2-ER-404. FAA's explanation is reasonable.

Finally, Los Angeles contends that FAA failed to take a hard look at the Project's cumulative noise impacts on public health. Brief 56-57. But neither Los Angeles nor another commenter adequately raised this issue with FAA, so it is waived. *See Protect Our Communities Found.*, 939 F.3d at 1036-37. Although the City complained about public health, it focused on air quality impacts, 2-ER-431-435, and only briefly mentioned noise impacts "from living in close proximity to an airport," 2-ER-444. And again, FAA considered noise impacts through its extensive modeling and concluded that those impacts were nonexistent for operations and minimal for construction. 1-ER-231-239, 2-ER-489-493.

### C. FAA carefully weighed environmental justice issues.

FAA also gave a hard look at potential environmental justice impacts. At the outset, FAA agrees with Los Angeles that this Court may review FAA's environmental justice analysis. Brief 58-59. Although this Court has observed that Executive Order 12898 does not create a private right to judicial review, *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998), an agency's assessment of environmental justice impacts as part of its NEPA analysis is subject to judicial review under the APA's deferential standard. *See, e.g.*, *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 688-89 (D.C. Cir. 2004) (agreeing with FAA's position). In short, the Court should apply the same deferential APA standard of review to FAA's study of environmental justice impacts that it applies to the rest of FAA's NEPA analysis. *Id*.

### 1. FAA rationally found that no environmental justice population would face disproportionately high and adverse effects.

Los Angeles challenges FAA's environmental justice analysis, Brief 57-72, but FAA applied a sound methodology and reached a rational conclusion about environmental justice impacts.

From the start of its environmental review, FAA was sensitive to environmental justice issues, conducting local outreach to minority and low-income populations and providing meaningful opportunities for public

involvement by environmental justice populations. 1-ER-74. To study potential

environmental justice impacts, FAA first examined the General Study Area to

identify any minority or low-income populations. 1-ER-173-176, 1-ER-191-192.

Using U.S. Census Bureau data, FAA identified two census tracts with a minority

population exceeding 50 percent, the threshold FAA chose. 1-ER-191-195. Then

FAA considered whether these populations identified within the General Study

Area would experience disproportionately high and adverse human health and

environmental effects. 1-ER-244-246.

FAA found that the Project would not cause disproportionately high and

adverse effects on environmental justice populations based on (1) its detailed study

of environmental impact categories throughout the EIS, including its extensive

noise modeling, and (2) its finding that the identified environmental justice

populations do not use resources specifically affected by the Project. 1-ER-244-

246; 2-ER-489-496; 1-ER-74; 1-ER-231-239. This is a rational conclusion

supported by sound record evidence.

## 2. FAA reasonably defined the environmental justice study area.

Los Angeles claims that FAA defined an unreasonably broad environmental

justice study area. Brief 60-63. In support, Los Angeles invokes portions of FAA's

Desk Reference and other guidance documents. *Id*. But the City *omits* the Desk

Reference's *specific* instructions for defining the study area for environmental

justice. Brief 60-61. The Desk Reference states that the "combination of all study areas for the other relevant impact categories represents the potential impact area for environmental justice, because environmental justice impacts may be realized in conjunction with impacts to any other impact category." 5-ER-1260.

FAA followed this guidance. It defined the General Study Area to assess indirect impacts of the Project, including effects on air quality, noise-sensitive land uses, and socioeconomic conditions. 1-ER-156. And then FAA used that General Study Area to consider whether those same effects would cause environmental justice impacts. 1-ER-191-192; 2-ER-493. Because the census tracts and their subparts (known as block groups) extended beyond the General Study Area, FAA included a block group if all or a portion of the block group was within the General Study Area. 2-ER-493.

Ignoring the Desk Reference's specific guidance, Los Angeles contends that FAA should have selected a smaller area to study environmental justice impacts from noise because noise is "localized around the noise's source." Brief 61. Los Angeles' noise-is-localized contention undercuts its NEPA argument on construction noise impacts. Besides, for other impact categories, the City advocated to *expand* the General Study Area beyond what FAA had selected to assess health risks and air quality. *Compare* 2-ER-437-438 *with* 2-ER-434. Most

commenters sought an expanded General Study Area, but FAA explained why it had selected a smaller area. 2-ER-394-395.

