Case No. 21-71170

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF LOS ANGELES, CALIFORNIA
*Petitioner,*

v.

UNITED STATES FEDERAL AVIATION ADMINISTRATION and
STEPHEN M. DICKSON, in his official capacity as Administrator;
UNITED STATES DEPARTMENT OF TRANSPORTATION and
PETER P. BUTTIGIEG, in his official capacity as Secretary,
*Respondents,*

BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY
*Real Party in Interest and Respondent.*

## REPLY BRIEF

MICHAEL N. FEUER, SBN 111529
City Attorney
ROBERT M. MAHLOWITZ, SBN 160125
Deputy City Attorney
LOS ANGELES CITY ATTORNEY'S OFFICE
200 North Main Street, 8th Floor
Los Angeles, CA 90012
Telephone: (213) 978-7100
Facsimile: (213) 978-8090
Email: mike.n.feuer@lacity.org
        robert.mahlowitz@lacity.org

ANDREA K. LEISY, SBN 206681
LAURA M. HARRIS, SBN 246064
CASEY A. SHORROCK, SBN 328414
REMY MOOSE MANLEY, LLP
555 Capitol Mall, Suite 800
Sacramento, CA 95814
Telephone: (916) 443-2745
Facsimile: (916) 443-9017
Email: aleisy@rmmenvirolaw.com
        lharris@rmmenvirolaw.com
        cshorrock@rmmenvirolaw.com

Attorneys for Petitioner
CITY OF LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

INTRODUCTION. ...........................................................................................10

ARGUMENT. .................................................................................................12

I.   The City has Article III standing. ......................................................12

II.  By treating Measure B consistency as a prerequisite to the EIS's detailed consideration of alternatives, FAA improperly predetermined the outcome of its NEPA review process. .................................................................14

   A.  FAA never considered the No Action Alternative a viable option. ...............15

   B.  Based on the undue weight FAA assigned to Measure B, FAA improperly pre-determined Project approval was the only option...................................15

III. The EIS's range of alternatives is unreasonably narrow..................................18

   A.  The Agencies' "purpose and need" argument is a red herring—each action alternative surviving Step 1 of the screening process meets the Project's purpose and need. ........................................................................18

   B.  FAA acted arbitrarily and capriciously in incorporating Measure B consistency into the EIS's alternatives screening process. ...........................20

      1. The EIS *does not explain* why FAA believes inconsistency with Measure B renders an alternative unreasonable or infeasible. ........................................21

      2. Consistency with a pre-EIS local vote is an *impermissible basis* to reject all action alternatives from detailed evaluation.................................................23

   C.  *Reasonable alternatives exist* for detailed consideration. .............................27

IV.  The EIS fails to take a hard look at cumulative noise impacts. ........................30

   A.  The EIS *ignores* cumulative noise impacts. ..................................................30

   B.  The City exhausted its administrative remedies regarding potential health impacts caused by cumulative noise. ...........................................................33

C. The Authority's assertion that there will be no cumulative impacts because the Project will not alter runway or flight procedures misses the point.........34

V. The EIS fails to take a hard look at the Project's direct construction impacts..35

    A. Impacts caused by the Project's construction activities are *direct*................35

    B. The EIS's construction analysis violates NEPA by *failing to discuss* inconsistencies with the City's General Plan noise policies. ........................36

    C. The EIS does *not* evaluate impacts of haul trucks in the City. ......................38

VI. The EIS fails to take a hard look at environmental justice impacts. .................40

    A. Defects in the EIS's cumulative and construction noise analyses render the EJ analysis deficient. ....................................................................................40

    B. FAA unreasonably fails to support the EIS's overbroad study area, which artificially constrains potential noise impacts on EJ populations. .................41

    C. FAA's data misrepresents impacts to EJ populations nearest the Airport.....43

    D. FAA failed to adequately respond to the City's comments...........................44

CONCLUSION. ..................................................................................................45

CERTIFICATE OF COMPLIANCE. ....................................................................46

CERTIFICATE OF SERVICE. ............................................................................47

# TABLE OF AUTHORITIES

<u>Cases</u>

*All. to Save the Mattaponi v. USACE*,
　606 F.Supp.2d 121 (D.D.C. 2009) ........................................................................29

*Barnes v. Dep't of Transp.*,
　655 F.3d 1124 (9th Cir. 2011)...............................................................................39

*Buckhead Civic Ass'n v. Skinner*,
　903 F.2d 1533 (11th Cir. 1990)............................................................................18

*California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*,
　767 F.3d 781 (9th Cir. 2014)......................................................................... 13, 26

*California v. Block*,
　690 F.2d 753 (9th Cir. 1982)........................................................... 21, 22, 23, 24

*Citizens Against Burlington, Inc. v. Busey*,
　938 F.2d 190 (D.C. Cir. 1991) ...................................................................... 19, 20

*City of Davis v. Coleman*,
　521 F.2d 661 (9th Cir. 1975).......................................................................... 13, 14

*City of Las Vegas v. FAA*,
　570 F.3d 1109 (9th Cir. 2009)..............................................................................13

*City of Sausalito v. O'Neill*,
　386 F.3d 1186 (9th Cir. 2004)................................................................. 10, 13, 14

*City of Waltham v. U.S. Postal Serv.*,
　786 F.Supp. 105 (D. Mass. 1992) ........................................................................24

*Coal. for Canyon Pres. v. Bowers*,
　632 F.2d 774 (9th Cir. 1980)................................................................................35

*Communities Against Runway Expansion, Inc. v. FAA.*,
　355 F.3d 678 (D.C. Cir. 2004) ...................................................41

*Ctr. for Biological Diversity v. Salazar*,
　695 F.3d 893 (9th Cir. 2012)....................................................35

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
　746 F.Supp.2d 1055 (N.D. Cal. 2009) ....................................29

*Env't Def. Fund, Inc. v. Blum,*
　458 F.Supp. 650 (D.D.C. 1978) ...............................................24

*Exch. Comm'n v. Chenery Corp.*,
　318 U.S. 80 (1943) ........................................................... 12, 28

*Fath v. Texas Dep't of Transp.*,
　924 F.3d 132 (5th Dist. 2018)..................................................32

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
　611 F.3d 692 (10th Cir. 2010)............................................ 14, 17

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
　681 F.2d 1172 (9th Cir. 1982)..................................................28

*Friends of Santa Clara River v. USACE*,
　887 F.3d 906 (9th Cir. 2018)............................................. 31, 32

*Friends of the Earth, Inc. v. USACE*,
　109 F.Supp.2d 30 (D.D.C. 2000) ............................................35

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
　857 F.2d 505 (9th Cir. 1988)...................................................39

*Int'l Snowmobile Mfrs. Ass'n. v. Norton*,
　304 F.Supp.2d 1278 (D. Wyo. 2004)........................................23

*Kern v. U.S. Bureau of Land Mgmt.*,
　284 F.3d 1062 (9th Cir. 2002)..................................................32

*Klamath-Siskiyou Wildlands Ctr. v. USFS*,
    373 F.Supp.2d 1069 (E.D. Cal. 2004)....................................................22

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
    42 F.3d 517 (9th Cir. 1994)....................................................18

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
    756 F.3d 447 (6th Cir. 2014)....................................................25

*League of Wilderness Defenders v. USFS*,
    689 F.3d 1060 (9th Cir. 2012)....................................................18

*Martin v. Occupational Safety & Health Review Comm'n*,
    499 U.S. 144 (1991)....................................................44