Los Angeles also contends that the larger General Study Area "greatly exceeds the boundaries of the 65 [decibel] CNEL aircraft noise contour used by the EIS to assess noise impacts." Brief 62. But the two census tracts that FAA identified as having environmental justice populations are partially *within* the CNEL 65 decibel noise contour. 2-ER-494. And FAA's noise modeling showed that the noise contours in 2024 and 2029 were the same for the no action alternative and the Project. 2-ER-494. At a minimum, FAA's analysis provided a reasonable basis to conclude that the Project would not cause disproportionate noise impacts on environmental justice populations. 2-ER-494; 1-ER-74.

### 3. FAA used reliable data to identify environmental justice populations.

Los Angeles contends that FAA has misrepresented the percentage of people of color impacted by the Project. Brief 63-68. But FAA used reliable data from the Census Bureau's American Community Survey. 1-ER-192 & n.110. This is both a rational choice and consistent with the 2015 Desk Reference. 5-ER-1261. The City offers three criticisms, but none has merit.

*First*, Los Angeles contends that rather than relying on census tracts, FAA should have used more granular block group data. Brief 63-66.[6] No FAA regulation or guidance requires the use of block group level data. *See, e.g.*, 3-PER-607-616. And when the City submitted its own alternative environmental justice data, it also did so using averages across census tracts, not block groups. 2-ER-439-441; 5-ER-1077 (noting EJSCREEN is a "census tract-level mapping tool").

Los Angeles notes that FAA possessed block group data and contends that the data is "compelling." Brief 65-66. But the block group data generally aligns with the census tracts. 4-ER-904-905. FAA identified two census tracts with a minority population over 50 percent. 1-ER-192 (tracts 1232.03 and 1232.04). Out of the 49 block groups within the General Study Area, three had a percentage of minority individuals over 50 percent. 4-ER-904-905. And two of those block groups are within the two census tracts that FAA found were environmental justice populations (tracts 1232.03 and 1232.04). 1-ER-192. In other words, for 48 of 49 block groups, the result is the same whether one uses data at the broader census tract or the more granular block group level.

---

[6] Los Angeles complains that FAA did not provide its environmental justice data in the Draft EIS or EIS. Brief 65 n.10. But as the City acknowledges (Brief 69), FAA included web links in the Draft EIS that should have disclosed the data but were broken. 2-ER-495. FAA updated those links in the final EIS. 2-ER-495.

To be sure, *one* block group within the City of Burbank (Block Group 3 for Census Tract 3105.1) has a minority population of 54.1 percent, while the average for that census tract's three block groups is 45 percent, below the threshold FAA identified for an environmental justice population. 4-ER-904-905. But what does that mean? Los Angeles speculates that this "*might* show that—contrary to the EIS's conclusion—there are environmental justice populations that will be disproportionately impacted by the Project's construction." Brief 66 (emphasis added). But FAA concluded that the Project would cause *no* significant impacts on *any* community, including the environmental justice populations that it identified in two census tracts. 1-ER-246; 2-ER-494; *compare* 1-ER-176 (identifying Census Tract 3105.1) *with* 2-ER-491-492 (identifying the closest noise sensitive land use in the southeast quadrant as a residential property about 1,400 feet from the project study area, when construction noise would attenuate below CNEL 64 decibels). A party asserting that an agency erred in its NEPA analysis must show that "NEPA's goals were materially impeded." *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017). The City's conjecture about one block group out of 49 does not show that NEPA's goals were materially impeded, especially when FAA rationally relied on census tract data.

*Second*, Los Angeles contends that FAA's environmental justice analysis presents "remarkably smaller percentages of minority and low-income populations

than likely actually exist." Brief 69-71. In its comments on the Draft EIS, Los

Angeles submitted its own calculations of minority populations from the

EJSCREEN tool, which the City notes led to "staggeringly different results than

reported in the EIS." Brief 69-70; 2-ER-438-441. But FAA may rely on its own

data and calculations in the face of conflicting evidence from another party. *See*

*Northern Plains*, 668 F.3d at 1075 ("[W]hen specialists express conflicting views,

an agency must have discretion to rely on the reasonable opinions of its own

qualified experts even if, as an original matter, a court might find contrary views

more persuasive.") (cleaned up). And Los Angeles has identified no errors in

FAA's actual data and calculations.

*Third*, Los Angeles claims that NEPA requires FAA to explain the

difference in results. Brief 71-72. FAA investigated Los Angeles' data but could

not recreate the City's results. And FAA did revise its environmental justice

analysis in response to Los Angeles' comments. 2-ER-493-494. But FAA declined

to use the EJSCREEN tool, noting that its 2015 Desk Reference identified the

Census Bureau's American Community Survey as an acceptable data source but

did not identify EJSCREEN as an acceptable source. 2-ER-495.[7]

---

[7] FAA's 2020 Desk Reference includes EJSCREEN as *another* acceptable method
for identifying potential environmental justice populations. 3-ER-631-632. FAA
used the 2015 Desk Reference for this EIS because it began developing the EIS
before release of the 2020 version. 1-ER-97 n.5.