*McKiver v. Murphy-Brown, LLC*,
    980 F.3d 937 (4th Cir. 2020)....................................................40

*Metcalf v. Daley*,
    214 F.3d 1135....................................................23

*Minisink Residents for Env't Pres. & Safety v. Fed. Energy Regul. Comm'n*,
    762 F.3d 97 (D.C. Cir. 2014)....................................................32

*Muckleshoot Indian Tribe v. USFS*,
    177 F.3d 800 (9th Cir. 1999)....................................................22

*N. Alaska Env't Ctr. v. DOI*,
    983 F.3d 1077 (9th Cir. 2020)....................................................37

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011)....................................30, 38, 39, 43

*Nat. Res. Def. Council, Inc. v. Evans*,
    279 F.Supp.2d 1129 (N.D. Cal. 2003)....................................................22

*Nat. Res. Def. Council, Inc. v. FAA*,
    564 F.3d 549 (2nd Cir. 2009)....................................................25

*Native Ecosystems Council v. USFS*,

    418 F.3d 953 (9th Cir. 2005).................................................................44

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,

    606 F.3d 1058 (9th Cir. 2010)..............................................................19

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

    524 F.3d 917 (9th Cir. 2008).................................................................32

*Natural Resources Defense Council v. United States Dep't of the Navy*,

    857 F.Supp. 734 (C.D. Cal. 1994) .........................................................22

*Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*,

    460 F.3d 1125 (9th Cir. 2006)..............................................................31

*Pit River Tribe v. U.S. Forest Serv.*,

    (USFS), 615 F.3d 1069 (9th Cir. 2010) ................................................16

*Sabine River Auth. V. DOI*,

    951 F.2d 669 (5th Cir. 1992)................................................................32

*Safe Air For Everyone v. Env't Prot. Agency*,

    488 F.3d 1088 (9th Cir. 2007)...................................................... 23, 36

*Sierra Club v. Bosworth*,

    510 F.3d 1016 (9th Cir. 2007)..............................................................41

*Sierra Club v. EPA*,

    292 F.3d 895 (D.C. Cir. 2002) .............................................................13

*Sierra Club v. FERC*,

    827 F.3d 36 (D.C. Cir. 2016) ...............................................................33

*Sierra Club v. FERC*,

    867 F.3d 1357 (D.C. Cir. 2017) ...........................................................44

*Sierra Club v. Marsh*,

    976 F.2d 763 (1st Cir. 1992)................................................................37

*Sierra Club, Illinois Chapter v. U.S. Dep't of Transp.*,

   962 F.Supp. 1037 (N.D. Ill. 1997) ........................................................22

*Simmons v. U.S. Army Corps of Engineers*,

   120 F.3d 664 (7th Cir. 1997)................................................................19

*Standing Rock Sioux Tribe v. USACE*,

   255 F.Supp.3d 101 (D.D.C. 2017) ......................................................39

*Tongass Conservation Soc. v. Cheney*,

   924 F.2d 1137 (D.C. Cir. 1991) ..........................................................25

*Twp. of Bordentown v. FERC*,

   903 F.3d 234 (3d Cir. 2018)................................................................32

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,

   6 F.4th 1321 (D.C. Cir. 2021) ...................................................... 42, 43

*Webster v. U.S. Dep't of Agric.*,

   685 F.3d 411 (4th Cir. 2012)...............................................................18

*WildWest Inst. v. Bull*,

   547 F.3d 1162 (9th Cir. 2008)...................................................... 16, 17

<u>Regulations</u>

40 C.F.R. § 1500.1(b) ............................................................................44

40 C.F.R. § 1502.14 ..............................................................................30

40 C.F.R. § 1502.14(a)..................................................................... 17, 23

40 C.F.R. § 1502.14(d) ...........................................................................15

40 C.F.R. § 1502.16(a)–(b)......................................................................35

40 C.F.R. § 1502.16(c) ..................................................................... 11, 36

40 C.F.R. § 1502.2(g) .............................................................................14

40 C.F.R. § 1502.9(b)–(c) ................................................................44

40 C.F.R. § 1506.1(a)(2) ................................................................16

40 C.F.R. § 1506.2(c) ................................................................16

40 C.F.R. § 1506.2(d) ............................................................. 11, 36

40 C.F.R. § 1508.8(a) ................................................................35

40 C.F.R. § 1508.8(b) ................................................................35

40 C.F.R. § 1508.9(a)(1) ................................................................32

# INTRODUCTION

FAA and the Burbank-Glendale-Pasadena Airport Authority (together, "Agencies") spend much of their briefs attempting to avoid and obfuscate the issues. First, FAA argues that the Court should not reach the merits because, according to FAA, the City of Los Angeles has not demonstrated the Project will injure the *City*. But the City brings this lawsuit to redress the Project's injury to its substantial interests in implementing the City's General Plan (GP) noise policies, preventing harm to City roads caused by the Project's construction haul trips, protecting the City's tax base, and protecting public health and safety within the City, and the City's environmental resources. As this Court's holdings make clear, these are concrete and cognizable injuries under Article III. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).

Second, the Agencies argue NEPA permits FAA to reject alternatives that do not meet the Project's purpose and need. The City does not argue otherwise. Rather, the City objects to FAA's unreasonable rejection of alternatives that *meet the purpose and need* but are inconsistent with the City of Burbank's 2016 local ballot measure, Measure B. By treating Measure B consistency as a prerequisite, FAA impermissibly narrowed the range of alternatives down to only the Project, in violation of NEPA.

Third, the Agencies claim the City has not proven reasonable alternatives exist that the environmental impact statement (EIS) rejected. But the City, other commenters, and the EIS itself, identified numerous reasonable alternatives. FAA improperly rejected those alternatives, however, because they conflict with Measure B.

Fourth, FAA incorrectly asserts the EIS thoroughly evaluates the Project's cumulative and construction-related impacts. The EIS's noise analysis ignores the combined noises generated by simultaneous construction and operation activities. The EIS also ignores impacts of the Project's construction haul trips on the City. And, contrary to FAA's assertion, the Authority provided FAA with detailed construction plans that would have allowed FAA to perform the omitted analyses. FAA, however, unreasonably declined to perform a detailed analysis.

Fifth, FAA disclaims any duty to consider whether the Project's construction noise conflicts with the City's GP noise policies. NEPA regulations and FAA Order 1050.1F, however, expressly require that analysis. 40 C.F.R. §§ 1506.2(d), 1502.16(c). Therefore, FAA violated NEPA in failing to consider whether the Project's construction noise conflicts with the City's GP noise standards.

Sixth, FAA fails to support its reliance on an overbroad study area for noise impacts to environmental justice (EJ) impacts by blindly relying on guidance in its non-binding Desk Reference while simultaneously acknowledging that noise is

greatest near its source. It also mispresents the percentage of minority populations nearest the Airport while continuing to avoid explaining discrepancies between the EIS's EJ population data and data from the FAA-recommended tool EJSCREEN.

Additionally, in an attempt to make up for this lack of analysis, FAA repeatedly cites evidence and reasons never presented in the EIS. The Court must reject FAA's counsel's post-hoc justifications, however, because "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

In short, the EIS's analysis is arbitrary and capricious and violates NEPA's procedures. The Court should order FAA to prepare a revised EIS that (i) does not reject alternatives based on Measure B and (ii) takes a hard look at construction and cumulative noise impacts to the City, including disproportionate impacts to populations of color.