FAA also responded to Los Angeles' comments by noting that the Project "does not result in significant impacts," so the EIS "correctly discloses the Proposed Project does not create disproportionately high and adverse human health or environmental effects on minority or low-income populations." 2-ER-495-496. Even assuming Los Angeles' demographic data is more accurate than the Census Bureau data that FAA used, FAA's conclusion is still fully supported by the EIS' detailed technical analysis of environmental impacts. 1-ER-74; 1-ER-244-246; 2-ER-489-496; 1-ER-231-239.

In short, FAA prepared a "reasonably thorough[]" evaluation of environmental justice impacts that satisfies NEPA's goals. *Los Angeles*, 138 F.3d at 807.

# CONCLUSION

Not only does Los Angeles lack standing to block a critical airport safety

project that is decades in the making, but its petition for review fails on the merits

as shown by FAA's thorough environmental review under NEPA. For all these

reasons, the petition should be dismissed for lack of jurisdiction or denied on the

merits.

Respectfully submitted,

/s/ *Justin D. Heminger*

Of Counsel:                                      TODD KIM
                                                 *Assistant Attorney General*
JOSEPH MANALILI                                  ANNA T. KATSELAS
CATHERINE M. BASIC                               JUSTIN D. HEMINGER
*Attorneys*                                      *Attorneys*
Office of the Chief Counsel                      Environment and Natural Resources Division
Federal Aviation Administration                  U.S. Department of Justice

April 27, 2022
90-13-1-16398

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        21-71170

I am the attorney or self-represented party.

**This brief contains 13,996 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
    29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
    *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/ Justin D. Heminger

**Date**        April 27, 2022

# ADDENDUM

Airport and Airway Improvement Act of 1982

    49 U.S.C. § 47101(a)(1) ...................................................................1a

    49 U.S.C. § 47107(a)(16) .................................................................2a

NEPA regulations of the Council on Environmental Quality

    40 C.F.R. § 1502.13........................................................................4a

    40 C.F.R. § 1502.14........................................................................5a

    40 C.F.R. § 1508.7..........................................................................6a

**Airport and Airways Improvement Act of 1982**
**49 U.S.C. § 47107(a)(1) – Policies**

(a) General.—It is the policy of the United States—

    (1) that the safe operation of the airport and airway system is the highest aviation priority;

\*\*\*

## Airport and Airways Improvement Act of 1982
## 49 U.S.C. § 47107(a)(16) – Project grant application approval conditioned on assurances about airport operations

(a) General written assurances.—The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that—

\*\*\*

    (16) the airport owner or operator will maintain a current layout plan of the airport that meets the following requirements:

        (A) the plan will be in a form the Secretary prescribes;

        (B) the Secretary will review and approve or disapprove only those portions of the plan (or any subsequent revision to the plan) that materially impact the safe and efficient operation of aircraft at, to, or from the airport or that would adversely affect the safety of people or property on the ground adjacent to the airport as a result of aircraft operations, or that adversely affect the value of prior Federal investments to a significant extent;

        (C) the owner or operator will not make or allow any alteration in the airport or any of its facilities unless the alteration—

            (i)  is outside the scope of the Secretary's review and approval authority as set forth in subparagraph (B); or

            (ii) complies with the portions of the plan approved by the Secretary; and

        (D) when an alteration in the airport or its facility is made that is within the scope of the Secretary's review and approval authority as set forth in subparagraph (B), and does not conform with the portions of the plan approved by the Secretary, and the Secretary decides that the alteration adversely affects the safety, utility, or efficiency of aircraft operations, or of any property on or off the airport that is owned, leased, or financed by the Government, then the owner or operator will, if requested by the Secretary—

(i)   eliminate the adverse effect in a way the Secretary approves; or

(ii)  bear all cost of relocating the property or its replacement to a site acceptable to the Secretary and of restoring the property or its replacement to the level of safety, utility, efficiency, and cost of operation that existed before the alteration was made, except in the case of a relocation or replacement of an existing airport facility that meets the conditions of section 47110(d);

**NEPA Regulations of the Council on Environmental Quality**
**40 C.F.R. § 1502.13 – Purpose and need.**

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

## NEPA Regulations of the Council on Environmental Quality
## 40 C.F.R. § 1502.14 – Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### NEPA Regulations of the Council on Environmental Quality
### 40 C.F.R. § 1508.7 – Cumulative impact.

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.