## ARGUMENT

## I.     The City has Article III standing.

The City's Article III standing here is a simple matter. The Project injures the City's interests in land management—including its interest in implementing the GP noise policies—as well as its interests in the City's public welfare, safety, and environment. These are precisely the types of injuries this Court has found

sufficiently concrete to support standing. *See e.g., City of Sausalito,* 386 F.3d at

1197–99 (injuries to Sausalito's "natural resources" including injuries caused by

"*noise*," satisfied Article III, as did traffic impacts to city-owned streets, and

crowd-related impacts affecting the city's municipal and safety functions); *City of

Davis v. Coleman*, 521 F.2d 661, 670–71 (9th Cir. 1975) (finding standing based

on impacts to Davis' water supply and inconsistencies with its general plan growth

policies); *City of Las Vegas v. FAA*, 570 F.3d 1109, 1114 (9th Cir. 2009) (finding

standing based on project's "flights over densely populated parts of the city,"

which, in turn, "threatens the city's interest in the environment and land

management"); *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S.

Dep't of the Interior* (DOI), 767 F.3d 781, 790–91 (9th Cir. 2014) (standing shown

where county and regional air district alleged water transfer agreement would harm

air quality and undermine land management).

Contrary to FAA's suggestion (FAA Br. 18), a declaration is not required to

demonstrate concrete and particularized injuries to the City, as those injuries are

evident in the record—including in the City's detailed DEIS comment letter and

attached expert reports. *See Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir.

2002) ("In many if not most cases the petitioner's standing to seek review of

administrative action is self-evident; no evidence outside the administrative record

is necessary…."); s*ee e.g.*, 2-PER-435 (noise and economic impacts in and to the

City); 2-PER-436 (construction noise conflicts with City GP policies); 2-PER-442–43 (social and economic harms; injury to tax base); 2-PER-454 (impaired visibility on City roadways with likely fatal collisions); 2-PER-459–60 (underestimation of construction-related emissions and over-estimation of mitigation effectiveness); 2-PER-461–63 (inadequate assessment of health impacts); 2-PER-462–64 (insufficient air quality impacts analysis of haul trips in the City); 2-PER-464–65 (underestimation of construction and cumulative noise impacts).

An order granting the Petition would redress these concrete and particularized injuries by requiring FAA to vacate the Project's approval. The City thus has Article III standing. *See City of Sausalito*, 386 F.3d at 1199; *City of Davis*, 521 F.2d at 670–71.

## II. By treating Measure B consistency as a prerequisite to the EIS's detailed consideration of alternatives, FAA improperly predetermined the outcome of its NEPA review process.

An EIS "shall serve as the means of assessing the environmental impacts of proposed agency actions, rather than justifying decisions already made." 40 C.F.R. § 1502.2(g). "The purpose behind NEPA is to ensure that the agency will only reach a decision on a proposed action after carefully considering the environmental impacts of several alternative courses…." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 717 (10th Cir. 2010). FAA violated these basic

principles by rejecting from detailed consideration any alternative inconsistent with Measure B.

### A. FAA never considered the No Action Alternative a viable option.

FAA argues there was no improper prejudgment because FAA could have denied the Project at any time before it issued the FEIS and Record of Decision. FAA Br. 36. This argument is unsupported by the EIS, which states the No Action Alternative is only included because it is legally required. 1-PER-36 (citing 40 C.F.R. § 1502.14(d)). FAA never considered denying the Authority's application to be a feasible alternative because it is inconsistent with the Agencies' purpose and need objectives. 1-PER-35–36; 1-PER-149–50.

### B. Based on the undue weight FAA assigned to Measure B, FAA improperly pre-determined Project approval was the only option.

Under the EIS's unreasonable alternatives screening process, FAA must reject any alternative that: (i) fails to meet the purpose and need, *and* (ii) is inconsistent with Measure B. 1-PER-132–33; 1-PER-144–150. The only alternative, including No Action, that meets both criteria is the *Project. Id*.; *see also* 2-PER-497 (replacing existing terminal would "not meet the requirements of…Measure B"). The resultant EIS is a post hoc rationalization for a decision FAA made prior to its NEPA review to approve the Project.

FAA argues there was no predetermination because the Agencies had not irretrievably and irreversibly committed resources to the Project prior to the EIS's preparation. FAA Br. 34–35. The problem with this argument, however, is that, for all intents and purposes, FAA *treated* Measure B's passage as an irreversible and irretrievable commitment to the Project.[1]

The cases FAA cites are inapposite. In *Pit River Tribe v. U.S. Forest Serv.* (USFS), 615 F.3d 1069, 1083 (9th Cir. 2010), there was no pre-commitment because the subject lease extensions had been "undone," making it possible for the agencies to "take a 'hard look' at these commitments anew." *Id*. In contrast, here, the vote on Measure B was not "undone," and FAA improperly treated Measure B consistency as a prerequisite to detailed consideration, preventing FAA from taking a hard look at other reasonable alternatives.

In *WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008), USFS's pre-marking of trees for removal before completing NEPA review for a logging project was not a pre-commitment because the markings could be removed. *Id*. Further,

---

[1] Assuming, *arguendo*, that Measure B's ratification marked the "point of no return," regarding which alternatives FAA may consider and approve (which it did not), then the proper time for FAA to prepare the EIS would have been when the Authority prepared the EIR (i.e., *before* Measure B was put to the vote), so that FAA could avoid limiting the choice of alternatives. *See* 40 C.F.R. §§ 1506.1(a)(2), 1506.2(c).

the record showed that USFS *believed* it could change course, as demonstrated by its decision to exclude several hundred acres of pre-marked trees from the plan it ultimately adopted. *Id.* In marked contrast, here, FAA believes, incorrectly, that Measure B limits its choice of alternatives and thus refused to evaluate in detail *any* reasonable alternatives in the EIS.

Finally, unlike *Forest Guardians*, 611 F.3d at 715–19, the evidence demonstrating predetermination in this case is *FAA's own EIS alternatives screening process*—not a handful of lower-level staff comments or a grant agreement with a non-profit that would have been executed even without the project. From the outset in this case, there was "only one predetermined outcome"—FAA's approval of the Project. *See Forest Guardians*, 611 F.3d at 719.

In sum, by improperly treating Measure B consistency as a prerequisite to a detailed consideration of alternatives in the EIS, FAA improperly pre-committed to the Authority's version of the Project and failed to take the required objective hard look at other reasonable alternatives that could meet the Project's purpose and need. *See* 40 C.F.R. § 1502.14(a).

## III. The EIS's range of alternatives is unreasonably narrow.

### A. The Agencies' "purpose and need" argument is a red herring— each action alternative surviving Step 1 of the screening process meets the Project's purpose and need.

The Agencies devote several pages of their briefs to touting the merits of the Project's purpose and need objectives. FAA Br. 20–25, Auth. Br. 18–20. Then, after explaining that federal agencies are allowed to reject alternatives that do not meet the purpose and need, the Agencies assert FAA properly eliminated all alternatives from detailed consideration in the EIS. *Id*. This argument is a slight of hand. The City has no qualm with FAA's rejection of alternatives that fail to meet the Project's purpose and need (i.e., the rejection of alternatives at Step 1 of the EIS's screening process). What the City objects to, and where FAA went afoul of NEPA, is FAA's arbitrary and capricious decision to incorporate "Measure B consistency" into Step 2 of the EIS's screening process, a decision that ensured that all reasonable alternatives—including those that meet the purpose and need— are rejected.[2]

_____

[2] The cases cited by the Agencies in which the courts upheld agencies' rejections of alternatives that did not meet the projects' purposes and needs are thus irrelevant. *See* FAA Br. 26–28, Auth. Br. 33–34 (citing *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp*., 42 F.3d 517, 524 (9th Cir. 1994); *League of Wilderness Defenders v. USFS*, 689 F.3d 1060, 1071-73 (9th Cir. 2012); *Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990). *See also Webster v. U.S. Dep't of Agric*., 685 F.3d 411, 426 (4th Cir. 2012) (agency properly rejected alternative based on technical infeasibility, costs, and inability to meet the purpose and need).

The Agencies' attempts to distinguish *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010), and *Simmons v. U.S. Army Corps of Engineers* (USACE), 120 F.3d 664 (7th Cir. 1997), dodge the issue. FAA did not, as the Agencies suggest, simply adopt the Authority's project objectives in furtherance of FAA's own safety and airport policies. FAA Br. 33; Auth. Br. 20. Instead, after identifying alternatives that *do* meet the Project's safety and airport objectives, the EIS proceeds to reject those alternatives because they are inconsistent with a local ballot measure that is not binding on FAA and that is not so much as mentioned in the purpose and need statement.[3] 1-PER-113–20.

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991), relied on by the Agencies, illustrates the impropriety of Step 2 of the EIS's alternatives screening process. There, the court upheld FAA's incorporation of the applicant's objectives for a project into FAA's decision on which alternatives to study in detail in an EIS. *Id*. at 198–99. The court explained that, although it must reject an "unreasonably narrow" definition of objectives that compels selection of a

---

[3] Notably, the Agencies devoted much of their briefs to Airport safety. FAA Br. 1, 9–10, 14, 20, 22–24, 33, 37–38; Auth. Br. 1–2, 6–8, 10, 14. The City does not substantively address this extensive commentary because operational safety is not the subject of this action. The issue here is whether FAA conducted a legally-adequate NEPA review. Nevertheless, the EIS is clear that the Airport is currently "safe to operate," and that "FAA has implemented safety protocols…to maintain safety." 1-PER-114.

particular alternative, if the agency's objectives are reasonable, the court will uphold the rejection of alternatives that do not meet them. *Id*. at 196.

Here, in contrast, the EIS's rejection of alternatives at Step 2 is not based on legitimate purposes, needs, and objectives. It is based on FAA's mistaken view that FAA should not, or could not, approve any alternative inconsistent with Measure B. By imputing Measure B consistency into the EIS's alternatives selection process, FAA ensured "that only one alternative" (the Project) would be considered, thus rendering the EIS a "foreordained formality," in violation of NEPA. *Citizens Against Burlington*, 938 F.2d at 196.

## B.  FAA acted arbitrarily and capriciously in incorporating Measure B consistency into the EIS's alternatives screening process.

The Agencies argue it was reasonable for FAA to reject alternatives that are inconsistent with Measure B because Burbank voter approval is required for any alternative that expands the Airport, and Burbank voters are unlikely to approve any other alternative, given Burbank's long-standing opposition to the Airport. FAA Br. 33–34; Auth. Br. 19–20. This explanation, however, is not provided in the EIS, and consistency with a pre-EIS local political decision is not a permissible reason for a federal agency to reject all action alternatives from an EIS's detailed evaluation.

1. **The EIS *does not explain* why FAA believes inconsistency with Measure B renders an alternative unreasonable or infeasible.**

The Agencies fail to explain why the EIS omits the explanation now offered to this Court. *Compare* FAA Br. 33–34 & Auth. Br. 19–20 *with* 1-PER-35–36, 1-PER-131–50, 1-PER-147-50, 2-PER-500–01. Although the EIS provides background on Measure B, 1-PER-97–100, it never clarifies why the EIS rejects all alternatives that are inconsistent with Measure B. Instead, the EIS states only:

> In Step 2, alternatives were eliminated if they would not be practical or feasible to implement from a technical or economic standpoint. This screening criteria includes whether the alternative is consistent with the development agreement entered into by the City of Burbank and the Authority and ratification of Measure B by Burbank voters.

1-PER-132–33. This is an assertion, *not* an explanation.

Courts have rejected similar failures by agencies to explain in their EISs rationales for rejecting alternatives. In *California v. Block*, 690 F.2d 753 (9th Cir. 1982), this Court struck down USFS' EIS for a proposed rule that classified roadless areas into three planning categories: Wilderness, Further Planning and Nonwilderness. The EIS seriously considered eight alternatives, but none designated more than 33 percent of the roadless acreage to undeveloped Wilderness. *Id.* at 765. Instead, the EIS "uncritically assume[d]" that a substantial portion of the roadless areas should be developed. *Id*. at 767. The Court held that the range of alternatives was inadequate because the EIS provided "[n]o

justification" for the Park Service's decision not to designate more acres Wilderness. *Id*. at 767.

Similarly, here, the EIS uncritically assumes that alternatives must be consistent with the pre-EIS vote on Measure B, but the EIS never explains why FAA views consistency with Measure B as a Project prerequisite. *See also Muckleshoot Indian Tribe v. USFS*, 177 F.3d 800, 812–13 (9th Cir. 1999), ("[USFS] failed to consider an adequate range of alternatives [where t]he EIS considered only a no action alternative along with two virtually identical alternatives;" rejection of alternatives was improperly based on decreasing landowner's incentive to trade; nothing in the record suggested Service considered ways to increase landowner's incentive to trade); *Klamath-Siskiyou Wildlands Ctr. v. USFS*, 373 F.Supp.2d 1069, 1088–89 (E.D. Cal. 2004) (USFS "simply dismissed … any proposal which would have reduced the amount of timber harvest" without explaining how the rejected alternatives reduced revenues).[4]

---

[4] *See also Natural Resources Defense Council v. United States Dep't of the Navy*, 857 F.Supp. 734, 739–40 (C.D. Cal. 1994) (vacated by consent decree) (agency improperly narrowed range of alternatives based on mistaken belief it could only approve alternatives within location identified by the Navy); *Nat. Res. Def. Council, Inc. v. Evans*, 279 F.Supp.2d 1129, 1166 (N.D. Cal. 2003) (EIS defective because its only explanation of alternative's "unreasonableness" was that the alternative could set an undesirable precedent); *Sierra Club, Illinois Chapter v. U.S. Dep't of Transp.*, 962 F.Supp. 1037, 1045 (N.D. Ill. 1997) (EIS invalid because underlying assumptions ensured only the proposed project was feasible).

Because the EIS fails to explain why, in FAA's view, alternatives inconsistent with Measure B are not viable, the Court should reject the Agencies' post-decisional explanations. *See Block*, 690 F.2d at 765–67; *Safe Air For Everyone v. Env't Prot. Agenc*y, 488 F.3d 1088, 1091 (9th Cir. 2007) ("[O]ur review of an administrative agency's decision begins and ends with the reasoning that the agency relied upon in making that decision....").

    2.    **Consistency with a pre-EIS local vote is an *impermissible basis* to reject all action alternatives from detailed evaluation.**

Even if the EIS were revised to explain why FAA incorporated consistency with Measure B into its alternatives screening process, the EIS would remain inadequate for failing to evaluate a reasonable range of alternatives. FAA has a duty "to rigorously explore and objectively evaluate all reasonable alternatives" in the EIS. 40 C.F.R. § 1502.14(a). But FAA impermissibly bypassed that duty based on a prejudged local political decision, in violation of NEPA. *See e.g., Metcalf v. Daley*, 214 F.3d 1135, 1144–46 (environmental assessment's (EA)) statement that a politically "difficult controversy" would arise if the agencies withdrew their support for the project was evidence that the agencies were impermissibly predisposed to approving the project); *Int'l Snowmobile Mfrs. Ass'n. v. Norton*, 304 F.Supp.2d 1278, 1291 (D. Wyo. 2004) (pre-FEIS statements made by Park Service's assistant secretary to the effect that snowmobiles would be banned from

the national parks demonstrated that the Parks Service had already reached a "prejudged political conclusion" regarding the project); *City of Waltham v. U.S. Postal Serv.*, 786 F.Supp. 105, 140 (D. Mass. 1992), *aff'd,* 11 F.3d 235 (1st Cir. 1993) (stating "political feasibility" is not a permissible factor for selecting project site); *Env't Def. Fund, Inc. v. Blum,* 458 F.Supp. 650, 663 (D.D.C. 1978) (cautioning that on remand, the agency "would be well advised to exclude from its deliberations all congressional pressures extraneous to the issues to be decided. This would assure the public and any reviewing court that the agency had conscientiously lived up to the responsibilities delegated to it by Congress.").

FAA is the NEPA lead agency with authority over airport safety. Yet, FAA ceded its authority to Burbank by allowing Burbank voters to dictate the range of alternatives considered in the EIS, thereby eliminating all but the (non-viable) No Action Alternative from detailed consideration. Consequently, the EIS violates NEPA because it fails to include a range of reasonable alternatives that permits informed decisionmaking and informed public participation. *See Block*, 690 F.2d at 767 ("The touchstone for [the court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation."). FAA must analyze all reasonable alternatives, irrespective of Measure B.

None of the cases the Agencies cite supports their argument that Measure B inconsistency is a permissible reason to reject alternatives. In *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 554, 556–68 (2nd Cir. 2009), FAA studied seven alternatives in detail, including one similar to the alternative advocated by petitioner. *Id*. The court held FAA reasonably rejected alternatives that would extend a runway into an environmentally-sensitive bayou because the state declared that such an alternative would violate the state's submerged-land laws, and resultantly it would deny the alternative's necessary environmental permits. *Id*. This is a far cry from FAA's rejection of *all* alternatives based on a non-binding *pre-EIS* local vote.

In *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.* (FHWA), 756 F.3d 447, 469 (6th Cir. 2014), FHWA "did not simply rubber-stamp" objections to the alternative advocated by plaintiff. Rather, FHWA considered objections and provided its own reasons for rejecting that alternative, including that it would not meet the project's purpose and need. *Id.* Here, in contrast, the EIS does not explain why Measure B consistency is required. And it fails to consider *any* action alternative in detail, including alternatives that would meet the Project's purpose and need.

In *Tongass Conservation Soc. v. Cheney*, 924 F.2d 1137, 1141 (D.C. Cir. 1991), the Navy reasonably rejected alternative sites for submarine sound testing

based on an expert technical report's conclusion, summarized in the EIS's addendum, that technology did not exist to conduct testing on other sites. *Id.* Here, there is no technical report—or any explanation at all—why an alternative's failure to comply with Measure B renders it infeasible. Political difficulty is not akin to technical infeasibility.

Finally, in *Imperial County*, 767 F.3d 781, 797, DOI reasonably rejected "hypothetical" alternative agreements to a multi-party water transfer agreement because the parties to the agreement—including DOI—had spent years negotiating the agreement and had not agreed, and would not likely agree, to another agreement allocating the limited Colorado River water supply at issue. *Id.* In contrast, here, FAA is not a party to the Development Agreement leading to Measure B, and Measure B is not a component of the Project. Measure B only asked voters to bless the Authority's preferred project, it did not ask voters to reject other alternatives. Thus, it is not a restriction at all. *See* 1-PER-100. Further, this case does not involve a scarce and finite resource that must be allocated among the parties—it involves a changeable land use map. FAA holds the purse strings to the Project (*see* 1-PER-30), yet relied on a local ballot measure to improperly limit the EIS's range of alternatives, in violation of NEPA.

## C. *Reasonable alternatives exist* for detailed consideration.

The Agencies attempt to shift the burden of NEPA compliance to the City, arguing that the City has not proven that reasonable alternatives were eliminated from analysis. FAA Br. 29; Auth. Br. 20. The Court should reject this attempt. The City and other commenters put FAA on notice that EIS alternatives screening analysis unduly narrowed the range of alternatives, and that there are reasonable alternatives that the EIS can and should evaluate. Moreover, the EIS itself identifies reasonable alternatives, but improperly rejects them based on Measure B.

As one example of a reasonable alternative the EIS should evaluate, the City, in its DEIS comment letter, suggested an "airfield reconfiguration alternative" that would also include upgrades to the existing terminal to meet the purpose and need. 2-PER-449. FAA responds that the airfield reconfiguration alternative *included in the EIS* would not meet the purpose and need, 2-PER-501, but fails to explain why variations of that alternative, as suggested by the City, would not meet the purpose and need. FAA Br. 30.

Another reasonable alternative suggested in comments, but improperly rejected by FAA, is a "Same Size Replacement Terminal" alternative (i.e., same size as existing terminal—233,233 square-foot). 2-PER-400. FAA summarily rejected this suggestion because (i) a same-size alternative is not the version of the Land Use Plan submitted by the Authority, (ii) FAA is under no duty to consider

that alternative, (iii) Measure B approved the larger (355,000 square foot) terminal, and (iv) a same-size alternative is inconsistent with the purpose and need. 2-PER-400–01. The EIS provides no evidence or explanation as to why a same-size alternative would not meet the purpose and need, however, so the court owes no deference to that conclusory statement. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982) (NEPA requires facts, not speculation).

The EIS itself also identifies three alternatives—the Remote Land Side Alternative, the New Airport Alternative, and the Southeast Quadrant Alternative—that meet the purpose and need but are improperly rejected because of Measures B inconsistency. 1-PER-36, 2-PER-500–01. The Agencies argue the EIS gives reasons for rejecting these alternatives "independent" of Measure B. FAA Br. 31; Auth. Br. 18–19. But that is *not* what the EIS says. Step 2 of the screening process asks whether an alternative is *both* "practical or feasible to implement *and* meets the requirements of [the] November 2016 voter initiative Measure B." 1-PER-133 (emphasis added); 1-PER-147; 1-PER-35–36. Readers cannot separate the potentially legitimate reasons from the clearly non-legitimate (Measure B) reason, making it impossible for readers, and the Court, to assess whether the EIS's rejection of alternatives at Step 2 is reasonable. *Compare Chenery Corp.*, 318 U.S. at 87. ("The grounds upon which an administrative order

must be judged are those upon which the record discloses that its action was based.").

Notably, the EIS does not state the Remote Landside Alternative is unreasonable or infeasible, just that its implementation could be "difficult." 1-PER-148; *cf. All. to Save the Mattaponi v. USACE*, 606 F.Supp.2d 121, 130 (D.D.C. 2009) (that Virginia is "unlikely" to permit an alternative is not an adequate reason to reject it as impractical under the Clean Water Act). If Measure B consistency had not been part of the calculus, that alternative might have been carried forward for detailed evaluation.

In any case, it was futile for the City, other commenters, and the EIS itself, to suggest reasonable alternatives because no alternative, other than the Project, could survive Step 2 of the EIS's screening process. Surly there exists at least one other reasonable alternative that could be studied in detail to help permit a reasoned choice. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F.Supp.2d 1055, 1089 (N.D. Cal. 2009) (unnecessary to decide whether particular alternatives suggested by plaintiffs should have been considered – "Suffice it to say, there are clearly a range of alternatives that could have been considered that would have reduced the [proposed off-highway vehicle] route network."). By failing to analyze any alternative based on the mistaken assumption that alternatives must comply with Measure B, the EIS fails to fulfill its most basic

function—to analyze "environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

## IV.   The EIS fails to take a hard look at cumulative noise impacts.

### A.   The EIS *ignores* cumulative noise impacts.

The EIS's cursory, non-quantified approach to cumulative noise impacts violates NEPA. O.B. 49–57 (citing 1-PER-248). "A cumulative impact analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011) (internal quotations omitted).

Attempting to distinguish *Northern Plains*, FAA asserts the EIS's modeling was performed "with the express understanding that the Airport's operations would continue throughout the construction period and thus include those operations in its noise analysis." FAA Br. 57. This argument is misleading, however, because it implies FAA modeled noise levels that would occur from ongoing existing operations *and* construction. It did not.

The EIS's construction noise methodology and analysis are entirely divorced from its operational noise discussion. 1-PER-233. Rather than calculate cumulative

30

noise, the construction noise analysis simply approximates noise attenuation based on "typical noise levels" identified in FHWA's noise model. None of the pages cited by FAA demonstrates otherwise. FAA Br. 58 (citing 1-PER-231) (no suggestion that modeling included both operational and construction noise); 1-PER-231–39 (master response regarding cumulative impacts not explaining how they were analyzed); FAA Br. at 65 (citing 2-PER-364–78) (noise appendix not indicating construction noise was modeled in combination with ongoing/future operational noise).

Further, each case cited by FAA is readily distinguished. Unlike in *Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1139–40 (9th Cir. 2006), the EIS here does not contain "extensive analyses" of the project's impact, including "data encompassing past projects," to conclude that there is no cumulative impact. *Id*. at 1140. Rather, the EIS simply assumes, without analysis, that the Project cannot cause a cumulative noise impact. 1-PER-248.

In *Friends of Santa Clara River v. USACE*, 887 F.3d 906, 926 (9th Cir. 2018), the EIS's determination that there would not be cumulative impacts on endangered steelhead was based on the project's "no effect[s]" determination under the Endangered Species Act (ESA). *Id*. at 925–26. An "effects determination" under ESA *is* a cumulative impact evaluation—it involves adding the project's effects to the combined effects of "'the past and present impacts of all

Federal, State, or private actions and other human activities in the action area'"
*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 924 (9th Cir. 2008). Thus, the ESA "no effects" determination there supported a "no cumulative impact" conclusion under NEPA. *Friends of Santa Clara*, 887 F.3rd at 926. No such analysis or support is present here.

*Fath v. Texas Dep't of Transp.*, 924 F.3d 132, 139 (5th Dist. 2018), involved an EA, not an EIS. The court explained that, unlike an EIS, an EA need not provide a "'full-fledged' environmental impact analysis." *Id*. at 140 (quoting *Sabine River Auth. V. DOI*, 951 F.2d 669, 677 (5th Cir. 1992); *see also* 40 C.F.R. § 1508.9(a)(1). In contrast, an *EIS's* cumulative impact analysis requires more than "'[g]eneral statements about 'possible' effects and 'some risk'." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002).

In *Minisink Residents for Env't Pres. & Safety v. Fed. Energy Regul. Comm'n* (FERC), 762 F.3d 97, 112–113 (D.C. Cir. 2014), and *Twp. of Bordentown v. FERC*, 903 F.3d 234, 254–56 (3d Cir. 2018), respectively, courts upheld cumulative impacts analyses where the timing of future projects were "quite distinct" and the location of other projects was "far afield from the geographic area impacted" by the project. In contrast here, *construction and operations will occur simultaneously* and *within the same geographic area*, so the cumulative impacts of those activities must be considered.

Finally, in *Sierra Club v. FERC*, 827 F.3d 36, 50 (D.C. Cir. 2016), plaintiffs voiced "no complaint about the analysis of the [p]roject's cumulative impacts within" the county in which the project is located. *Id*. at 50. Rather, plaintiff challenged the scope of the cumulative analysis claiming it should be nationwide, not regionwide, which is distinct from the claim the City makes here.

### B. The City exhausted its administrative remedies regarding potential health impacts caused by cumulative noise.

FAA mistakenly asserts the City waived its arguments about potential health impacts from the Project's cumulative contribution to noise because, according to FAA, the City did not raise that issue during the administrative process. FAA Br. 58. However, the City's comment letter states, unambiguously:

> Crucially, the DEIS does not contain any discussion of **cumulative noise** … impacts, **either during construction or operations**. Among other things, the new terminal facilities together with the proposed new departure routes … could alter noise contours resulting in adverse cumulative operational noise effects. Such noise effects would, in turn, lead to cumulative EJ and socioeconomic effects. **For example, noise impacts from living in close proximity to an airport can be significant and often include adverse health impacts, including tinnitus, hearing loss, increased blood pressure, stress and higher incidences of human error**. (See Exhibit B, § V.) The FAA should squarely address these cumulative noise, EJ … impacts in the EIS.

2-PER-444 (emphasis added); *see also* 2-PER-464–65 (Ex. B, § V, to the City's comment letter); 3-PER-554–56 (additional letter attachments regarding health impacts of loud noise).

The City plainly alerted FAA to its failure to assess health impacts caused by cumulative noise; there was no waiver.

## C. The Authority's assertion that there will be no cumulative impacts because the Project will not alter runway or flight procedures misses the point.

Claiming the City is trying to "hold the Authority hostage," the Authority argues the Project could not result in cumulative impacts together with changes in FAA's flight paths because the Project will not affect airport operations.[5] Auth. Br. 23–24. Even if the Project does not affect airport operations, that would not mean there are no cumulative impacts during construction. The Airport will remain operational during construction. 1-PER-208–09. Yet, the EIS provides no analysis of the construction-plus-operational noise levels.

## V. The EIS fails to take a hard look at the Project's direct construction impacts.

### A. Impacts caused by the Project's construction activities are *direct*.

FAA asserts it is "vital to distinguish" the EIS's General Study Area from the Detailed Study Area because, according to FAA, impacts in the Detailed Study Area are *direct* impacts, whereas impacts in the General Study Area are *indirect*.

---

[5] The Authority claims that the City challenges the EIS's cumulative noise analysis as a "guise" for "flight path dispute[s]." Auth. Br., p. 13. This is untrue. The City references citizen noise complaints as evidence that current and approved future Airport operations generate impactful noise, which will be exacerbated when combined with years of construction noise. O.B., p. 53.

FAA Br. 38–39. But construction impacts are the axiomatic example of *direct* impacts. Construction impacts are caused by construction activities (including haul trips) generating noise, dust, air pollutants, etc., happening in real time in close proximity to sensitive receptors. 40 C.F.R. § 1508.8(a); *cf. Friends of the Earth, Inc. v. USACE*, 109 F.Supp.2d 30, 30–39 (D.D.C. 2000); 40 C.F.R. § 1508.8(b) (defining indirect impacts).

Regardless, the distinction FAA attempts to draw is immaterial because NEPA requires evaluation of direct, indirect, and cumulative impacts. 40 C.F.R. § 1502.16(a)–(b); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012) ("Taking a 'hard look' includes considering all foreseeable direct and indirect impacts.") (quotation omitted); *Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774, 783 (9th Cir. 1980) ("[S]o-called 'secondary' impacts are often as significant as 'primary' effects.").

Furthermore, contrary to FAA's suggestion (FAA Br. 39–41), construction activities *will* occur near *residential* land uses within the City. The new terminal is located directly south of the City's boundary, with residentially-zoned neighborhoods directly north-east of the new terminal. *Construction of the new terminal will therefore impact residential land uses within the City*. 1-PER-122; 1-PER-102. FAA's argument also fails to account for the City residents and workers

adversely affected by the Project's construction haul trips (580–690 daily trips).
*See* 1-PER-207–09, 2-PER-481.

B.     **The EIS's construction analysis violates NEPA by *failing to discuss* inconsistencies with the City's General Plan noise policies.**

FAA denies that it must analyze whether the Project is inconsistent with the City's GP noise policies. FAA Br. 46–47. To support this position, FAA notes its Desk Reference states land use compatibility standards need not serve as significance thresholds. *Id*. (citing 5-PER-1202). However, that same section of the Desk Reference, as well as FAA Order 1050.1, state that local noise standards "must be disclosed to the extent required under 40 CFR 1502.16(c) and 1506.2(d)." 5-PER-1202, 5-PER-1239. Thus, even if FAA chooses not to use the City's noise policies as significance thresholds, the EIS must still, at a minimum, discuss, "any inconsistency" between the Project and the City's noise standards, and if there is an inconsistency, "describe the extent to which the agency would reconcile" those differences. 5-PER-1232.

FAA further asserts that it need not consider inconsistencies with the City's noise policies because the EIS employs the "Lmax" metric, whereas the GP uses the "CNEL" metric. FAA Br. 47. The Court should reject this argument because: (i) FAA cites no authority for this proposition, and (ii) FAA's argument constitutes

a post hoc rationalization for FAA's failure to assess this impact. *See* 2-PER-493 (#30); *Safe Air*, 488 F.3d at 1091.

FAA also contends it is not required to assess the Project's inconsistency with the GP noise policies because the Authority's CEQA EIR does not identify significant noise impacts within the City. FAA Br. 47. But the EIR does not consider whether the Project is inconsistent with the City GP's CNEL standards; rather the EIR focuses on whether a 5-dBA increase in noise levels would occur. 5-PER-1048–49. Moreover, FAA cannot rely on the EIR as a substitute for the EIS's omitted analysis, particularly since the EIR is not incorporated in the EIS by reference. *N. Alaska Env't Ctr. v. DOI*, 983 F.3d 1077, 1085 n. 9 (9th Cir. 2020) (agency may not rely on CEQA analysis in defending a hard-look challenge, unless analysis is incorporated into NEPA document); s*ee also Sierra Club v. Marsh*, 976 F.2d 763, 771 (1st Cir. 1992) ("reviewing court may not rely on information and analysis in an administrative record to cure an inadequate EIS.").

FAA argues it lacked sufficient information about the Authority's construction plans to perform the omitted noise analysis. FAA Br. 44. This argument is belied by the record, which demonstrates that the Authority had "provided [a] detailed construction schedule (phasing, equipment[,] haul route) for the Proposed Action." 2-PER-345 (DEIS, App. D); 2-PER-347–359 (data).

Therefore, the EIS's noise analysis is not "based on the available data," as FAA now claims. FAA Br. 44.

## C. The EIS does *not* evaluate impacts of haul trucks in the City.

FAA states the EIS "extensively analyzed surface traffic in the General Study Area" and concluded that construction traffic would not significantly impact City intersections. FAA Br. 48 (citing 1-PER-243–44, 2-PER-466–67, 2-PER-480–83). From this, FAA asserts it "reasonably declined to do an associated noise analysis." *Id*. The record pages cited by FAA, however, do not show the EIS actually analyzes traffic impacts caused by the Project's haul trips. Instead, the EIS punts this analysis by relying on the Authority's forthcoming construction traffic management plan (TMP) to address potential construction traffic impacts. FAA Br. 48–49 (citing 1-PER-243–44, 2-PER-466–67, 2-PER-480–83).

The fact that the Authority will prepare a construction TMP in the future does not negate the requirement for the EIS to study noise impacts caused by the Project's construction haul trips. *Compare* FAA Br. 49. Indeed, nothing in the record suggests that the construction TMP will even address *noise* impacts—it is a *traffic plan*. *See e.g.,* 1-PER-243; 2-PER-467; 2-PER-480; 2-PER-482–83; 2-PER-489; 2-PER-503; *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) (rejecting reliance on mitigation measure in the absence of data connecting the measures to the subject impact). Moreover, agencies cannot

omit analyses required by NEPA by simply assuming that mitigation measures will address the issue. *Northern Plains*, 668 F.3d at 1084–85 ("mitigation measures, while necessary, are not alone sufficient to meet…NEPA obligations to determine the projected extent of the environmental harm to enumerated resources before a project is approved"); *Standing Rock Sioux Tribe v. USACE*, 255 F.Supp.3d 101, 133–34 (D.D.C. 2017) (reliance on mitigation is no substitute for actual environmental analysis).

FAA also claims the EIS need not study truck trip noise because FAA lacked construction plans from the Authority showing routes. FAA Br. 49. But, while NEPA does not require agencies to foresee the unforeseeable, FAA must still use its "best efforts" to learn all that it reasonably can. *Barnes v. Dep't of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011); *see Northern Plains*, 668 F.3d at 1085 (lack of access to private property was invalid excuse for omitting any analysis). Considering the relatively few local roadways connecting the Airport to Interstate-5, 1-PER-181–87, FAA could have identified some potential haul routes and disclosed the potential impacts.

FAA further contends it need not assess truck trip noise because the Authority studied that impact in the CEQA EIR. FAA Br. 50. Again, FAA cannot now rely on the EIR's analysis because the EIS does not incorporate the EIR by reference. Further, the EIR only considers the impacts of haul trips in Burbank, not

the City. 5-PER-1049; 5-PER-1038. FAA thus abused its discretion by failing to include an analysis of truck trip noise impacts to the City.

## VI.  The EIS fails to take a hard look at environmental justice impacts.

"It is well-established—almost to the point of judicial notice—that environmental harms are visited disproportionately upon the dispossessed—here on minority populations and poor communities." *McKiver v. Murphy-Brown*, *LLC*, 980 F.3d 937, 982 (4th Cir. 2020). Here, the EIS fails to take a hard look at EJ impacts. O.B. 57–62.

### A.  Defects in the EIS's cumulative and construction noise analyses render the EJ analysis deficient.

FAA asserts the EIS reasonably determines that the Project would not cause disproportionate impacts to populations of color because (i) the EIS thoroughly studies environmental impacts, "including [through] extensive noise modeling," and (ii) the EJ "populations do not use resources specifically affected by the Project." FAA Br. 60. FAA is mistaken on both points.

First, there is no "extensive noise" analysis. Instead, as discussed above, the EIS cursorily concludes, without supporting data, that construction-related and cumulative noise impacts would not be adverse. Second, anyone living near the Airport and along haul routes may hear noise generated by the Project's demolition, construction, and haul trips. It is therefore unreasonable to conclude

that populations of color would "not use resources specifically affected by the Project." *Cf.* FAA Br. 60.

**B.    FAA unreasonably fails to support the EIS's overbroad study area, which artificially constrains potential noise impacts on EJ populations.**

Contrary to FAA's argument, FAA is owed no deference here, as FAA "made 'a clear error of judgment'" by utilizing a broad study area to improperly disperse the Project's localized noise impacts on surrounding EJ populations. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007); *see also Communities Against Runway Expansion, Inc. v. FAA.*, 355 F.3d 678, 689 (D.C. Cir. 2004) ("A[n EJ] comparison population based on a larger geographic area could reasonably be rejected because significant noise impacts are limited to the vicinity of the airport"); O.B. 62. FAA continues to assert, in essence, that because it followed guidance in its 2015 Desk reference, its EJ analysis was reasonable. FAA Br. 60 – 61. This is untrue. FAA artificially constrained its analysis by doggedly adhering to its *non-binding* Desk Reference in the face of evidence of analytical inadequacies. O.B. 48.

FAA argues that its overbroad study area appropriately reflects "the area potentially affected by the project." This argument is disingenuous. FAA asserts again and again that noise attenuates. *See e.g.,* FAA Br. 42, 64. It is therefore not reasonable for FAA to conclude that the large EJ study area accurately reflects the

areas affected by the Project's localized construction noise and cumulative noise impacts. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) (study area for EJ impacts was unreasonable because the EIS elsewhere concluded that impacts could occur outside of that study area).

FAA then mistakenly claims the City's "noise-is-localized" contention undercuts the City's construction noise arguments. FAA Br. 61. But the reverse is true. FAA's acknowledgement that noise is localized undercuts *FAA's* conclusion that the broad EJ study area accurately captures noise impacts. Further, as explained in the Opening Brief, noise from construction-related truck trips would occur along haul routes in EJ "neighborhoods" surrounding the Airport, and could therefore disproportionally impact local minority populations. O.B. 47–48. Yet FAA failed to consider those impacts. The City's concerns are not inconsistent.

FAA further attempts to justify its overly broad EJ study area by claiming "the two census tracts...identified as having [EJ] populations" are partially within the CNEL 65 decibel noise contour. FAA Br. 62. But this only proves FAA is aware that EJ populations exist near the Airport that will be disproportionately impacted by cumulative and construction-related noise for years to come. O.B. 39–40.

## C. FAA's data misrepresents impacts to EJ populations nearest the Airport.

To support its skewed EJ data, FAA invokes the general rule that agencies may "'rely on the reasonable opinions of its own qualified experts.'" FAA Br. 65 (citing *Northern Plains*, 668 F.3d at 1075). In so arguing, FAA fails to acknowledge *its own recommendation to use EJSCREEN* methodology. 3-PER-632. There is no "battle of the experts" here. There is only FAA, recommending an analytical tool while simultaneously disavowing its results.

FAA also mistakenly asserts the City "has identified no errors in FAA's actual data and calculations." FAA Br. 65. This is incorrect. The City's comment letter and brief explain, in detail, why FAA's use of aggregated census data— rather than granular and accurate block group data — "unreasonably underestimates the percentage of potentially impacted minority, and likely, low-income residents." O.B. 64–65; 2-PER-437–41; *see Vecinos para el Bienestar*, 6 F.4th at 1330 (agency use of block data); *Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017) (same).

The City also noted that FAA's own data demonstrates at least one block group near the Airport "has a minority population of 54.1 percent—*exceeding* the EIS's 50 percent threshold." O.B. 66. Attempting to downplay this fact, FAA asserts it does not matter because the EIS does not identify adverse impacts. FAA Br. 64. But, as discussed above, the EIS fails to take a hard look at the Project's

construction and cumulative noise impacts. FAA thus has no evidence to support the conclusion that residents of the block group near the Airport would not be disproportionately impacted. *See Native Ecosystems Council v. USFS*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. § 1500.1(b) ("To take the required 'hard look'...an agency may not rely on incorrect assumptions or data in an EIS.").

### D. FAA failed to adequately respond to the City's comments.

NEPA requires the FEIS to explain the differences between the City's EJSCREEN analysis results and FAA's census-tract based results. O.B. at 71–72; *see* 40 C.F.R. §§ 1502.9(b), (c). In response to the City's argument, FAA claims it "could not recreate the City's results." FAA Br. 65. The Court must reject this argument, however, because this explanation is not provided in the EIS's responses to comments. 2-PER-493–96; *see also* 40 C.F.R. §§ 1502.9(b), (c); *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991), (citations omitted) (post hoc rationalizations for agency action, advanced for the first time in the reviewing court by appellate counsel are not entitled to deference). In fact, no evidence in the record suggests FAA even attempted to perform an EJSCREEN analysis. Rather, the FEIS's responses to the City's EJ comments simply repeat FAA's opinions that (i) it need not use EJSCREEN and (ii) the Project would not cause adverse impacts. 2-PER-493–96. For the reasons presented in the Opening Brief and above, however, these assumptions are

mistaken. Accordingly, FAA failed to reasonably respond to the City's comments identifying large disparities between the EIS's estimates and the City's EJSCREEN estimates.

## CONCLUSION

For the foregoing reasons and as presented in the Opening Brief, the Court should grant the Petition.

Respectfully submitted,

Dated: June 9, 2022

By: /s/ *Andrea K. Leisy*
ANDREA K. LEISY
LAURA M. HARRIS
CASEY A. SHORROCK
Remy Moose Manley, LLP
555 Capitol Mall, Suite 800
Sacramento, CA 95814
Tel.: (916) 443-2745
Fax: (916) 443-9017
aleisy@rmmenvirolaw.com
lharris@rmmenvirolaw.com
cshorrock@rmmenvirolaw.com


By: /s/ *Robert M. Mahlowitz*
MICHAEL N. FEUER
ROBERT M. MAHLOWITZ
LOS ANGELES ATTORNEY'S OFFICE
200 North Mains Street, 8th Floor
Tel.: (213) 978-7100
Fax: (213) 978-8090
mike.n.feuer@lacity.org
robert.mahlowitz@lacity.org

Attorneys for Petitioner
CITY OF LOS ANGELES, CALIFORNIA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-71170

I am the attorney or self-represented party.

**This brief contains** | 8,092 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ◉ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Andrea K. Leisy     **Date** | Jun 9, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on this 9th day of June, 2022.

All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

| | |
|---|---|
| Justin D. Heminger<br>U.S. Department of Justice<br>Environment and Natural Resources<br>Division<br>Appellate Section<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530<br>justin.heminger@usdoj.gov<br>efile_app.enrd@usdoj.gov | Respondents<br>*United States Federal Aviation Administration, Stephen M. Dickson, United States Department of Transportation, and Peter P. Buttigieg*<br><br>**VIA ECF/E-SERVICE** |
| Ginetta L. Giovinco<br>Chelsea E. O'Sullivan<br>RICHARDS, WATSON & GERSHON<br>350 South Grand Avenue, 37th Floor<br>Los Angeles, CA 90071<br>ggiovinco@rwglaw.com<br>psaunders@rwglaw.com<br>co'sullivan@rwglaw.com<br><br>Thomas A. Ryan<br>Jessica J. Thomas<br>MCDERMOTT, WILL & EMERY, LLP<br>3049 Century Park East, Suite 3200<br>Los Angeles, CA 90067<br>tryan@mwe.co<br>swoods@mwe.com<br>jthomas@mwe.com<br>bsommars@mwe.com | Real Party in Interest and Respondent<br>*Burbank-Glendale-Pasadena Airport Authority*<br><br>**VIA ECF/E-SERVICE** |

/s/ *Kathryn A. Ramirez*
KATHRYN A. RAMIREZ